Matthew P. Ward (DE Bar No. 4471)
Ericka F. Johnson  (DE Bar No. 5024)
Morgan L. Patterson (DE Bar No. 5388)
Nicholas T. Verna (DE Bar No. 6082)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: maward@wcsr.com
E-mail: erjohnson@wcsr.com
E-mail: mpatterson@wcsr.com
E-mail: nverna@wcsr.com

*Proposed Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOUT MEDIA, INC., <u>et al.</u>,[1] | ) | Case No. 16-13369-MEW |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |
| | ) | |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507: (A) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION TERM LOAN FINANCING;
(B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL;
(C) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (D) GRANTING ADEQUATE
PROTECTION; (E) MODIFYING AUTOMATIC STAY; (F) SCHEDULING
A FINAL HEARING; AND (G) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number are: Scout Media Holdings, Inc. (1936), Scout Media, Inc. (1438), FTFS Acquisition, LLC (7230), and Scout.com, LLC (3269).  The location of the Debtors' headquarters and the Debtors' service address is 122 West 26th Street, Fifth Floor, New York, NY 10036.

Scout Media, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned proposed counsel, hereby move (the "Motion") this Court pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 9014, and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules (the "Local Rules"), for the entry of an order, substantially in the form attached as <u>Exhibit 1</u> (the "Interim Order"), and a final order (the "Final Order"), (i) authorizing the Debtors to (a) obtain postpetition financing pursuant to a superpriority debtor-in-possession financing facility on the terms described herein and (b) utilize cash collateral; (ii) granting liens and superpriority administrative claims; (iii) scheduling a final hearing with respect to the relief requested herein; and (iv) granting related relief (the "Motion").  In support of this Motion, the Debtors respectfully represent as follows:

## **PRELIMINARY STATEMENT**

1.    As more fully described in this Motion and in the Declaration of Craig Amazeen in Support of First Day Pleadings (the "First Day Declaration"), the Debtors' primary objective in filing these Cases (as defined below) is to consummate a sale (the "Sale") of the assets of Scout Media, Inc. and Scout.com, LLC.  To achieve this objective, the Debtors seek immediate access to the proposed $6.2 million debtor-in-possession super-priority financing facility (the "DIP Credit

Facility") to be provided by the DIP Lender.[2]  This proposed postpetition financing

will, among other things, provide the capital necessary to allow the Debtors to

continue operating without material disruption to their businesses, during the chapter

11 cases for the period pending the Sale, all in an effort to maximize the value of

their estates for the benefit of creditors.

2.      The Debtors currently do not have sufficient cash to operate.

Therefore, absent entry into the DIP Credit Facility, the Debtors will have no

alternative but to immediately cease operating and convert these Cases to cases

under chapter 7.  The funds provided by the DIP Credit Facility will ensure the

Debtors avoid that fate and permit them to continue operating and advancing the

sales process to a conclusion.

3.      The DIP Credit Facility was the product of an extensive,

arm's-length negotiation with the DIP Lender (as defined below), and no competing

proposal provided the Debtors with a similarly beneficial set of comprehensive

terms.  The borrowings under the DIP Credit Facility are governed by an interest rate

of 13.00% and the facility matures on the earlier of (i) February 6, 2017, or (ii) the

consummation of the sale of all or substantially all of the assets of the Debtors.  The

DIP Lender will be entitled to a (a) $65,000 application fee, (b) $260,000 origination

fee, and (c) a contingency fee of (i) $0.00 if the Unsecured Creditor Proceeds is less

than 30% of the Total Unsecured Creditor Obligations; (ii) $250,000 if the

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings given to them in the
Interim Order and the DIP Credit Agreement, as applicable.

3

Unsecured Creditor Proceeds is greater than or equal to 30% and less than 50% of the Total Unsecured Creditor Obligations; (iii) $325,000 if the Unsecured Creditor Proceeds is greater than or equal to 50% and less than 75% of the Total Unsecured Creditor Obligations; (iv) $425,000 if the Unsecured Creditor Proceeds is greater than or equal to 75% and less than 90%; and (v) $500,000 if the Unsecured Creditor Proceeds is greater than or equal to 90% of the Total Unsecured Creditor Obligations.  In addition, the DIP Lender, will receive a superpriority administrative claim with respect to, and liens and priming liens on, substantially all of the Prepetition Collateral and all of the assets of FTFS Acquisition, LLC, and certain other exceptions described herein.

4.      As set forth in the Amazeen Declaration (as defined below), the Debtors do not believe that post-petition financing would be available on better terms.  Moreover, the DIP Lender, having been the prepetition lender, was familiar with the Debtors' business and capital structure and, critically, was prepared to move quickly toward finalizing the DIP Credit Facility.  By this Motion, the Debtors also seek authorization to use Cash Collateral (as defined below) in the ordinary course of business to, among other things, provide working capital and for other general corporate purposes, with the objective of providing the Debtors with the funding necessary to continue their operations until the consummation of the Sale.

5.      The DIP Credit Facility paves the way for the Debtors' only and best option — to execute on a sale process that will monetize certain of the Debtors' assets in the most value-maximizing manner for the benefit of all

stakeholders.  In addition, the DIP Credit Facility was negotiated in good faith, is a

sound exercise of the Debtors' business judgment, and is in the best interests of the

estates.  As a result, the Debtors respectfully request that the Court grant this Motion

and thereby authorize the Debtors to obtain postpetition financing and to use Cash

Collateral pursuant to the terms set forth in this Motion, that certain Senior Secured,

Super-Priority Debtor-In-Possession Credit Agreement attached as Exhibit A to the

Interim Order (the "DIP Credit Agreement"), the Interim Order, and the Final Order.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to consider this matter pursuant to

28 U.S.C. sections 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C.

section 157(b).

7.      Venue for this matter is proper in this district pursuant to 28

U.S.C. sections 1408 and 1409.

## GENERAL BACKGROUND

8.      On December 1, 2016 (the "SMI Petition Date"), an

involuntary petition was filed against Scout Media, Inc. ("Scout Media" or "SMI"),

and on December 8, 2016 (the "Remaining Debtors' Petition Date" and, together

with the SMI Petition Date, the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors

are continuing in possession of their properties and are managing their businesses, as

debtors in possession, pursuant to Bankruptcy Code sections 1107(a) and 1108.  No

official committee of unsecured creditors has been appointed in these cases.

9.     Scout Media, the primary operating company of the Debtors, is a privately held digital sports media company that publishes and distributes content related to the National Football League (the "NFL"), fantasy sports, college football and basketball, high school recruiting, hunting, fishing, outdoors, military, and history.  In 2013, Fox Sports sold Scout Media to North American Membership Group Holdings, Inc., which remains a non-debtor affiliate of Scout Media Holdings, Inc.  Since that time, Scout Media emerged as a leader in the digital sports media market with its growth supported by a series of successful partnerships, including its alliance with iHeartMedia in January 2016.

