Matthew P. Ward (DE Bar No. 4471)
Ericka F. Johnson  (DE Bar No. 5024)
Morgan L. Patterson (DE Bar No. 5388)
Nicholas T. Verna (DE Bar No. 6082)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: maward@wcsr.com
E-mail: erjohnson@wcsr.com
E-mail: mpatterson@wcsr.com
E-mail: nverna@wcsr.com

*Proposed Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOUT MEDIA, INC., <u>et al.</u>,[1] | ) | Case No. 16-13369-MEW |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS
(I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF SCOUT MEDIA, INC. AND SCOUT.COM,
LLC'S ASSETS, INCLUDING PROCEDURES FOR SELECTION OF A
STALKING HORSE PURCHASER,  (B) SCHEDULING AN AUCTION,
(C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; AND
(E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND
MANNER OF NOTICE THEREOF; (II)(A) APPROVING THE SALE OF**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number are: Scout Media Holdings, Inc. (1936), Scout Media, Inc. (1438), FTFS Acquisition, LLC (7230), and Scout.com, LLC (3269).  The location of the Debtors' headquarters and the Debtors' service address is 122 West 26th Street, Fifth Floor, New York, NY 10036.

**SUBSTANTIALLY ALL OF SCOUT MEDIA, INC. AND SCOUT.COM, LLC'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Scout Media, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, hereby move (the "Motion") the Court pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"):

(i)     approving the proposed procedures attached as Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures") to be used in connection with the sale (the "Sale") of substantially all of Scout Media, Inc. and Scout.com, LLC's assets (the "Assets"), including the procedures for the selection of a stalking horse purchaser;

(ii)    scheduling an auction for the Assets (the "Auction"), the hearing with respect to the approval of the sale (the "Sale Hearing"), and approval of the form and manner of notice thereof;

(iii)   authorizing certain procedures related to the Debtors' assumption and assignment of executory contracts and unexpired leases (the "Assignment Procedures") in connection with any Sale; and

(iv)    granting related relief.

2

The Debtors also move the Court, pursuant to Bankruptcy Code sections 105, 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006 for entry of one or more orders in substantially the form attached hereto as <u>Exhibit B</u> (the "Sale Order"):

(i)     authorizing the sale of the Assets to one or more successful bidders at the Auction (each such sale, a "Sale Transaction") free and clear of all liens, claims, interests, and encumbrances;

(ii)    authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

(iii)   granting related relief.

In support of this motion, the Debtors submit the Declaration of Craig Amazeen in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration")[2] filed contemporaneously herewith and the Declaration of Andrew De Camara in Support of Debtors' Sale and Bidding Procedures Motion attached hereto as <u>Exhibit C</u> (the "Sale Declaration") and respectfully represent as follows:

## <u>JURISDICTION AND VENUE</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]     Capitalized terms used but not defined herein shall have the meanings assigned such terms in the First Day Declaration.

**BACKGROUND**

A.    **General Background**

3.    On December 1, 2016 (the "SMI Petition Date"), an involuntary petition was filed against Scout Media, Inc. ("Scout Media" or "SMI"), and on December 8, 2016 (the "Remaining Debtors' Petition Date" and, together with the SMI Petition Date, the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to Bankruptcy Code sections 1107(a) and 1108. No official committee of unsecured creditors has been appointed in these cases.

4.    Scout Media, Inc. ("Scout Media"), the primary operating company of the Debtors, is a privately held digital sports media company that publishes and distributes content related to the National Football League (the "NFL"), fantasy sports, college football and basketball, high school recruiting, hunting, fishing, outdoors, military, and history. In 2013, Fox Sports sold Scout Media to North American Membership Group Holdings, Inc., the sole owner of Scout Media Holdings, Inc. Since that time, Scout Media emerged as a leader in the digital sports media market with its growth supported by a series of successful partnerships, including its alliance with iHeartMedia in January 2016.

5.    Scout Media owns and operates a digital network of 150 team-specific, credentialed publishers, and their respective social communities. These publishers produce premium video and story content on a proprietary network

that enables users to consume the latest news, rankings, and analysis, and engage with other like-minded fans.

      6.     Scout Media is the only sports network with a full-time video channel for every NFL and major college team.  Scout Media produces approximately 11,000 stories and 1,000 premium videos monthly.

      7.     As described more fully below, in the First Day Declaration, and in the Sale Declaration, it became clear during the summer of 2016 that the Debtors could not continue as they were, and they hired a financial advisor and began a sales process, seeking a buyer for the shares of Scout Media to purchase such shares through an assignment for the benefit of creditors.  While many parties expressed an interest in purchasing Scout Media, it became clear that buyers would be more willing to do so through an organized chapter 11 process that includes protections from successor liability.  Accordingly, unfortunately, to date no stalking horse bidder has been selected. The Debtors have commenced these chapter 11 cases (collectively, the "Cases") with the hope of selling the assets of debtors Scout Media and Scout.com, LLC as a going concern in a competitive auction to be held in January 2017.  The Debtors intend to continue operating as usual in these Cases during the period leading up to the auction so as to preserve the value of their businesses, thereby encouraging a going concern sale that would save jobs and maximize returns to creditors.  Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure, financial

condition, and the reasons for and objectives of these cases, is set forth in the First

Day Declaration.

### B.    The Prepetition Sale Process

8.    In September 2016, facing liquidity constraints caused by

judgment liens and multiple garnishments, the Debtors retained Sherwood Partners,

Inc. ("Sherwood"), and in October, Sherwood began to explore and solicit interest in

a sale of Scout Media Holdings, Inc.'s stock in Scout Media and Scout.com, LLC.

See Sale Decl. ¶ 5.  In November 2016, the Debtors and Sherwood determined that a

sales process would be more effective through the commencement of chapter 11

cases and the modified the restructuring goal to be a sale of substantially all of Scout

Media and Scout.com, LLC's assets.

9.    Sherwood conducted a robust marketing process, canvassing

the market and contacting 154 potential strategic and financial buyers that, based on

Sherwood's experience and involvement in the sports marketing arena, might be

interested in the Debtors' businesses.  See id. at ¶ 6.  This list of potential buyers was

developed in concert with the Debtors' management and Board of Directors (the

"Board"), who supplemented the initial list supplied by Sherwood with additional

potential purchasers.  Additionally, as news of the Debtors' sale process became

public, the Debtors and Sherwood received inquiries from other interested parties

and, where appropriate, Sherwood provided diligence and engaged in negotiations

with those parties as well.

6

10.     Of the 154 potential strategic and financial buyers Sherwood contacted, twenty (20) parties signed non-disclosure agreements and are in the process of being provided with access to extensive diligence materials.  See id. at ¶ 6.

11.     Despite varying levels of due diligence and meetings with interested parties, no one has submitted a letter of intent or provided any other definitive sale offer at this time.