10.     Scout Media owns and operates a digital network of 150 team-specific, credentialed publishers, and their respective social communities. These publishers produce premium video and story content on a proprietary network that enables users to consume the latest news, rankings, and analysis, and engage with other like-minded fans.

11.     Scout Media is the only sports network with a full-time video channel for every NFL and major college team.  Scout Media produces approximately 11,000 stories and 1,000 premium videos monthly.

12.     It became clear during the summer of 2016 that the Debtors could not continue as they were, and they hired a financial advisor and began a sales process, seeking a buyer for the shares of Scout Media to purchase such shares through an assignment for the benefit of creditors.  While many parties expressed an interest in purchasing Scout Media, it became clear that buyers would be more

willing to do so through an organized chapter 11 process that includes protections

from successor liability.  Accordingly, unfortunately, to date no stalking horse bidder

has been selected. The Debtors have commenced these chapter 11 cases

(collectively, the "Cases") with the hope of selling the assets of debtors Scout Media

and Scout.com, LLC as a going concern in a competitive auction to be held in

January 2017.  The Debtors intend to continue operating as usual in these Cases

during the period leading up to the auction so as to preserve the value of their

businesses, thereby encouraging a going concern sale that would save jobs and

maximize returns to creditors.  Additional information regarding the Debtors and

these Cases, including the Debtors' businesses, corporate structure, financial

condition, and the reasons for and objectives of these cases, is set forth in the First

Day Declaration.

## **<u>RELIEF REQUESTED</u>**

13.     By this Motion, the Debtors seek entry of the Interim and

Final Orders, pursuant to Bankruptcy Code sections 105, 361, 362, 363(c), 363(e),

364(c), 364(d)(1), 364(e), and 507, Bankruptcy Rules 2002, 4001, 9014, and 9018,

and Local Rule 4001-2:

- authorizing the Debtors to obtain postpetition financing, as set forth below and in the DIP Credit Agreement, with Multiplier Capital, LP (the "DIP Lender" or the "DIP Secured Party"), with funds thereunder available for use in accordance with the budget (as amended, modified, or updated in accordance with

the DIP Credit Agreement, the "Budget")[3] and the other terms set forth in the DIP Credit Agreement;

- authorizing the Debtors to execute and enter into the DIP Credit Documents and to perform such other and further acts as may be required in connection with the DIP Credit Documents;

- authorizing the Debtors to grant (i) security interests in and liens on the DIP Collateral (including liens pursuant to Bankruptcy Code sections 364(c)(2) and 364(c)(3) and priming liens pursuant to Bankruptcy Code section 364(d)) and (ii) superpriority claims (including a superpriority administrative claim pursuant to Bankruptcy Code section 364(c)(1));

- authorizing the Debtors' use of cash collateral (as such term is defined in Bankruptcy Code section 363(a)), including, without limitation, all of the Debtors' cash on hand as of the Petition Date (the "Cash Collateral");

- authorizing the Borrowers to use Cash Collateral and the proceeds from the DIP Credit Facility upon entry of the Interim Order (i) to pay related postpetition transaction costs, fees, and expenses with respect to the DIP Credit Facility, (ii) to provide working capital and for other general corporate purposes, (iii) to fund the Carve-Out, and (iv) to pay administration costs of the Cases and claims or amounts approved by the Bankruptcy Court;

- modifying the automatic stay imposed under Bankruptcy Code section 362 to the extent necessary to implement the terms of the DIP Credit Agreement, Interim Order, Final Order, and as otherwise provided herein;

- scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of a Final Order authorizing the borrowings under the DIP Credit Facility on a final basis and approval of notice procedures with respect thereto; and

- granting certain related relief.

---

[3]     The Budget is attached as <u>Exhibit 2</u> hereto.

## FACTUAL BACKGROUND

**A.      First Lien Obligations**

14.      On November 15, 2013, Scout Media Holdings, Inc. ("SMHI"), Scout Media, and Scout.com, LLC ("S.com"), and certain of their non-debtor affiliates, as borrowers (the "Borrowers") and the DIP Lender entered into that certain Loan and Security Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement," and, together with all associated agreements, instruments, and documents, the "Loan Documents"). Pursuant to the terms of the Loan Documents, the DIP Lender agreed to provide the Borrowers with loans on a first-lien basis.

15.      As of the Petition Date, the Borrowers were indebted in the approximate outstanding principal amount of $10,927,060.44, together with all other liabilities and obligations of the Borrowers arising out of or in connection with the Loan Documents, including, but not limited to, all accrued and unpaid interest, fees, costs, and expenses including professional fees (collectively, the "First Lien Obligations").

**B.      Bridge Loan Obligations**

16.      On or about March 11, 2016, certain lenders (collectively, the "Bridge Loan Lenders") agreed to provide a bridge loan allegedly secured by a second lien on assets of SMHI.  As of the Petition Date, the aggregate outstanding amount of the Bridge Loans was approximately $11.6 million (the "Bridge Loans"),

plus accrued interest, fees, and other specified obligations (the Obligations owing to

the Bridge Loan Lenders are referred to herein as the "Bridge Loan Obligations").

17.     Each of the Bridge Loan Lenders executed a Debt and

Security Interest Subordination Agreement dated March 11, 2016 (the

"Subordination Agreement").  Pursuant to the Subordination Agreement, the Bridge

Loan Lenders agreed to subordinate payment by SMHI to the DIP Lender until the

First Lien Obligations were fully satisfied, and they further agreed to subordinate its

security interests in any collateral in which the DIP Lender held liens.

**C.      Collateral for the Secured Facilities.**

18.     The First Lien Obligations are secured by properly perfected

security interests in substantially all of each of the Debtors' (other than FTFS

Acquisition, LLC's) assets, including all accounts, all inventory, all equipment, all

deposit accounts, all general intangibles (including, without limitation, all

intellectual property), all investment property, all other property, and any and all

claims, rights, and interests in any of the above, and all guaranties and security for

any of the above, and all substitutions and replacements for, additions, accessions,

attachments, accessories, and improvements to, and proceeds (including proceeds of

any insurance policies, proceeds of and claims against third parties of, any and all of

the above), and all books relating to the above (collectively, the "Pre-Petition

Collateral").