### C.    The Proposed Asset Purchase Agreement

12.     The Debtors have prepared a form asset purchase agreement (the "APA," substantially in the form attached hereto as Exhibit D), which will be provided to all prospective bidders (each, a "Potential Bidder") in connection with a marketing process for the Assets.  Potential Bidders will be required to submit to the Debtors an executed asset purchase agreement (each, a "Modified APA") reflecting the terms upon which the Potential Bidder would seek to effect a purchase of the Assets and the assumption of certain liabilities as soon as is practicable, but no later than January 17, 2017 at 5:00 p.m. (Prevailing Eastern Time) (the "Bid Deadline"). The Debtors will also entertain entering into an agreement (the "Stalking Horse Agreement") with a stalking horse purchaser (the "Stalking Horse Purchaser"), as may be determined by the Debtors in their business judgment prior to the hearing on this Motion.

13.     Upon the selection of a Stalking Horse Purchaser, if any, the Debtors will file and serve a notice that includes: (i) the identity of the proposed

Stalking Horse Purchaser; (ii) a summary of the key terms of the Stalking Horse Agreement; (iii) a summary of the type and amount of bid protections (the "Bid Protections"), if any, being offered to the proposed Stalking Horse Purchaser; (iv) a summary of any necessary modifications or amendments to the Bid Procedures; and (v) a copy of the Stalking Horse Agreement.  In the event a Stalking Horse Purchaser is selected, the Debtors will request that the Court set a hearing to approve any such Stalking Horse Purchaser, Stalking Horse Agreement, and accompanying Bid Protections on an expedited basis.

14.    In the event that the Debtors do not select a Stalking Horse Purchaser, the Debtors will provide to the Notice Parties (as defined herein) a summary of the principal terms of any Successful Bids (as defined in the Bid Procedures Order) prior to the Sale Hearing.  The Debtors request that the Court schedule the Sale Hearing on January 27, 2017, or such other time that the Court is available.  The Debtors may adjourn the Sale Hearing at any time in their discretion without further written notice.

15.    The Debtors believe that holding an Auction for the Assets represents the best means to generate value for their estates and maximize creditor returns.

**D.    The Need for a Timely Process**

16.    The Debtors propose to conduct the Sale process and Auction on the following timeline:

| | |
|---|---|
| **December 22, 2016** | Hearing to Consider Entry of the Bidding Procedures Order |
| **December 23, 2016** | Deadline to Serve Sale Notice and Notice of Assumption and Assignment |
| **December 30, 2016** | Sale Notice Publication Deadline |
| **January 6, 2017 at 5:00 p.m. (prevailing Eastern Time)** | Deadline to file Cure Objections and Assignability Objections |
| **January 17, 2017 at 5:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **January 18, 2016 at 5:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to notify bidders of their status as Qualified Bidders |
| **January 19, 2017 at 10:00 a.m. (prevailing Eastern Time)** | Auction, to be held at the offices of Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Ave., Suite 1501, Wilmington, Delaware |
| **January 20, 2017 at 5:00 p.m. (prevailing Eastern Time)** | Deadline to File Auction Results |
| **January 24, 2017 at 5:00 p.m. (prevailing Eastern Time)** | Deadline to file objections to Sale Transaction(s) (other than Cure Objections and Assignability Objections) |
| **January 24, 2017 at 5:00 p.m. (prevailing Eastern Time)** | Deadline to file Adequate Assurance Objections |
| **January 27, 2017** | Proposed hearing to approve proposed Sale Transaction(s) |

17.     The Debtors believe that conducting the Sale process within the time periods set forth above and in the Bidding Procedures is reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase the Assets.  In formulating the procedures and time periods, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to quickly and efficiently sell their operations while they still have realizable value and can be maintained as a going

concern.  Furthermore, potential bidders will have access to comprehensive

information prepared by the Debtors and their advisors and a substantial body of

data, inclusive of presentations with Sherwood and the Debtors' management,

membership reports, publisher reports, and historical financial data and projections.

See Sale Decl. ¶ 8.

18.     The failure to adhere to the time periods in the Bidding

Procedures could jeopardize the Debtors' ability to maintain their operations during

the pendency of the Sale process, which would result in a substantial loss of value

for creditors and foreclose any possibility of going concern value being extracted at

the Auction.  The Debtors' postpetition debtor-in-possession financing (the "DIP

Credit Facility") requires the Debtors' to adhere to certain milestones related to the

sale process.  Failure to adhere to these milestones could result in a loss of financing

necessitating an immediate shut down of operations.

19.     In addition to the milestones, the Debtors have significant

business and financial reasons to move quickly.   Even with the DIP Credit Facility,

there are limited funds available to the Debtors and they continue to incur expenses

every day that a sale transaction is not consummated.   The Debtors have balanced

the benefits of running an extended auction with their liquidity needs and their ability

to maintain going concern operations and are proposing a sale timeline that is

designed to maximize value while at the same time limit needless expenditures and

the incurrence of administrative expenses, thereby risking a liquidity shortfall that

could have a disastrous impact on their businesses.  The Debtors have determined, in

their business judgment, that the proposed marketing period, which will allow the

Debtors to devote funds to maintaining the business as a going concern, offers the

estates the best chance of maintaining value, saving jobs and maximizing returns to

creditors.  See First Day Decl. ¶ 8.

## **RELIEF REQUESTED**

20.     By this Motion, pursuant to Bankruptcy Code sections 105(a),

363, and 365 and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, the

Debtors request that the Court:

(a)     enter the Bidding Procedures Order:

(i)     approving the Bidding Procedures substantially in the form attached as Exhibit 1 to the Bidding Procedures Order;

(ii)    scheduling the Auction for January 19, 2017;

(iii)   scheduling the Sale Hearing for January 27, 2017;

(iv)    authorizing and approving the (A) notice to each non-Debtor counterparty (each, a "Counterparty") to an executory contract or unexpired lease (collectively, the "Contracts") of the Debtors' proposed cure amounts (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Assumption and Assignment Notice") and (B) the procedures for the assumption and assignment of Contracts and the determination of Cure Costs with respect thereto (collectively, the "Assumption and Assignment Procedures");

(v)     authorizing and approving the notice of the Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Sale Notice"); and

(vi)    authorizing the Debtors to publish critical content contained in the Sale Notice in the <u>Wall Street Journal</u>, <u>NY Times</u>, or <u>USA Today</u> (the "Publication Notice"); and

(b)    enter the Sale Order:

(i)    authorizing the sale of the Assets free and clear of all liens, claims, interests, and encumbrances, with liens to attach to the proceeds of such Sale Transaction;

(ii)    authorizing the assumption and assignment of the Proposed Assumed Contracts (as defined below);

(iii)    granting relief from the automatic stay and permission to repay the Obligations and Pre-Petition Obligations (each as defined in the Interim Order approving debtor in possession financing), in full, at the close of the Sale; and

(iv)    granting related relief.