19.     The Debtors believe that the liens and security interests of the

DIP Lender (the "First Lien Pre-Petition Liens") are:  (i) senior in priority to the

security interests of all other persons except for the security interests permitted to exist under Section 2.2 of the Credit Agreement ("Permitted Encumbrances"), to the extent the Permitted Encumbrances are valid, enforceable, and are perfected and are not subject to avoidance, subordination, recharacterization, or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding, and properly perfected and are not subject to avoidance, subordination, or disallowance pursuant to the Bankruptcy Code or applicable law.

20.    The Bridge Loan Obligations are allegedly secured by security interests in assets owned by SMHI.  As of the Petition Date, the Debtors have not conducted a lien analysis with respect to the Bridge Loan Obligations and alleged security interests.

**D.    The Debtors' Immediate Need for Liquidity**

21.    The Debtors are in need of an immediate infusion of liquidity. As of the Petition Date, the Debtors have a limited amount of cash with which to operate their businesses and fund these Cases.  Without an infusion of incremental liquidity, the Debtors will not be able to operate their businesses.

22.    On December 2, 2016, certain of the SMI's alleged creditors filed an involuntary petition under chapter 11 against SMI due to the SMI's inability to remain current on its obligations.  Further, in the months leading up to the filing of these Cases, the Debtors were borrowing funds from the DIP Lender to operate their businesses.  This cost structure was not sustainable.  As a result, the Debtors began to explore strategic options, including a sale of certain of their assets.

E.    **Prepetition Sale Process**

23.    In September 2016, facing liquidity constraints caused by judgment liens and multiple garnishments, the Debtors retained Sherwood Partners, Inc. ("Sherwood"), and in October, Sherwood began to explore and solicit interest in a sale of Scout Media Holdings, Inc.'s stock in Scout Media and Scout.com, LLC. In November 2016, the Debtors and Sherwood determined that a sales process would be more effective through the commencement of chapter 11 cases.  Shortly thereafter, on or around December 6, 2016, the board of SMHI authorized and consented to a sales process for a sale of substantially all of Scout Media and Scout.com, LLC's assets.

24.    Prior to the Petition Date, Sherwood conducted a robust marketing process, canvassing the market and contacting potential strategic and financial buyers that, based on Sherwood's experience and involvement in the sports marketing arena, might be interested in the Debtors' businesses.  Additionally, as news of the Debtors' sale process became public, the Debtors and Sherwood received inquiries from other interested parties and, where appropriate, Sherwood provided diligence and engaged in negotiations with those parties as well.  However, to date, no one has submitted a letter of intent or provided any other definitive sale offer.

## MATERIAL TERMS OF THE DIP CREDIT FACILITY

25.     Local Rule 4001-2 requires that certain provisions contained in the DIP Credit Agreement be highlighted and that the Debtors provide justification for the inclusion of such highlighted provision(s).  The principal terms of the DIP Credit Facility are as follows:[4]

| Required Disclosures | Summary of Material Terms |
|---|---|
| **Borrowers**<br><br>*DIP Credit Agreement, page 1 and Schedule to DIP Credit Agreement, page 1* | Scout Media Holdings, Inc., Scout Media, Inc., FTFS Acquisition, LLC, and Scout.com, LLC |
| **DIP Lender**<br><br>*DIP Credit Agreement, page 1 and Schedule to DIP Credit Agreement, page 1* | Multiplier Capital, LP |
| **DIP Credit Facility**<br><br>*DIP Credit Agreement, §§ 1.6, 2.1, 2.3, 2.4 and Schedule to DIP Credit Agreement page 1* | Subject to the Carve-Out, senior secured super-priority revolving credit facility in an aggregate principal amount not to exceed $6.2 million, less any reserves. |
| **Carve-Out**<br><br>*DIP Credit Agreement, § 7 and Interim Order ¶ 41* | The DIP Credit Agreement provides a carve-out (the "Carve-Out") for (a) the payment of allowed professional fees and disbursements incurred by bankruptcy counsel and financial advisor, retained pursuant to sections 327 or 1103(a)(i) of the Bankruptcy Code, subject to the amounts set forth in the Initial Approved Budget: (i) arising from services performed or expenses incurred prior to the earlier of (1) the date on which the DIP Lender provides written notice (the "Carve-Out Trigger Notice") to Debtors that either an Event of Default has occurred or the DIP Loan Agreement is terminated or (2) the |

---

[4]     This summary is qualified, in its entirety by the provisions of the DIP Credit Agreement and the Interim Order.  Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the Interim Order and the DIP Credit Agreement, as applicable.

| Required Disclosures | Summary of Material Terms |
|---|---|
| | Termination Date; and (ii) in an amount not to exceed $50,000 arising from services performed or expenses incurred following the Carve-Out Trigger Notice (provided nothing herein shall be construed to (i) provide for double payment of any fees or disbursements; (ii) alter the procedures for the approval of professional compensation as set forth under the Bankruptcy Code and the rules of the Bankruptcy Court; or (iii) alter the ability of any party to object to such fees and disbursements); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court.  For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be senior to all liens securing the DIP Obligations, the Pre-Petition Obligations, the Adequate Protection Liens and all claims (including superiority administrative expense claims) and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Pre-Petition Obligations or other claims granted herein to the Pre-Petition Lender or the DIP Lender; and (ii) is valid only to the extent of any amounts not previously funded by the DIP Lender to the Debtors in accordance with the Initial Approved Budget. |
| **Interest Rate and Fees**<br><br>*DIP Credit Agreement, §§ 1.3, 1.4and Schedule to Credit Agreement §§ 2, 3* | Interest shall accrue at 13.00% per annum.<br><br>Application Fee: **$65,000**, payable concurrently with the initial funding of Loans hereunder.<br><br>Origination Fee: **$260,000**, which is fully earned on the date hereof and paid to Multiplier as follows: (i) **$130,000** of which shall be payable concurrently with the initial funding of Loans hereunder, and (ii) **$130,000** of which shall be payable on the Termination Date.<br><br>Contingency Fee:   An amount equal to:<br>(i)    **$0.00**, if the Unsecured Creditor Proceeds is less than 30% of the Total Unsecured Creditor Obligations;<br><br>(ii)    **$250,000**, if the Unsecured Creditor Proceeds is greater than or equal to 30% and less than 50% of the Total Unsecured Creditor Obligations;<br><br>(iii)    **$325,000**, if the Unsecured Creditor Proceeds is greater than or equal to 50% and less than 75% of |