## BIDDING PROCEDURES

### A.    Overview[3]

21.    The Bidding Procedures are intended to provide for a fair, timely, and competitive sale process consistent with the timeline of these Cases.  The Bidding Procedures, if approved, will enable the Debtors to identify bids from potential buyers that would constitute the best and highest offer for the Assets.  Because the Bidding Procedures are attached to the proposed Bidding Procedures Order as <u>Exhibit 1</u>, they are not stated herein in their entirety.  However, certain key terms of the Bidding Procedures are highlighted below:

---

[3]    All capitalized terms not defined in this section have the meanings given to such terms in the Bidding Procedures.

| | |
|---|---|
| **Bid Deadline** | Any person or entity that desires to participate in the Auction as a Stalking Horse Purchaser must submit its bid (and such bid must constitute a Qualified Bid (as defined below)) on or before **the hearing on this Motion** (the "Stalking Horse Bid Deadline") in writing to the Bid Notice Parties set forth in the Bidding Procedures.<br><br>Unless a bid was submitted pursuant to the Stalking Horse Bid Deadline and that bid was designated the Stalking Horse Bid, any person or entity that desires to participate in the Auction (each, a "Prospective Bidder"), must submit its bid (and such bid must constitute a Qualified Bid (as defined below)) on or before **January 17, 2017 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") in writing to the Bid Notice Parties set forth in the Bidding Procedures. |
| **Diligence** | To be eligible to participate in the Auction, a Prospective Bidder must first deliver (i) an executed confidentiality agreement, in form and substance satisfactory to the Debtors and consistent with the terms of the confidentiality agreements that the Debtors required potential bidders to sign prior to the filing of these Cases, (ii) a statement or other factual support demonstrating to the Debtors' satisfaction in the exercise of their reasonable business judgment that the Prospective Bidder has a bona fide interest in purchasing the Assets, and (iii) preliminary proof of the Prospective Bidder's financial capacity to close the proposed sale transaction.  Upon execution of a valid confidentiality agreement, any Prospective Bidder identified by the Debtors as reasonably likely to be a Qualified Bidder that wishes to conduct due diligence on the Assets may, in the Debtors' discretion be granted access to all material information regarding the Assets; <u>provided</u> that, if any Prospective Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Prospective Bidder any trade secrets or proprietary information, as determined in their sole discretion.  If the Debtors determine that a Prospective Bidder does not qualify as a Qualified Bidder, such Prospective Bidder shall not be entitled to receive due diligence access or additional non-public information. |
| **Qualified Bid Requirements** | In order to qualify as a "Qualified Bid," the bid must be in writing and the Debtors must determine that the bid satisfies the following requirements (and any Prospective Bidder that submits a Qualified Bid satisfying the following requirements shall be a "Qualified Bidder"):<br><br>• <u>Purchased Assets</u>:  A Qualified Bid must identify the following: (A) the Assets (or the portion thereof) to be purchased, including any Contracts of the Debtors that would be assumed and assigned in connection with the relevant Sale Transaction (all such executory contracts and unexpired leases, the "Proposed Assumed Contracts"); (B) the liabilities, if any, to be assumed, including any debt to be assumed; (C) the cash purchase price of, and any other consideration offered in connection with, the bid; (D) the proposed form of adequate assurance of future performance with respect to any Proposed Assumed Contracts; and (E) whether the Prospective Bidder intends to operate all or a portion of the Debtors' business as a going concern (as applicable), or to liquidate the business.<br><br>• <u>Identification of Bidder</u>:  A Qualified Bid must fully disclose the |

legal identity of each person or entity bidding for the applicable Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in (including through license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid or the Auction in connection with such bid, and the complete terms of any such participation, and must also disclose any past or present connections or agreements with the Debtors, the Stalking Horse Purchaser, any other known Prospective Bidder or Qualified Bidder, and/or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors).

- Asset Purchase Agreement if There Is a Stalking Horse Purchaser Only:  If a Stalking Horse Purchaser is designated and approved, Qualified Bids must include a duly authorized and executed copy of the Stalking Horse APA modified to reflect such Qualified Bidder's proposed Sale Transaction (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications to (A) the Stalking Horse APA and (B) the proposed Sale Order.

- Asset Purchase Agreement if there is no Stalking Horse Purchaser: If no Stalking Horse Purchaser is designated and approved, a Qualified Bid must include a duly authorized and executed copy of the form asset purchase agreement provided by the Debtors (the  "Form APA") modified to reflect such Qualified Bidder's proposed Sale Transaction (the "Alternative Transaction Agreement") (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications to (A) the Form APA and (B) the proposed Sale Order.

- Credit Bidding:  In connection with the Sale of the Assets, a person or entity holding a properly perfected security interest in such Assets may seek to credit bid some or all of their claims that are not subject to a bona fide dispute for their respective collateral (each such bid, a "Credit Bid") pursuant to Bankruptcy Code section 363(k).  A Credit Bid may be applied only to reduce the cash consideration with respect to the Assets in which the party submitting the Credit Bid holds a security interest with respect to which there are no other more senior security interests.  Each person or entity holding a valid, properly perfected security interest in Assets with respect to which there are no other more senior security interests for which it submits a bid shall be deemed a Qualified Bidder with respect to its right to acquire such Assets by Credit Bid.

- Financial Information:  A Qualified Bid must include the following: (A) a statement that the Prospective Bidder is financially capable of consummating the Sale Transaction; (B) if the bid includes a Credit Bid, a statement that any properly perfected more senior security interest will be satisfied in cash and any remaining balance of the bid after reducing the applicable purchase price of the Assets by the amount of the proposed Credit Bid is based on an all-cash offer; and (C) satisfactory evidence of committed financing or other financial

ability to consummate the proposed Sale Transaction(s) in a timely manner.

- Good Faith Deposit. Each Qualified Bid (other than one that includes a Credit Bid) must be accompanied by a good faith deposit (the "Good Faith Deposit") in the form of cash (or other form acceptable to the Debtors in their sole and absolute discretion) in an amount equal to 10% of the purchase price offered to purchase the Assets (or portion thereof). All Good Faith Deposits shall be held in escrow in a non-interest bearing account identified by the Debtors until no later than five business days after the conclusion of the Auction unless such bidder is selected as the Successful Bidder or as a Backup Bidder (as hereinafter defined), and thereafter returned to the respective Qualified Bidders in accordance with the Bidding Procedures. The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties.[4]

- Adequate Assurance. A Qualified Bid must include evidence of the Prospective Bidder's ability to comply with Bankruptcy Code section 365 (to the extent applicable), including providing adequate assurance of such Prospective Bidder's ability to perform future obligations arising under the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the Prospective Bidder, in a form that will permit the immediate dissemination of such evidence to the Counterparties to such contracts and leases.