14

| Required Disclosures | Summary of Material Terms |
|---|---|
| | the Total Unsecured Creditor Obligations;<br><br>(iv)  **$425,000**, if the Unsecured Creditor Proceeds is greater than or equal to 75% and less than 90% of the Total Unsecured Creditor Obligations; and<br><br>(v)  **$500,000**, if the Unsecured Creditor Proceeds is greater than or equal to 90% of the Total Unsecured Creditor Obligations.<br><br>As used herein "Unsecured Creditor Proceeds" shall mean the gross proceeds from the Sale, available to unsecured creditors (other than those unsecured creditors whose debts will be assumed by or assigned to purchaser in connection with the Sale) after satisfying all Obligations hereunder.<br>As used herein "Total Unsecured Creditor Obligations" shall mean the sum of (a) aggregate amount of all allowed unsecured claims less (b) aggregate amount of any allowed unsecured claims that are assumed by or assigned to purchaser in connection with the Sale. |

| Required Disclosures | Summary of Material Terms |
|---|---|
| **Priority and Security**<br><br>*DIP Credit Agreement, §§ 1.6, 2.1 Interim Order ¶¶ 9-12* | The DIP Lender under the DIP Credit Facility shall be afforded certain liens and claims on all assets or property of the Debtors, subject to the Carve-Out and Permitted Prior Liens, in each case, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation: all Pre-Petition Collateral; all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Receivables and Intellectual Property); all Investment Property; all Other Property; any and all claims and/or causes of action existing under the Bankruptcy Code, including, but not limited to, subject to entry of a Final Order, claims and/or causes of action existing under Sections 542, 544, 547, 548, 549, and/or 550 of the Bankruptcy Code (collectively the "Avoidance Actions"); all equity interests in another Person owned by any Debtor; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including, but not limited to, proceeds of proceeds, claims against third parties, any claim to any item referred to in this definition, and any claim against any third party for loss of, damage to or destruction of any or all of, the aforementioned collateral or for proceeds payable under, or unearned premiums with respect to, policies of insurance) of, any and all of the above, all Debtors' books relating to any of the above, and any and all products and proceeds of the foregoing in whatever form, including, but not limited to, cash, negotiable instruments and other instruments for the payment of money, chattel paper, security agreements and other documents; upon entry of a Final Order providing for such relief, the Debtors' rights under Section 506(c) of the Bankruptcy Code; and to the extent not covered by the foregoing, all other assets or property of the Debtors (subject to any exclusions contained in the DIP Loan Agreement), whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any |

| Required Disclosures | Summary of Material Terms |
|---|---|
| | of the foregoing (all of which being hereinafter collectively referred to as the "DIP Collateral"). |
| | The DIP Liens, subject to the Carve-Out, shall constitute and be deemed a cost and expense of administration in the Bankruptcy Case and shall be entitled to priority under Section 364(c)(1), Section 364(c)(2), Section 364(c)(3), and Section 364(d) of the Bankruptcy Code ahead of all other costs and expenses of administration of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code, except as may be otherwise provided in the DIP Orders.. |
| | The DIP Liens are senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, subject only to (i) the Carve-Out and (ii) any valid, perfected, enforceable and non-avoidable liens existing as of the Petition Date  that are senior to Prepetition Liens. |
| **Approved Budget**<br><br>*DIP Credit Agreement, §§ 4.5, 4.11* | Cash Collateral and proceeds of the DIP financing may be used for the purposes described in the Budget or the Carve-Out, in each case adjusted for the applicable period by Permitted Variance (as defined in the Interim Order). |
| **Conditions Precedent**<br><br>*DIP Credit Agreement, § 1.2 and Schedule to Credit Agreement § 7* | Establishment of the DIP Credit Facility and any obligation of Multiplier to make the initial Loan is subject to the satisfaction of the following conditions:<br><br>a)   the filing by Borrower of the sale motion and bid procedures motion, with the sale motion requesting, among other things, relief from automatic stay, permission to repay Obligations and Pre-Petition Obligations, in full, at the close of the Sale.<br><br>b)   the Interim Order, in form and substance satisfactory to Multiplier, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, appealed, stayed or subject to any motion to reconsider in any respect;<br><br>c)   all requisite corporate or company action and proceedings in connection with this Agreement and the other Loan Documents shall be satisfactory in form and substance to Multiplier, and Multiplier shall have received all information and copies of all documents, including records of requisite corporate or company |

17

| Required Disclosures | Summary of Material Terms |
|---|---|
| | action and proceedings which Multiplier may have requested in connection therewith, such documents where requested by Multiplier or its counsel to be certified by appropriate corporate or company officers; |
| | d)   Multiplier shall have received and approved the Budget; |
| | e)   Multiplier shall have received this Agreement and all other Loan Documents and all instruments and documents to be delivered hereunder and thereunder by the date hereof, each of which shall have been duly executed by all respective parties thereto and each of which shall be in full force and effect and in form and substance satisfactory to Multiplier; |
| | f)   The representations and warranties contained in this Agreement and in each of the other Loan Documents shall be true on and as of the date of the signing of this Agreement and on the date of each extension of credit or the making of any Loans pursuant to this Agreement, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default, and no condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist; and |
| | g)   Multiplier shall have (i) received such information (financial or otherwise) as requested from the Borrower, (ii) discussed the Budget with officers and representatives of the Borrower, and (iii) been satisfied with the nature and substance of such discussions. |
| **Representations and Warranties**<br><br>*DIP Credit Agreement, § 3* | Includes standard representations and warranties, as modified to include representations and warranties as are customary in debtor-in- possessions loan agreements of this type,. |
| **Events of Default**<br><br>*DIP Credit Agreement, § 6* | The DIP Credit Agreement provides for the following events of default:<br><br>a)   Borrower has not met any of the Milestones set forth in Section 6 of the Schedule within two Business Days thereof unless extended or waived by Multiplier; or<br><br>b)   any warranty, representation, statement, report or |

| Required Disclosures | Summary of Material Terms |
|---|---|
| | certificate made or delivered to Multiplier by Borrower or any of Borrower's officers, employees or agents, now or in the future, shall be untrue or misleading in a material respect when made or deemed to be made; or |
| | c)   Borrower shall fail to pay the principal, accrued interest, premium, if any, and fees on any of the Loans or otherwise which is due under this Agreement; or |
| | d)   Borrower shall fail to pay any other monetary Obligation, within five Business Days after the date due; or |
| | e)   Borrower shall fail to comply with any agreements between the Borrower and Multiplier relating to the status of Multiplier as a "small business investment company" as that term is defined under the Small Business Investment Act of 1958, as amended, and the rules and regulations promulgated thereunder; or |
| | f)   Borrower shall fail to perform any non-monetary Obligation within five Business Days after the date due; or |
| | g)   three Business Days after written notice to Borrower of the failure by Borrower to deliver to Multiplier any of the documents or other information required to be delivered pursuant to the DIP Orders when due (during which time Borrower may cure); or |
| | h)   except as set forth herein, three Business Days after the failure by Borrower to observe or perform any of the material terms or provisions contained in the DIP Orders; or |
| | i)   except for defaults existing prior to or occasioned by the filing of the Bankruptcy Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits Borrower from complying or permits Borrower not to comply, a default or breach occurs under any (i) Pre-Petition Loan Document, or (ii) any other document instrument or agreement entered into by Borrower post-petition that is not cured within any applicable grace period therefore, and such default or breach (1) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of Borrower, or (2) causes, or permits any holder of such Indebtedness or a trustee to cause, such |