- Representations and Warranties: A Qualified Bid must include the following representations and warranties: (A) expressly state that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its bid; and (B) a statement that the Prospective Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith.

- Authorization: A Qualified Bid must include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing of the proposed Sale Transaction(s) in accordance with the terms of the bid and these Bidding Procedures.

---

[4] The "Consultation Parties" are (a) Levy, Small & Lallas and Chipman Brown Cicero & Cole, as counsel to the DIP Lender and (b) counsel for any official committee of unsecured creditors appointed in these Cases.

| | |
|---|---|
| | • <u>Other Requirements</u>:  A Qualified Bid shall:  (A) expressly state that the bid is formal, binding, not subject to or conditioned on any further due diligence, and irrevocable until the selection of the Successful Bid and the Backup Bid (as defined below) in accordance with these Bidding Procedures; <u>provided</u> that if such Prospective Bidder is selected as the Successful Bidder or Backup Bidder, its bid must remain irrevocable until the Debtors' consummation of a sale with the Successful Bidder or the Backup Bidder;  (B) if the bid is for assets subject to a Stalking Horse Bid, state that the bid is not subject to conditions more burdensome than those in the Stalking Horse APA; (C) expressly state that the Prospective Bidder is committed to closing the proposed Sale Transaction(s) contemplated by the bid as soon as practicable; (D) except for the Bid Protections (as defined in the Bidding Procedures Order) for the Stalking Horse approved in the Bidding Procedures Order, expressly state and acknowledge that no Prospective Bidder shall be entitled to a break-up fee, termination fee, expense reimbursement, or similar type of "bid protection" in connection with the submission of a bid; (E) expressly waive any claim or right to assert any substantial contribution administrative expense claim under Bankruptcy Code section 503(b) in connection with bidding for the Assets and/or participating in the Auction; (F) not contain any financing contingencies of any kind; (G) not contain any condition to closing of the proposed Sale Transaction(s) on the receipt of any third party approvals (excluding Bankruptcy Court approval and any applicable required governmental and/or regulatory approval); (H) state that all necessary filings under applicable regulatory, antitrust, and other laws will be made and that payment of the fees associated therewith shall be made by the Prospective Bidder; (I) expressly state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable Assets; (J) include contact information for the specific person(s) the Debtors should contact in the event they have any questions about the Prospective Bidder's bid; and (K) be received by the Bid Notice Parties by the Bid Deadline. |
| **Disqualification of Bids** | The Debtors, in their business judgment, and in consultation with the Consultation Parties, reserve the right to reject any bid if such bid, including (without limitation) on the grounds that it:  (A) is on terms that are more burdensome or conditional than the terms of the Stalking Horse APA, if any; (B) requires any indemnification of the Prospective Bidder; (C) is not received by the Bid Deadline; (D) is subject to any contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; or (E) does not, in the Debtors' determination (after consultation with the Consultation Parties), include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors' estates. |
| **Selecting Stalking** | If a Stalking Horse Bid is received and accepted by the Debtors in their sole |

| | |
|---|---|
| Horse Bidder | discretion after consulting with the Consultation Parties on or prior to the hearing on the Bid Procedures (the "Stalking Horse Bid Deadline") |
| | A hearing to consider approval of the Debtors' selection of the Stalking Horse Purchaser will be requested on an expedited basis. |
| Selecting Qualified Bidders | The Debtors shall make a determination regarding which bids qualify as Qualified Bids and as Baseline Bids (as defined below) and shall notify bidders whether they have been selected as Qualified Bidders by no later than **January 18, 2017 at 5:00 p.m. (prevailing Eastern Time)**. |
| Bid Protections | Other than the Bid Protections that may be provided to a Stalking Horse Purchaser, no party submitting a bid, whether or not such bid is determined by the Debtors to qualify as a Qualified Bid, shall be entitled to a break-up fee or expense reimbursement, or any other bid protection, unless such break-up fee, expense reimbursement, or other bid protection is approved by the Bankruptcy Court |
| Auction | If the Debtors receive more than one Qualified Bid for the same Assets with acceptable purchase prices by the Bid Deadline, the Debtors shall conduct the Auction. The Auction, if required, will be conducted at the offices of **Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801 on January 19, 2017 at 10:00 a.m. (prevailing Eastern Time)** (the "Auction Date"), or at such other time and location as designated by the Debtors, after consulting with the Consultation Parties. The Debtors shall have the right to conduct any number of Auctions on the Auction Date to accommodate multiple bids that comprise a single Qualified Bid, if the Debtors determine, in their reasonable business judgment that conducting such auctions would be in the best interests of the Debtors' estates. If the Debtors receive no more than one Qualified Bid, the Debtors may cancel the Auction and instead request at the Sale Hearing that the Bankruptcy Court approve the bid proposed by the sole Qualified Bid. |
| | Transcription. The bidding at the Auction shall be transcribed and the Debtors shall maintain a transcript of all bids made and announced at the Auction. |
| | Participants and Attendees: Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with the Bidding Procedures. Qualified Bidders participating in the Auction must appear in person at the Auction, or through a duly authorized representative. The Debtors may, in their sole and exclusive discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction. Each of the Consultation Parties shall be entitled to have a reasonable number of representatives and/or professional advisors attend the Auction. |
| | Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (A) it has not engaged in any collusion with respect to the submission of any bid or the Auction, and (B) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets identified in such bid if selected as the Successful Bidder. |

17

| | |
|---|---|
| **Baseline Bid** | Bidding shall commence at the amount of the Qualified Bid that the Debtors, in consultation with the Consultation Parties, determine in their business judgment to be the highest or otherwise best Qualified Bid (the "Baseline Bid"). If a Stalking Horse Purchaser is selected and approved, the Stalking Horse Purchaser's bid shall constitute the Baseline Bid attributable to Assets sought to be purchased by the Stalking Horse Purchaser (the "Stalking Horse Assets"). |
| **Minimum Overbid** | Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the relevant Assets; provided, however, that to the extent that there is more than one Qualified Bid for the Stalking Horse Assets, the bidding for Stalking Horse Assets will start at an amount equal to the proposed purchase price, plus the aggregate amount of the Break Up Fee and the Expense Reimbursement, if any. The minimum required increments for successive Qualified Bids (each such bid, a "Minimum Overbid") will be announced at the outset of the Auction. The Debtors may, in their reasonable business judgment, and after consulting with the Consultation Parties, announce increases or reductions to Minimum Overbids at any time during the Auction.

Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any bid subsequent to a Baseline Bid, the Debtors will, at each round of bidding, give effect to the Bid Protections payable to the Stalking Horse Purchaser under the Stalking Horse APA, if any, as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs that may be imposed on the Debtors. To the extent that a Minimum Overbid has been accepted entirely or in part because of the addition, deletion, or modification of a provision or provisions in any Stalking Horse APA, the Debtors will identify such added, deleted, or modified provision or provisions and the value thereof. |
| **Leading Bid** | After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer for the relevant Assets (the "Leading Bid"). Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

The Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to their APA at the Auction to improve their bids. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

The Debtors shall have the right, after consulting with the Consultation Parties, to determine, in their reasonable business judgment, which bid is the highest or otherwise best bid with respect to the applicable Asset(s) and reject at any time, without liability, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules, or the Local Bankruptcy Rules for the Southern District of New York, these Bidding Procedures, any order of the Bankruptcy Court, or the best interests of the Debtors and their estates.

Any Leading Bid made from time to time by a Qualified Bidder must remain |

| | open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher or otherwise better bid submitted by another Qualified Bidder during the Auction as a Leading Bid and (ii) such Leading Bid is not selected as the Backup Bid.<br><br>To the extent not previously provided (which will be determined by the Debtors), a Qualified Bidder submitting a subsequent bid must submit at the Debtors' request, as part of its subsequent bid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction at the purchase price contemplated by such subsequent bid. |
|---|---|
| **Successful Bids** | Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (A) determine, consistent with the Bidding Procedures, which bid constitutes the highest or otherwise best bid(s) for the applicable Asset(s) (each such bid, a "Successful Bid"); and (B) notify all Qualified Bidders at the Auction for the applicable Asset(s) of the identity of the bidder that submitted the Successful Bid (each such bidder, the "Successful Bidder") for such Asset(s) and the amount of the purchase price and other material terms of the Successful Bid. |
| **Backup Bids** | Immediately prior to the conclusion of the Auction, the Debtors may, in consultation with the Consultation Parties, (a) determine, consistent with these Bidding Procedures, which Qualified Bid is the next highest or otherwise best Qualified Bid for the relevant Assets after the Successful Bid (each such Qualified Bid, a "Backup Bid"); and (b) notify all Qualified Bidders at the Auction for the applicable Asset of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid.<br><br>Backup Bids must remain open until the Debtors' consummation of a sale with the Successful Bidder.  If the Successful Bidder for the applicable Assets fails to consummate a Sale Transaction, the Backup Bidder shall be deemed the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate a Sale Transaction for the applicable Assets with the Backup Bidder. |
| **Auction Results** | On or before **January 20, 2017 at 5:00 p.m. (prevailing Eastern Time)**, the Debtors shall file with the Bankruptcy Court and serve on the Sale Notice Parties the results of the Auction, which shall include (i) a copy of the Successful Bid and Backup Bid and (ii) the identity of the Successful Bidder and Backup Bidder.<br><br>On or before **January 20, 2017**, the Debtors shall file with the Bankruptcy Court and serve on the Sale Notice Parties the Notice of the Proposed Assumed Contracts. |
| **Modification of Procedures** | The Debtors may, after consulting with the Consultation Parties, modify the rules, procedures, and deadlines set forth herein (including, without limitation, extending the Bid Deadline, modifying the Qualified Bid Requirements, modifying the procedures for conducting the Auction, rescheduling the Auction, or adjourning the Sale Hearing), or adopt new rules, procedures, and deadlines or otherwise modify these Bidding |

|   | Procedures in order to, in their reasonable discretion, better promote the goals of such procedures, namely, to maximize value for the estates.  All such modifications and additional rules will be communicated to each of the Notice Parties, Prospective Bidders, and Qualified Bidders. |
|---|---|

### B.   Notice Procedures

22.     The Debtors request approval of the Sale Notice substantially in the form attached to the Bidding Procedures Order as Exhibit 3.  Within two (2) business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by first class mail or email on:  (a) the Consultation Parties (as applicable); (b) all persons and entities known by the Debtors to have expressed an interest to the Debtors in a Sale Transaction involving any of the Assets during the past twelve (12) months, including any person or entity that has submitted a bid for any of the Assets, as applicable; (c) all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors); (d) all non-Debtor parties to any Contracts that are proposed to be assumed or rejected in connection with a Sale Transaction; (e) any governmental authority known to have a claim against the Debtors in these chapter 11 cases; (f) the United States Attorney General; (g) the Antitrust Division of the United States Department of Justice; (h) the United States Attorney for the Southern District of New York; (i) the Office of the Attorney General in Washington, Minnesota, New York, and Delaware; (j) the Federal Trade Commission; (k) the office of the United States Trustee for the Southern District of New York; (l) the Internal Revenue Service; (m) the United

States Securities and Exchange Commission; (n) all of the Debtors' known creditors (for whom identifying information and addresses are known to the Debtors); (o) all parties who have filed a notice of appearance and request for service of papers in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and (p) all other persons and entities as directed by the Court.

23.     Additionally, the Debtors will cause the material information contained in the Sale Notice to be published in condensed format once in modified and/or condensed form in the Wall Street Journal, New York Times, or USA Today.

24.     The Debtors submit that the procedures described above (the "Notice Procedures"), coupled with the Assumption and Assignment Procedures further described below, constitute adequate and reasonable notice of the key dates and deadlines for the Sale, including, among other things, the deadline to object to the Sale of the Assets, assumption and assignment of the Contracts, the Auction, the Bid Deadline, and the Sale Hearing.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

25.     In connection with any Sale Transaction, the Debtors propose to assume and assign to the Successful Bidder(s) the Proposed Assumed Contracts (defined below).  The Assumption and Assignment Procedures will, among other things, notice the Counterparties of the potential assumption and assignment of their Contracts and the Debtors' calculation of Cure Costs with respect thereto. Specifically, the Assumption and Assignment Procedures provide that:

(a)    <u>Assumption and Assignment Notice</u>:  Within two (2) business days after the entry of the Bidding Procedures Order, the Debtors shall file with the Bankruptcy Court and serve on the Sale Notice Parties, including each Counterparty to a Contract that may be assumed, in connection with any Sale Transaction the Assumption and Assignment Notice, which shall (i) identify the Contracts; (ii) list the Debtors' good faith calculation of Cure Costs with respect to each Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject the agreement of the Successful Bidder and Court approval; and (iv) prominently display the deadline to file objections to the assumption, assignment, or sale of the Debtors' Proposed Assumed Contracts.  In the event that the Debtors identify Counterparties that were not served with the Assumption and Assignment Notice, the Debtors may subsequently serve such Counterparty with an Assumption and Assignment Notice, and the following procedures will nevertheless apply to such Counterparty; <u>provided</u>, <u>however</u>, that the deadline to file a Cure Objection or  Assignability Objection with respect to such additional Counterparty shall be 5:00 p.m. (prevailing Eastern Time) on the date that is 14 days following service of the Assumption and Assignment Notice.