| Required Disclosures | Summary of Material Terms |
|---|---|
| | Indebtedness or a portion thereof to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or cash collateral in respect thereof to be demanded, in each case, regardless of whether such default is waived, or such right is exercised, by such holder or trustee; or |
| | j) Borrower breaches any material contract or obligation, which has resulted or may reasonably be expected to result in a Material Adverse Change; or |
| | k) dissolution, termination of existence, temporary or permanent suspension of business, or business failure of Borrower; or |
| | l) revocation or termination of, or limitation or denial of liability upon, any guaranty of any of the Obligations or Security Interest or any attempt to do any of the foregoing, or any default or event of default occurs under any such guaranty; or |
| | m) revocation or termination of, or limitation or denial of liability upon, any pledge of any certificate of deposit, securities, money or other property or asset pledged by any third party to secure any or all of the Obligations, or any attempt to do any of the foregoing; or |
| | n) a Change of Control shall occur; or |
| | o) a Material Adverse Change shall occur; or |
| | p) an event of default shall occur and be continuing under any other Loan Document (after giving effect to, but without duplication of, grace periods under such other Loan Document applicable thereto); or |
| | q) the (i) termination, (ii) cancellation or (iii) at least 7 calendar days of non-performance, by Borrower's publishers (existing on the Closing Date) which collectively represents more than 25% of the aggregate membership revenues of Borrower in the prior twelve-month period; or |
| | r) this Agreement or any Loan Document is terminated other than as provided for in this Agreement or becomes void or unenforceable; or any Security Interest ceases to be a valid and perfected senior, priming Security Interest on any portion of the Collateral, other than Permitted Liens; or |

| Required Disclosures | Summary of Material Terms |
|---|---|
| | s) the bringing of a motion by Borrower in the Bankruptcy Case to obtain additional financing from a party other than Multiplier under Section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash all Obligations under this Agreement and the Pre-Petition Obligations or to use "cash collateral" of Multiplier under Section 363(c) of the Bankruptcy Code in a manner and to the extent not otherwise consented to by Multiplier; or |
| | t) Borrower seek to have its costs and expenses categorized as costs and expenses of administration of the Bankruptcy Case under Section 506(c) of the Bankruptcy Code; or |
| | u) Borrower makes any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness, trade payables or other pre-petition claims against Borrower, unless expressly provided in the DIP Orders or consented to by Multiplier; or |
| | v) Borrower filing a pleading, or in any way support another party's pleading, seeking to modify or otherwise alter any of the terms and conditions set forth in the DIP Orders without the prior written consent of Multiplier; |
| | w) the entry of an order of the Bankruptcy Court amending, supplementing or otherwise altering any of the terms and conditions set forth in the DIP Orders without the prior written consent of Multiplier; |
| | x) for a period in excess of three (3) calendar days, reversal, vacatur or stay of the effectiveness of any DIP Order, without the express prior written consent of Multiplier; or |
| | y) Borrower (or any party with the support of any of Borrower) shall challenge the validity or enforceability of any of the Loan Documents or the Pre-Petition Loan Documents; or |
| | z) the entry by the Bankruptcy Court of an order granting relief from the automatic stay imposed by Section 362 of the Bankruptcy Code sought by any party that materially adversely affects Borrower's property, without the written consent of Multiplier; or |
| | aa) Borrower uses the Loans for any item other than those |

| Required Disclosures | Summary of Material Terms |
|---|---|
| | set forth in the Budget or the Interim Order, except as agreed in writing in advance by Multiplier; |
| | bb) subject to Section 365 of the Bankruptcy Code, Borrower shall fail to obtain, maintain or comply in all material respects with any order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any governmental authority and such failure could reasonably be expected to have a Material Adverse Change; or |
| | cc) Borrower, without the prior consent of Multiplier, shall (i) determine, whether by vote of its Board or otherwise, to suspend the operation of its business in the ordinary course or liquidate all or substantially all of its assets, or (ii) file a motion or other application in the Bankruptcy Case seeking authority to do any of the foregoing; or |
| | dd) there exists at any time (i) an unfavorable variance of more than one hundred and ten percent (110%) between the actual aggregate disbursements of Borrower with respect to the first three weeks after the Closing Date and thereafter on a rolling three week basis versus the projected aggregate disbursements for the same period with respect to the aggregate amounts set forth for expenses and disbursements, unless such unfavorable variance is less than or equal to a favorable variance with respect to aggregate revenues and collections of Borrower for the same period or (ii) an unfavorable variance of less than eighty-five percent (85%) between the actual aggregate revenues and collections of Borrower with respect to the first three weeks after the Closing Date and thereafter on a rolling three week basis versus the projected aggregate revenues and collections for the same period with respect to the aggregate amounts set forth for revenues and collections, unless such unfavorable variance is less than or equal to a favorable variance with respect to aggregate expenses and disbursements of Borrower for the same period, or (iii) the aggregate cumulative expenditures by the Borrower (inclusive of the Carve-Out) exceeds one hundred percent (100%) of the aggregate amount budgeted for the entire period covered by the Budget, or (iv) Borrower's actual aggregate expenditures with respect to any line item relating to the payment of professional fees, financial advisor fees and related |

| Required Disclosures | Summary of Material Terms |
|---|---|
| | expenses, exceeds the amount budgeted therefore in the Budget; or |
| | ee) the entry of an order of the Bankruptcy Court granting any Lien on or security interest in any of the Collateral that is *pari passu* with or senior to the Liens held by Multiplier on, or as Security Interests in, the Collateral, the Adequate Protection Liens, the Pre-Petition Lender Superiority Claims or the Pre-Petition Liens (in each case as defined in the Interim Order), or Borrower shall seek or request the entry of any such order; or |
| | ff) Borrower creating or permitting to exist any other superpriority claim which is *pari passu* with or senior to the claims of Multiplier hereunder, the Adequate Protection Liens, the Pre-Petition Lender Superiority Claims or the Pre-Petition Liens, except for the Carve-Out; |
| | gg) any stalking horse bidder withdraws its bid prior to the consummation of the Sale; or |
| | hh) Borrower seeks to sell any of their assets outside the ordinary course of business, unless (i) the proceeds of such sale are used to indefeasibly pay the Obligations in full in cash (subjected to any unfunded Carve-Out amounts due under the Budget), and to the extent there are remaining proceeds thereafter, are used to indefeasibly pay the Pre-Petition Obligations at closing, and (ii) such sale is pursuant to bidding procedures and a sale motion approved by Multiplier; or |
| | ii) without the written consent of Multiplier, (i) dismissal of any of the Bankruptcy Cases or conversion of any of the Bankruptcy Cases to chapter 7 cases, or appointment of a chapter 11 trustee or examiner or other responsible officer with enlarged powers relating to the operation of the business of Borrower in any of the Bankruptcy Cases, which dismissal, conversion or appointment shall not have been reversed, stayed or vacated within three (3) calendar days, or (ii) Borrower shall seek or request the entry of any order to effect any of the events described in subclause (i) of this clause. |
| **Maturity/Termination Date**<br><br>*Schedule to DIP Credit Agreement,* | The Maturity Date means the earlier to occur of: (a) the February 6, 2017 or (b) the consummation of the sale of all or substantially all of the assets of the Borrower pursuant to a 363 |