(b)    <u>Cure Objections and/or Assignability Objections</u>.

(i)    <u>Deadline</u>:  Any Counterparty to a Contract that wishes to object to the proposed assumption, assignment, and sale of the Proposed Assumed Contract on any grounds (other than Adequate Assurance Objections, as noted below), including the subject of which objection is either (i) the Debtors' proposed Cure Costs to cure any outstanding monetary defaults then existing under such contract (each, a "Cure Objection") and/or (ii) an objection to the assignability of the Contract, whether on grounds that such contract is not assignable, is not an executory contract or unexpired lease, or otherwise (each, an "Assignability Objection"), shall file with the Bankruptcy Court and serve on the Objection Recipients its Cure Objection and/or Assignability Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than

22

**January 6, 2017 at 5:00 p.m. (prevailing Eastern Time)**.

(ii)  <u>Resolution</u>:  The Debtors and a Counterparty that has filed a Cure Objection and/or Assignability Objection shall first confer in good faith to attempt to resolve the Cure Objection and/or Assignability Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection and/or Assignability Objection prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such Cure Objection and the assignability of the Contract shall be determined by the Bankruptcy Court at the Sale Hearing <u>provided</u> that, a Cure Objection may, at the Debtors' discretion, after consulting with the Consultation Parties and the applicable Successful Bidder, be adjourned (an "Adjourned Cure Objection") to a subsequent hearing. An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction; <u>provided</u> that, the Debtors maintain a cash reserve equal to the cure amount the objecting Counterparty believes is required to cure the asserted monetary default under the applicable Contract.  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Cure Objection shall be deemed assumed and assigned to the applicable Successful Bidder, as of the closing date of the applicable Sale Transaction.  All objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under a Contract will be heard at the Sale Hearing, except with respect to an Adjourned Cure Objection as set forth herein.

(iii)  <u>Failure to Timely Object</u>:  If a Counterparty fails to timely file with the Bankruptcy Court and serve on the Objection Recipients a Cure Objection and/or Assignability Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Contract (unless such Counterparty has timely filed an Adequate Assurance

23

Objection (as defined below) with respect to the Contract, in which case the Counterparty may only object to the Successful Bidder's adequate assurance) to the Successful Bidder and forever shall be barred from asserting any objection with regard to such assumption, assignment, and sale. The Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in any Contract, or any other document, and the Counterparty to the Contract shall be deemed to have consented to the Cure Costs and forever shall be barred from asserting any other claims related to such Contract against the Debtors or any Successful Bidder(s) or their property.

(c)     <u>Proposed Assumed Contracts Notice</u>:  No later than one (1) business day after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court, serve on the Sale Notice Parties, including each applicable Counterparty, a list of the Proposed Assumed Contracts that the Debtors will seek to assume and assign at the Sale Hearing (the "Proposed Assumed Contracts Notice").

(d)     <u>Adequate Assurance Objections</u>.

(i)     <u>Deadline</u>:  Any Counterparty to a Proposed Assumed Contract that wishes to object to the proposed assumption, assignment, and sale of the Proposed Assumed Contract, the subject of which objection is a Successful Bidder's proposed form of adequate assurance of future performance with respect to such contract (each, an "Adequate Assurance Objection"), shall file with the Bankruptcy Court and serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **January 24, 2017, at 5:00 p.m. (prevailing Eastern Time)**.

(ii)     <u>Resolution of Objections</u>:  The Debtors and a
Counterparty that has filed an Adequate Assurance
Objection shall first confer in good faith to attempt to
resolve the Adequate Assurance Objection without
Court intervention.  If the parties are unable to
consensually resolve the Adequate Assurance
Objection prior to the commencement of the Sale
Hearing, such objection and all issues of adequate
assurance of future performance of the applicable
Successful Bidder shall be determined by the
Bankruptcy Court at the Sale Hearing.

(iii)    <u>Failure to Timely Object</u>:  If a Counterparty fails to
timely file with the Bankruptcy Court and serve on the
Objection Recipients an Adequate Assurance
Objection, the Counterparty shall be deemed to have
consented to the assumption, assignment, and sale of
the Proposed Assumed Contract (unless the
Counterparty has filed a timely Cure Objection and/or
Assignability Objection with respect to the Proposed
Assumed Contract, the deadline and procedures for
resolution and adjudication of which are set forth
above) to the Successful Bidder and forever shall be
barred from asserting any objection.  The Successful
Bidder shall be deemed to have provided adequate
assurance of future performance with respect to the
applicable Proposed Assumed Contract in accordance
with Bankruptcy Code section 365(f)(2)(B),
notwithstanding anything to the contrary in the
Proposed Assumed Contract, or any other document.

## BASIS FOR RELIEF

**A.    The Bidding Procedures Are Appropriate and Are in the Best
Interests of the Debtors and their Estates**

26.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in

the ordinary course of business may be by private sale or by public auction."  The

paramount goal of any proposed sale of property of a debtor's estate is to maximize

the value of the sale proceeds received by the estate.  <u>See</u> <u>Official Committee of</u>

Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir.

2003) (the debtor has the "fiduciary duty to maximize the value of the bankruptcy

estate."); Burtch v. Ganz (In re Mushroom Co.), 382 F.3d 325, 339 (3d Cir. 2004)

(finding that debtor "had a fiduciary duty to protect and maximize the estate's

assets."); In re Food Barn Stores, Inc., 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a

primary objective of the Code [in asset sales is] to enhance the value of the estate at

hand.") (citing Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re

Midway Airlines, Inc.), 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances

one of the Code's central purposes, the maximization of the value of the bankruptcy

estate for the benefit of creditors.").

        27.    Courts uniformly recognize that procedures established for the

purpose of enhancing competitive bidding are consistent with the fundamental goal

of maximizing value of a debtor's estate.  See Calpine Corp. v. O'Brien Envtl.

Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999)

(noting that bidding procedures that promote competitive bidding provide a benefit

to a debtor's estate); In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr.

S.D.N.Y. 1992) ("court-imposed rules for the disposition of assets . . . [should]

provide an adequate basis for comparison of offers, and [should] provide for fair and

efficient resolution of bankrupt estates.").

        28.    The Debtors, with the assistance of their advisors, have

structured the Bidding Procedures to attract competitive and active bidding from

those parties with the financial capability to do so.  The Bidding Procedures will

26

allow the Debtors to conduct the Auction in a fair, controlled, and transparent

manner that will encourage participation by financially capable bidders that

demonstrate the financial wherewithal to close a transaction.  Accordingly, the

Bidding Procedures should be approved as reasonable, appropriate, and in the best

interests of the Debtors, their estates, and all parties in interest.