| Required Disclosures | Summary of Material Terms |
|---|---|
| *§ 4 and DIP Credit Agreement § 7* | sale under the Bankruptcy Code (the "Sale").<br><br>The Termination Date means the earliest to occur of: (a) the Maturity Date, or (b) the earlier of (i) the date upon which the Interim Order expires or (ii) 23 days after the entry of the Interim Order, in either case, if the Final Order has not been entered prior to the expiration of such period; (c) if a Reorganization Plan has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such Reorganization Plan or (ii) the 30th day after the date of entry of the confirmation order; (d) the date of indefeasible prepayment in full by Borrower of all obligations hereunder in accordance with the terms hereof; or (e) upon acceleration of the Obligations upon the occurrence of an Event of Default. |
| **Adequate Protection**<br><br>*Interim DIP Order ¶ 17* | Granting the Adequate Protection Liens and the Pre-Petition Lender Superpriority Claims (junior only to the DIP Obligations, the Superpriority DIP Claim, the Carve-Out, and any validly perfected secured claim), effective and perfected upon the date of entry of the Interim Order, which shall secure the payment of an amount equal to the diminution in the value of the Prepetition Secured Parties' interests in FTFS Acquisition, LLC and continuing, valid, binding, enforceable and perfected post-petition "replacement" liens on the Pre-Petition Collateral from and after the Petition Date.<br><br>As additional adequate protection, the Debtors are authorized to provide adequate protection in the form of current payment of all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Pre-Petition Lender (including all reasonable fees, costs, disbursements and expenses of their outside counsel). |
| **Section 506(c) Waiver**<br><br>*Interim Order ¶¶ I, 45* | Upon entry of a Final Order providing for such relief, except for the Carve-Out, no costs or expenses of administration that have been or may be incurred in any of the Cases at any time shall be charged against the DIP Lender or the Pre-Petition Lender or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order) or the DIP Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise. |
| **Applicability of "equities of the case" exception to Section 552(b); No Marshaling** | Upon entry of a Final Order providing for such relief, the Pre-Petition Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to the |

| Required Disclosures | Summary of Material Terms |
|---|---|
| *Interim Order ¶¶ 46, 47* | Pre-Petition Lender with respect to proceeds, products, offspring, or profits of any of the Pre-Petition Collateral.<br><br>Upon entry of a Final Order providing for such relief, in no event shall the DIP Lender or the Pre-Petition Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Pre-Petition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order. |
| **Expenses**<br><br>*DIP Credit Agreement, § 8.10 and Interim Order ¶ 36* | The Debtors shall pay the DIP Lender's reasonable attorneys' and consultants' fees and all filing, recording, search, title insurance, appraisal, audit, and other reasonable costs incurred by Multiplier, pursuant to, or in connection with, or relating to this Agreement, the other Loan Documents or the DIP Orders.<br><br>In addition, the Debtors shall indemnify the DIP Lender against any liability arising in connection with the DIP Facility, the DIP Credit Documents or the transactions contemplated thereby or any use made or proposed to be made with the proceeds of the DIP Facility. |

## **ADDITIONAL PROVISIONS**

26.     In addition to the disclosures made pursuant to the Local Rules, the DIP Credit Agreement and the Interim Order contain certain other provisions that the Debtors believe this Court likely would want the Debtors to highlight, even though these provisions are noted in the Material Terms of the DIP Credit Facility chart set forth in this Motion.  In particular, the DIP Credit Agreement contains various "milestones" that the Debtors must meet throughout the chapter 11 cases, and failure to meet such milestones constitutes an Event of Default under the DIP Credit Agreement.  These milestones (collectively, the "Milestones") require that the following events shall have occurred on or before the dates specified below:

- the date of the Petition occurs no later than December 9, 2016;

- the Bankruptcy Court enters a final order approving the DIP Credit Facility, in form acceptable to Multiplier, no later than January 5, 2017;

- the Bankruptcy Court approves bidding procedures for the Sale, in form acceptable to Multiplier, no later than January 5, 2017;

- Borrower holds an auction for the Sale pursuant to the bidding procedures order no later than February 2, 2017;

- a sale hearing approving the Sale pursuant to the bidding procedures order entered by the Bankruptcy Court, occurs no later than February 3, 2017; and

- the Sale is consummated no later than February 6, 2017.

Given the Debtors' desire to minimize the costs of administering these Cases and the substantial progress toward the Sale that already has been achieved to date, the Debtors believe these milestones are reasonable and capable of satisfaction.

27.    Section 2.5 of the DIP Credit Agreement provides that the DIP Lender has the absolute right to credit bid any and/or all the Obligations and/or any and/or all of the Pre-Petition Obligations at any sale or asset disposition of all or any portion of the Collateral and/or any other asset of the Debtor and to assign such credit bid to any third party designated by Multiplier.  Borrower agrees not to object or otherwise take any action that would prevent Multiplier from credit bidding or dispute any credit bid of Multiplier and further agrees to support and assert Multiplier's right to credit bid.

## REQUEST FOR THE APPROVAL OF THE
## DIP CREDIT AGREEMENT AND RELATED ACTIONS

**A.      Approval Under Bankruptcy Code Section 364(c)**

28.     As described above, it is essential that the Debtors obtain

access to sufficient postpetition financing and use of Cash Collateral to avoid

immediate and irreparable harm to their businesses pending the Sale.  The

preservation of estate assets, the Debtors' continuing viability, and their ability to

maximize value for stakeholders depends heavily upon the expeditious approval of

the relief requested herein.