### B.    Entry into a Sale Transaction is a Sound Exercise of the Debtors' Business Judgment

29.    Bankruptcy Code section 363 provides that the debtor may,

"after a notice and a hearing . . . use, sell, or lease, other than in the ordinary course

of business, property of the estate."  11 U.S.C. § 363.  In turn, Bankruptcy Code

section 105(a) provides that the court "may issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C.

§ 105(a).

30.    While the Bankruptcy Code does not specify the appropriate

standard for approving the sale of property under section 363, courts uniformly agree

that a business judgment standard applies.  See, e.g., Meyers v. Martin (In re Martin),

91 F.3d 389, 395 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991));

In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephen Indus., Inc. v.

McClung, 789 F.2d 386 (6th Cir. 1986); Committee of Equity Security Holders v.

Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  Courts

typically apply four factors in determining whether a section 363 sale is appropriate,

namely whether:  (a) a sound business justification exists for the sale; (b) adequate

and reasonable notice of the sale was provided to interested parties; (c) the sale will produce a fair and reasonable price for the property; and (d) the parties have acted in good faith.  Id. at 1070 (setting forth the "sound business" purpose standard for the sale of the debtor's assets under section 363 of the Bankruptcy Code); In re Decora Indus., Inc., Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting Lionel factors) (citing Guilford Trans. Indus., Inc. v. Del. & Hudson Ry. Co. (In re Del. & Hudson Ry. Co.), 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)).  As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting Smith v. Van Gorkcom, 488 A.2d 858, 872 (Del. 1985)).

> 1.     **The Debtors Have Demonstrated a Sound Business
> Justification for the Sale of the Assets**

31.     A sound business justification exists where a sale of the debtor's assets is necessary to preserve the value of a Debtor's estates.  See, e.g., In re Del. & Hudson Ry. Co., 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . ."); In re Lionel Corp., 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b)

application expressly find from the evidence presented before him . . . a good

business reason to grant" the sale).

32.     As set forth above, in the First Day Declaration and in the Sale

Declaration, the Debtors have demonstrated a sound business justification for entry

into any Sale Transaction that may result from the Auction.  The Debtors are no

longer able to operate their businesses as currently constituted without near-constant

infusions of cash.  A sale is necessary to rehabilitate the business in order to

maximize the value of the Assets, consistent with the Debtors' fiduciary duties to

their economic stakeholders.

## 2.     The Notice Procedures Are Appropriate and Comply with Bankruptcy Rule 2002

33.     Bankruptcy Rule 2002 (a) and (c) require the Debtors to notify

creditors of the Sale, including a disclosure of the time and place of any auction, the

terms and conditions of the sale and the deadline for filing any objections.

34.     The Debtors submit that the Notice Procedures comply with

Bankruptcy Rule 2002 and are reasonably calculated to provide all creditors and

known parties in interest with adequate and timely notice of a Sale Transaction, the

Bidding Procedures, the Auction and the Sale Hearing.  Moreover, the Debtors are

publishing the material information contained in the Publication Notice in the <u>Wall

Street Journal</u>, <u>New York Times</u> or <u>USA Today</u>.  The Debtors request that the Court

approve the Notice Procedures as set forth herein, including the form and manner of

the Sale Notice and that no other further notice of the Bidding Procedures, the

Auction, and the Sale Hearing is necessary or required.

### 3.   The Proposed Sale Will Yield a Fair and Reasonable Purchase Price

35.    As set forth above, the Debtors believe that the proposed Sale

will yield a fair and reasonable price for the Assets.  The Bidding Procedures were

carefully designed to ensure that the Auction, if necessary, will yield the maximum

value for the Debtors' economic stakeholders.  The Debtors have constructed the

Bidding Procedures to encourage competitive bidding, while giving the Debtors the

opportunity to review and analyze all competitive bids, only from Qualified Bidders,

who will have been vetted prior to the Auction.  These carefully constructed

measures will prevent any bid that does not constitute a fair and adequate purchase

price for the Assets or any combination thereof.

36.    Further, parties in interest will have the opportunity to conduct

in-depth diligence as set forth in the Bidding Procedures.  These parties will also

have the opportunity to bid on a combination of, substantially all or a portion of the

Assets.

4.      **The Bidding Procedures Ensure a Good Faith Process and the Ultimate Purchaser of the Assets Is Entitled to the Protections of Bankruptcy Code Section 363(m)**

37.     Bankruptcy Code section 363(m) is designed to protect the sale of a debtor's assets to a good faith purchaser.  Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . .were stayed pending appeal.

11 U.S.C. § 363(m).

38.     While the Bankruptcy Code does not define good faith, the United States Court of Appeals for the Third Circuit has held that indices of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.), 788 F.2d 143, 147 (3d Cir. 1986) (quoting Hoese Corp. v. Vetter Corp. (In re Vetter Corp.), 724 F.2d 52, 55 (7th Cir. 1983) (other citations omitted); see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) (noting that the type of "misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud,

collusion between the [purchaser] and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders.").

39.     The Bidding Procedures were designed with the goal of producing a fair and transparent bidding process to allow the Debtors to generate the best offer for the Assets.  The Successful Bidder(s) and the Debtors will have negotiated at arm's-length and in good faith for the purchase of the Assets, backed by the Court-approved Auction.  As such, the Debtors request that the ultimate purchaser of the Assets be entitled to the protections of Bankruptcy Code section 363(m).

## C.     The Sale of the Assets Free and Clear of Liens, Claims, Interests, and Encumbrances Is Appropriate under Bankruptcy Code Section 363(f)

40.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of each lien, claim, interest, and encumbrance provided that one of the following conditions are met:

a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.     the entity holding each such interest consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5).

32

41. The Debtors represent that, whatever Sale Transaction is pursued, such Sale Transaction will satisfy one of the five requirements set forth under Bankruptcy Code section 363(f), including (without limitation) that the holder of each lien on the Assets will consent to the sale or the purchase price will be at least as much as the actual value of any such lien. As such, the Debtors may sell the Assets free and clear of any and all liens, claims, and encumbrances. Any lien holder will be adequately protected by attachment of its lien to the net proceeds of the Sale Transaction, subject to any claims and defenses that the Debtors may have with respect thereto. Accordingly, the Debtors request that the Court authorize the Debtors to sell the Assets free and clear of any liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f).

### D.    Assumption and Assignment of Executory Contracts

42. Bankruptcy Code section 365(a) provides that a debtor "subject to the court's approval, may assume or reject any executory contract . . ." 11 U.S.C. § 365(a).

43. Courts employ a business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract. See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business

judgment by the bankruptcy court. . .").  The business judgment test "requires only

that the trustee [or debtor in possession] demonstrate that [assumption] or rejection

of the contract will benefit the estate."  Wheeling-Pittsburgh Steel Corp. v. West

Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr.