29.     Bankruptcy Code section 364 distinguishes among

(a) obtaining unsecured credit in the ordinary course of business, (b) obtaining

unsecured credit out of the ordinary course of business, and (c) obtaining credit with

specialized priority or with security.  See 11 U.S.C. § 364.  If a debtor in possession

cannot obtain postpetition credit on an unsecured basis, pursuant to Bankruptcy Code

section 364(b), a court may authorize a debtor to obtain credit or to incur debt, the

repayment of which is entitled to superpriority administrative expense status, or is

secured by a senior lien on unencumbered property, or a junior lien on encumbered

property, or a combination of the foregoing.  See 11 U.S.C. § 364(c).[5]

---

[5]      Section 364(c) of the Bankruptcy Code provides as follows:

(c)      If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

30.     The statutory requirement for obtaining postpetition credit

under section 364(c) of the Bankruptcy Code is a finding, made after notice and

hearing, that the debtor in possession is "unable to obtain unsecured credit allowable

under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11

U.S.C. § 364(c); see In re Ames Dep't Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990) ("a debtor must show that it has made a reasonable effort to seek other sources

of credit under sections 364(a) and (b)" of the Bankruptcy Code).

31.     Courts have articulated a three-part test to determine whether a

debtor may obtain financing under Bankruptcy Code section 364(c):

- the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011)

(applying these factors); Ames Dep't Stores, 115 B.R. at 39.

---

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

B.      **The Debtors Were Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis**

32.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code section 364(c). Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.; see also In re Ames Dep't Stores, 115 B.R. at 37 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the] Debtor to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

33.     The Debtors attempted to secure debtor in possession financing for other sources; however, the Prepetition Lender would not consent to the priming of its prepetition liens. Without such consent, the Debtors believe they would not be able to secure financing other than the financing offered by the DIP Lender. Further, the Debtors' management, with the assistance of their advisors, explored various alternative sources of capital and financing as a part of this process,

but determined that financing was unavailable on an unsecured basis. The Debtors'

extensive efforts to seek the necessary postpetition financing from sources within the

Debtors' existing capital structure and from third parties were reasonable and

sufficient and satisfy the statutory requirements of Bankruptcy Code section 364(c).

See, e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y.

1992) (a debtor seeking financing under Bankruptcy Code section 364(c) made an

acceptable attempt to obtain less onerous financing by speaking to several lenders

that denied the loan request); Ames Dep't Stores, 115 B.R. at 40 (same).

**C.    The DIP Credit Facility is Necessary to Preserve and Protect the Assets
of the Debtors' Estates**

34.    It is essential that the Debtors immediately obtain the

financing necessary to preserve and protect the value of their estates. The Debtors

do not have sufficient working capital, financing, or cash collateral to continue the

operation of their businesses without near-term, additional financing. Without an

infusion of cash, the Debtors will be unable to operate their businesses. In addition,

the Debtors require such liquidity in order to meet accruing payroll obligations and

obligations to its publishers that will come due in the near term. The Debtors'

inability to pay their employees would threaten the stability of the Debtors'

workforce and would result in significant disruptions to the operation of the Debtors'

businesses, which, in turn, could have a negative impact on the Debtors' ability to

monetize certain of their assets in a sales process. Accordingly, the DIP Credit

Facility is necessary to ensure that the Debtors are able to maintain their businesses,

and thus maximize the value of their estates.  See Burtch v. Ganz (In re Mushroom

Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to

maximize their estates' assets).

**D.    The Terms of the DIP Credit Facility are Fair, Reasonable, and
        Appropriate Under the Circumstances**

35.    In considering whether the terms of postpetition financing are

fair and reasonable, courts consider the terms in light of the relative circumstances

and disparate bargaining power of both the debtor and potential lender.  See In re

Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also

Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re

Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may

have to enter into hard bargains to acquire funds).

36.    The terms of the DIP Credit Agreement and the proposed

Interim Order were negotiated in good faith and at arm's-length between the Debtors

and the DIP Lender, resulting in agreements designed to permit the Debtors to obtain

the needed liquidity to maximize the value of their assets through the closing of the

Sale.

**E.    The DIP Credit Facility is in the Best Interests of the Debtors' Estates
        and Creditors**

37.    The Debtors believe that the approval of the DIP Credit

Facility is in the best interests of the Debtors' estates and their creditors.  The

Debtors, in the exercise of their sound business judgment, believe that they have

negotiated for the best possible terms for the DIP Credit Facility, which would

permit the Debtors to operate through the closing of the Sale.

38.     The Debtors submit that the milestones under the DIP Credit

Facility are appropriate in these circumstances and provide the Debtors and their

advisors with sufficient runway to continue the postpetition marketing process, hold

an auction, and complete the sale process in the most value-maximizing manner for

the benefit of all stakeholders.  See Farmland Indus., 294 B.R. at 884 (stating that it

"was not unreasonable for the DIP [l]enders to insist on having a definite timetable,"

and that debtor in possession financing amendment "despite the tough new

guidelines ... is in the best interests of the estate ... to avoid a termination of the

[d]ebtors' DIP financing [which] would have been disastrous for the [d]ebtors ... and,

more than likely, have caused the [d]ebtors to cease their business operations, to the

extreme detriment of their creditors.").

**F.      Entry into the DIP Credit Facility Is an Exercise of the Debtors' Sound
         Business Judgment**

39.     As described above, after appropriate investigation and

analysis, the Debtors' management has concluded that the DIP Credit Facility is the

best option available under the circumstances of these cases.  Bankruptcy courts

routinely defer to a debtor's business judgment on certain business decisions,

including the decision to borrow money, unless such decision is arbitrary and

capricious.  See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr.

S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business

judgment in granting section 364 financing"). In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

40.     The Debtors, with the assistance of their advisors, have exercised their sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Credit Facility. In light of this, and that the Debtors could not obtain postpetition financing from another lending source on terms superior to the DIP Credit Facility, the Debtors' decision to enter into the DIP Credit Facility is a sound exercise of the Debtors' business judgment, including, as discussed below, the following aspects of the DIP Credit Facility:  (a) the Carve-Out; (b) the Budget; and (c) the payment of certain fees under the DIP Credit Agreement. Accordingly, this Court should grant the Debtors authority to enter into the DIP Credit Facility and obtain funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to Bankruptcy Code sections 364(c) and 364(d).

## G.     The Scope of the Carve-Out is Appropriate

41.     The proposed DIP Credit Facility subjects the security interests and administrative expense claims of the DIP Lenders, as well as the Adequate Protection Liens, to the Carve-Out. Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate

and any statutory committee can retain assistance from counsel.  See Ames, 115 B.R. at 40.  The DIP Credit Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  See id. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of professional fees of the Debtors and any official committees, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Credit Facility.