W.D. Pa. 1987).

44.    At the Auction, the Debtors propose to assume and assign the

Contracts to the Successful Bidder(s) as part of the Sale Transaction(s).  Assumption

of the Proposed Assumed Contracts is a sound exercise of the Debtors' business

judgment.  Assuming and assigning the Proposed Assumed Contracts will enable the

Debtors to garner the highest or otherwise best offer for the Assets, by enabling the

Debtors to offer parties in interest with a combination of Contracts that are in some

instances an integral part of the Assets that the Debtors seek to sell.

45.    Bankruptcy Code section 365(f) requires, in part, that the

assignee of any executory contract provide "adequate assurance of future

performance . . . whether or not there has been a default in such contract."  11 U.S.C.

§ 365(f)(2).  Section 365(b), which codifies the requirements for assuming an

executory contract, provides, in pertinent part that the debtor may only assume an

executory contract if it:

> (A) cures, or provides adequate assurance that the
> [debtor] will promptly cure[s] [any defaults existing
> under the executory contract];
>
> (B) compensates, or provides adequate assurance that
> the [debtor] will promptly compensate, a party other
> than the debtor to such contract . . . for any actual

34

> pecuniary loss to such party resulting from such
> default; and
>
> (C) provides adequate assurance of future performance
> under such contract or lease.

11 U.S.C. § 365(b).

46.    While undefined by the Bankruptcy Code, adequate assurance

is guided by "a practical, pragmatic construction based upon the facts and

circumstances of each case."  Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes,

Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting In re Bon Ton Restaurant &

Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1995)); see also In re Alipat,

Inc., 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term

adequate assurance "borrowed its critical language . . . from Section 2-609 of the

Uniform Commercial Code" which "suggest[s] that adequate assurance is to be

defined by commercial rather than legal standards . . . [and] factual considerations").

While no single standard governs every case, adequate assurance "will fall

considerably short of an absolute guarantee of performance."  In re Carlisle Homes,

Inc., 103 B.R. at 538.  Adequate assurance may be provided by demonstrating the

assignee's financial health and experience in managing the type of enterprise or

property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr.

S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar

business, and financial wherewithal satisfied the adequate assurance requirement of

section 365 of the Bankruptcy Code).

47.     The Bidding Procedures specifically require any Qualified Bidders to provide financial and other information that would provide the Counterparties with adequate assurance of future performance of the applicable obligations under any Proposed Assumed Contracts included as part of a Qualified Bid.  Moreover, the Debtors will provide adequate assurance information to all Counterparties to the Proposed Assumed Contracts, and upon request by such Counterparty, furnish additional adequate assurance information if reasonable and appropriate under the circumstances.  Finally, Counterparties unsatisfied with the proposed adequate assurance of future performance provided to them will be able to lodge objections with respect thereto.

48.     Accordingly, the Debtors have satisfied the requirements of Bankruptcy Code section 365 with respect to the assumption and assignment of the Proposed Assumed Contracts.

49.     In order to facilitate the assumption and assignment of the Proposed Assumed Contracts, the Debtors respectfully request that the Court find that all anti-assignment provisions included in the Proposed Assumed Contracts, including those Proposed Assumed Contracts that have the effect of restricting or limiting assignment, to be unenforceable and prohibited pursuant to Bankruptcy Code section 365(f).[5]

---

[5]     Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease. . ." 11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a

E.    **The Sale of the Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman**

50.    Bankruptcy Code section 363(b)(1) provides that a debtor may not sell or release personally identifiable information about individuals unless either the sale complies with the debtor's privacy policies previously given to consumers and these policies remain in place, or a consumer privacy ombudsman is appointed pursuant to Bankruptcy Code section 332.

51.    Here, the Debtors submit that, under the circumstances, the transfer of personally identifiable information is permitted by the terms of its existing privacy policy.  The Debtors' existing privacy policy provides:

We may share personal information: . . .

To assign, sell, license, or otherwise transfer to a third party, all information collected from or in relation to you in connection with an assignment, sale, joint venture, bankruptcy proceeding, or other transfer or disposition of a portion or all of the assets or stock of Scout or its affiliated entities.

See Scout Privacy Policy, Last Updated July 6, 2016.

52.    Accordingly, because the transfer of this information is consistent with the Debtors' privacy policy, the Debtors submit that there is no need for the appointment of a consumer privacy ombudsman.

---

provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

## REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

53.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the

Debtors seek (a) entry of an order granting the relief sought herein, and (b) a waiver

of any stay of the effectiveness of such an order.  Bankruptcy Rule 6004(h) provides

that "[a]n order authorizing the use, sale, or lease of property other than cash

collateral is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  Bankruptcy Rule 6006(d) provides that "[a]n order

authorizing the trustee to assign an executory contract or unexpired lease under

§ 365(f) is stayed until the expiration of 14 days after entry of the order, unless the

court order otherwise."

54.     As set forth above, the relief requested herein is necessary and

appropriate to maximize the value of the Debtors' estates for the benefit of their

economic stakeholders.  Accordingly, the Debtors submit that ample cause exists to

justify (a) the immediate entry of an order granting the relief sought herein and (b) a

waiver of the 14 day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the

extent that each Rule applies.

## NOTICE

55.     Notice of this motion shall be given to (a) the Office of the

United States Trustee for the Southern District of New York; (b) those creditors

holding the 30 largest unsecured claims against the Debtors' estates; (c) counsel to

the Lender; (d) the Bridge Lenders; and (e) the Internal Revenue Service; and (f) the

Securities and Exchange Commission.  The Debtors submit that no other or further

notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court

(i) enter the Bidding Procedures Order following the Bid Procedures Hearing;

(ii) enter the Sale Order following the Sale Hearing; and (ii) grant the Debtors such

further relief as may be appropriate.


Dated:  December 9, 2016              **WOMBLE  CARLYLE  SANDRIDGE  &
                                      RICE, LLP**

                                      */s/ Matthew P. Ward*
                                      Matthew P. Ward (DE Bar No. 4471)
                                      Ericka F. Johnson  (DE Bar No. 5024)
                                      Morgan L. Patterson (DE Bar No. 5388)
                                      Nicholas T. Verna (DE Bar No. 6082)
                                      222 Delaware Avenue, Suite 1501
                                      Wilmington, DE 19801
                                      Telephone: (302) 252-4320
                                      Facsimile: (302) 252-4330
                                      E-mail: maward@wcsr.com
                                      E-mail: erjohnson@wcsr.com
                                      E-mail: mpatterson@wcsr.com
                                      E-mail: nverna@wcsr.com

                                      *Proposed Counsel to the Debtors
                                      and Debtors-in-Possession*