42.     Given the likelihood that the Debtors' professionals, as advisors with the knowledge base regarding the Debtors, will be necessary to effect any wind down following an event that triggers a Carve-Out Notice, the Carve-Out provides that the Professional Expense Cap for any Professional Persons of the Debtors is $725,000 and for any Professional Persons of the Committee is $50,000. In addition, the Carve-Out also includes the fees to be paid to this Court and the U.S. Trustee, and the reasonable expenses of any trustee appointed under Bankruptcy Code section 726(b), and does not impair the ability of any party to object to such fees, expenses, reimbursement, or compensation.  Accordingly, the Debtors submit that the proposed Carve-Out is appropriate in these circumstances.

H.      **The Budget is Appropriate**

43.      As described above, the Debtors' access to Cash Collateral

and DIP Loans under the DIP Credit Facility will be subject to the Budget, attached

hereto as <u>Exhibit 2</u>.  After diligent consideration of all known circumstances, and

upon consultation with their advisors, the Debtors believe, in their reasonable

business judgment, that the proposed Budget (including the variances permitted

thereunder pursuant to the DIP Credit Agreement) is achievable and will allow the

Debtors to operate in chapter 11 without the accrual of unpaid liabilities.

Accordingly, the Debtors submit that the proposed Budget is appropriate.

<u>REQUEST FOR USE OF CASH COLLATERAL</u>

44.      In connection with their need for debtor-in-possession

financing, the Debtors also require the use of Cash Collateral.  Bankruptcy Code

section 363(c)(2) provides that the Debtors may not use, sell, or lease cash collateral

unless "(A) each entity that has an interest in such cash collateral consents; or (B) the

court, after notice and a hearing, authorizes such use, sale, or lease in accordance

with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Prepetition Lender

is the DIP Lender and has consented to use of its Cash Collateral.  The Bridge

Lenders, under the Subordination Agreement, are deemed to consent.

<u>REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY</u>

45.      Bankruptcy Code section 362 provides for an automatic stay

upon the filing of a bankruptcy petition.  The proposed Interim Order contemplates

the modification of the automatic stay (to the extent applicable), to the extent

necessary to permit the (a) Debtors and (b) DIP Lender to implement the terms of the

Interim Order. Stay modification provisions of this type are standard features of

postpetition debtor-in-possession financing facilities and, in the Debtors' business

judgment, are reasonable under the present circumstances. Accordingly, the Debtors

respectfully request that this Court authorize the modification of the automatic stay

in accordance with the terms set forth in the Interim Order and DIP Credit

Agreement.

### **GOOD FAITH**

46. The terms and conditions of the DIP Credit Facility and the

use of Cash Collateral are fair and reasonable and were negotiated by the parties in

good faith and at arms' length. Therefore, the DIP Lenders should be accorded the

benefits of Bankruptcy Code section 364(e) to the extent any or all of the provisions

of the DIP Credit Facility, or any interim or final order of this Court pertaining

thereto, are hereafter modified, vacated, stayed, or terminated by subsequent order of

this or any other court.

### **REQUEST FOR HEARING AND AUTHORITY TO**
### **MAKE INTERIM BORROWINGS UNDER THE DIP CREDIT FACILITY**

47. Pursuant to Bankruptcy Rule 4001(b), the Debtors request that

this Court conduct an interim hearing and authorize the Debtors' use of Cash

Collateral in order to (a) maintain and finance the ongoing operations of the Debtors,

and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates

and all parties in interest.

48.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364 may not be commenced earlier than 14 days after the service of such motion.  Fed. R. Bankr. P. 4001(c).  Upon request, however, this Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., In re Simasko, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also In re Ames Dep't Stores, 115 B.R. at 38.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., Simasko, 47 B.R. at 449; Ames Dep't Stores, 115 B.R. at 36.

49.     Pursuant to Bankruptcy Rule 4001(c), the Debtors respectfully request that this Court conduct a preliminary hearing on the Motion and authorize the Debtors from the entry of the Interim Order until the Final Hearing to obtain access to approximately $2 million, as set forth in the budget, over such period under the terms contained in the DIP Credit Agreement and the Interim Order and to utilize Cash Collateral.

## ESTABLISHING NOTICE PROCEDURES AND SCHEDULING FINAL HEARING

50.     The Debtors respectfully request that this Court schedule the Final Hearing and authorize them to serve the Motion and the signed Interim Order, which fixes the time, date, and manner for the filing of objections, on (a) the Office of the United States Trustee for the Southern District of New York; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c) the DIP Lender, Levy, Small & Lallas, 815 Morgaga Drive, Los Angeles, CA 90049 (Attn: Leo Plotkin) and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 N. Market St., Suite 5400, Wilmington, DE 19801 (Attn: William E. Chipman, Jr.); (d) the Bridge Lenders; (e) the Internal Revenue Service, (f) the Securities and Exchange Commission and any other federal, state, or local governmental agency to the extent required by the Bankruptcy Code, Bankruptcy Rules, the Local Rules, or order of the Court; and (g) all persons and entities that have filed a request for service of filings in these Cases pursuant to Bankruptcy Rule 2002.

## NOTICE

51.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the Southern District of New York; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c)  DIP Lender, Levy, Small & Lallas, 815 Morgaga Drive, Los Angeles, CA 90049 (Attn: Leo Plotkin) and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 N. Market St., Suite 5400, Wilmington, DE 19801 (Attn: William E. Chipman, Jr.); (d) the

Bridge Lenders; (e) the Internal Revenue Service, (f) the Securities and Exchange

Commission and any other federal, state, or local governmental agency to the extent

required by the Bankruptcy Code, Bankruptcy Rules, the Local Rules, or order of the

Court; and (g) all persons and entities that have filed a request for service of filings

in these Cases pursuant to Bankruptcy Rule 2002 (the parties set forth in the

preceding clauses (a) through (g), collectively, the "Notice Parties").  In light of the

nature of the relief requested, the Debtors submit that not further notice is necessary.

## NO PRIOR REQUEST

52.    No prior request for the relief sought herein has been made to

this Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order substantially in the form attached hereto as <u>Exhibit 1</u>: (a) granting the relief requested herein on an interim basis; (b) scheduling the Final Hearing; and (c) granting the Debtors such further relief as this court may deem proper.

Dated:  December 9, 2016

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

<u>/s/ Ericka F. Johnson</u>
Matthew P. Ward (DE Bar No. 4471)
Ericka F. Johnson  (DE Bar No. 5024)
Morgan L. Patterson (DE Bar No. 5388)
Nicholas T. Verna (DE Bar No. 6082)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: maward@wcsr.com
E-mail: erjohnson@wcsr.com
E-mail: mpatterson@wcsr.com
E-mail: nverna@wcsr.com

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*