**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SCOUT MEDIA, INC., et al.,[1] | ) | Case No. 16-13369-MEW |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |
| | ) | |

## DECLARATION OF CRAIG AMAZEEN
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS
## AND FIRST DAY MOTIONS

I, Craig Amazeen, hereby declare under penalty of perjury:

1.      I am the President of Scout Media Holdings, Inc. ("SMHI"),

Scout Media, Inc. ("SMI"), FTFS Acquisition, LLC ("FTFSA"), and Scout.com,

LLC ("S.com" and together with SMHI, SMI, and FTFSA, the "Debtors").  In this

capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial

affairs, and books and records.  I have been the President of Scout since July 2016.  I

have twenty-one years of senior leadership experience in the sports industry.  Prior to

joining the Debtors, I served as SVP with the Sacramento Kings (NBA), leading all

content aggregating departments, including broadcast, digital, marketing, creative

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number are: Scout Media Holdings, Inc. (1936), Scout Media, Inc. (1438), FTFS Acquisition, LLC (7230), and Scout.com, LLC (3269).  The location of the Debtors' headquarters and the Debtors' service address is 122 West 26th Street, Fifth Floor, New York, NY 10036.

services, and brand development.  Prior to the Kings, I served in leadership positions

with the Arizona Cardinals (NFL) and the Phoenix Coyotes (NHL).  I am a ten-time

Emmy and eight-time Gold Advertising (Addy) Award winner.

2.       On December 1, 2016 (the "SMI Petition Date"), an

involuntary petition was filed against Scout Media, Inc. ("Scout Media" or "SMI"),

and on the date hereof (the "Remaining Debtors' Petition Date" and, together with

the SMI Petition Date, the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101, et seq. (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors in possession pursuant to

Bankruptcy Code sections 1107(a) and 1108.  Concurrently herewith, the Debtors

filed a motion seeking joint administration of these chapter 11 cases (collectively, the

"Cases") pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

3.       I submit this declaration (the "First Day Declaration") to

provide an overview of the Debtors and these Cases and to support the Debtors'

chapter 11 petitions and first day motions (each, a "First Day Motion," and,

collectively, the "First Day Motions").[2]

---

[2]       All capitalized terms used but otherwise not defined herein shall have the meanings set forth
          in the relevant First Day Motion.

4.      Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team and the Debtors' advisors, or my opinion based on my experience with and knowledge of Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

### Preliminary Statement

5.      The primary operating company of the Debtors is SMI.  SMI is a privately held digital sports media company that publishes and distributes content related to the National Football League (the "NFL"), fantasy sports, college football and basketball, high school recruiting, hunting, fishing, outdoors, military, and history.  In 2013, Fox Sports sold Scout Media to North American Membership Group Holdings, Inc., which remains a non-debtor affiliate of Scout Media Holdings, Inc.  Since that time, SMI emerged as a leader in the digital sports media market with its growth supported by a series of successful partnerships, including its alliance with iHeartMedia in January 2016.

6.      SMI owns and operates a digital network of 150 team-specific, credentialed publishers and their respective social communities.  These publishers are critical to the Debtors' success.  They produce premium video and story content

on a proprietary network that enables users to consume the latest news, rankings, analysis, and engage with other like-minded fans.  SMI is the only sports network with a full-time video channel for every NFL and major college team.  SMI produces approximately 11,000 stories and 1,000 premium videos monthly.

7.     Despite being a leading sports information destination, the Debtors have been affected by the perfect storm of an unsustainable balance sheet combined with complications arising from litigation on multiple fronts from certain judgment creditors.  In addition, the Debtors believe that its former Chief Executive Officer may have breached duties owed to the company that contributed to the near term prospect of inadequate liquidity.  This led to the departure of the Chief Executive Officer and a number of others on the Debtors' management team.

8.     Faced with these challenges, the Debtors engaged Sherwood Partners, Inc. ("Sherwood") as its financial advisor, to help develop and implement one or more strategic alternatives that would de-lever the Debtors' capital structure.

9.     Unable to address adequately their cash needs outside of bankruptcy, the Debtors commenced these Cases to implement a dual-track process to maximize value for their stakeholders and seek to preserve jobs by pursuing (a) a sale of substantially all their assets and the transition of their employees, operations, and files, and (b) an orderly wind-down of their businesses, to the extent necessary.

10.    In connection with the commencement of these Cases, and to optimize their chances of successfully completing a going concern sale, the Debtors have negotiated with their first lien secured lender, Multiplier Capital, LP, to obtain

the debtor in possession financing with a budget that is designed to meet the

Debtors' objectives in these Cases.

11.    To familiarize this Court with the Debtors, their businesses,

and the first day relief the Debtors seek in order to stabilize their operations and

facilitate their restructuring efforts, this First Day Declaration is organized into five

sections.  Section I provides information with respect to the Debtors' corporate

structure; Section II describes the Debtors' businesses and operations; Section III

summarizes the Debtors' prepetition capital structure and indebtedness; Section IV

sets forth the circumstances leading to the commencement of these Cases; and

Section V summarizes the relief requested in, and the facts supporting, each of the

First Day Motions.

## I.
## Corporate Structure

12.    SMI began its operations under its current organizational

structure on or about November 2013, when Fox Sports sold SMI to NAMG.

NAMG's acquisition of Scout Media was financed largely with debt borrowings and

cash on hand.

13.    Following the acquisition, SMI became a subsidiary of SMHI.

The following is the Debtors' organizational chart as of the Petition Date.  The

Debtors have several non-debtor affiliates that are not operating and that do not hold

assets that are not depicted on the organizational chart.



14.    SMHI, a Delaware corporation, serves as a holding company and its purpose was to facilitate the acquisition of its subsidiaries and to hold interests in such subsidiaries.  SMHI also incurred debt to make such acquisitions, and provides management and corporate oversight for the operations of SMHI's subsidiaries.

15.    SMI, a Washington corporation, is the primary operating entity within the Debtors' organizational structure.  Members enter into membership agreements with SMI to access content produced by SMI.  Additionally, advertisers pay for access to SMI's digital resources to use as marketing platforms.  SMI is the primary revenue generator for the Debtors.

16.    S.com, a Washington limited liability company, has no operations.  Its primary purpose is to hold the Debtors' domain names, including, but not limited to, scout.com.

17.    FTFS, a Delaware limited liability company, was formed for the purpose of acquiring the Debtors' fantasy football business.

**II.**

**Current Businesses and Operations**

18.    The Debtors are a leading provider of digital sports media and information, including college football and basketball recruiting content.  The Debtors' Custom Player Database permits users to access "up to the day" information about the players being recruited by their favorite college teams as information is posted by the Debtors' recruiting experts.  The Debtors have exclusive, professional, and accredited journalists, including Heisman trophy voting writers, who provide in depth expert analysis and inside information to SMI members.

19.    SMI's revenue is derived primarily from advertising, membership subscriptions, and other sources.  SMI members subscribe and gain access to premium content, including articles and videos that are first available to members, and in certain circumstances, may only be available to members.  Members are also able to access an elite community of expert writers, insiders, and fans online to exchange thoughts and insights.  They receive discounts on tickets and are able to get expert advice on fantasy sports.

20.    The Debtors also generate revenue branded and programmatic advertising on their website Scout.com.  Programmatic advertising allows the advertiser to tailor specific messages to a target audience creating more effective advertising.  The Debtors' other advertising revenue is derived from sponsorships.

21.     The following chart depicts the Debtors' fiscal year 2015 revenue by segment on a consolidated basis:



### III.
### The Prepetition Capitalization and Indebtedness

**A.     First Lien Obligations**

22.     On November 15, 2013, SMHI, SMI, S.com, and certain of their non-debtor affiliates, as borrowers (the "Borrowers") and Multiplier Capital, LP (the "Lender") entered into that certain Loan and Security Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement," and, together with all associated agreements, instruments, and documents, the "Loan Documents").  Pursuant to the terms of the Loan Documents, the Lender agreed to provide the Borrowers with loans on a first-lien basis.

23.     As of the Petition Date, the Borrowers were indebted in the approximate outstanding principal amount of $10,927,060.44, together with all other liabilities and obligations of the Borrowers arising out of or in connection with the

Loan Documents, including, but not limited to, all accrued and unpaid interest, fees,

costs, and expenses including professional fees (collectively, the "First Lien

Obligations").

### B.    Bridge Loan Obligations

24.    On or about March 11, 2016, certain lenders (collectively, the

"Bridge Loan Lenders") agreed to provide a bridge loan (the "Bridge Loans")

allegedly secured by a second lien on assets of SMHI.  As of the Petition Date, the

aggregate outstanding amount of the Bridge Loans was approximately $11.6 million,

plus accrued interest, fees, and other specified obligations (the Obligations owing to

the Bridge Loan Lenders are referred to herein as the "Bridge Loan Obligations").

25.    Each of the Bridge Loan Lenders executed a Debt and

Security Interest Subordination Agreement dated March 11, 2016 (the

"Subordination Agreement").  Pursuant to the Subordination Agreement, the Bridge

Loan Lenders agreed to subordinate payment by SMHI to the Lender until the First

Lien Obligations were fully satisfied, and they further agreed to subordinate its

security interests in any collateral in which the Lender held liens.

### C.    Collateral for the Secured Facilities.

26.    The First Lien Obligations are secured by properly perfected

security interests in substantially all of each of the Debtors' (other than FTFSA's)

assets, including all accounts, all inventory, all equipment, all deposit accounts, all

general intangibles (including, without limitation all intellectual property), all

investment property, all other property, and any and all claims, rights, and interests

in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of and claims against third parties of, any and all of the above), and all books relating to the above (collectively, the "Pre-Petition Collateral").

27.    The Debtors believe that the liens and security interests of the Lender (the "First Lien Pre-Petition Liens") are:  (i) senior in priority to the security interests of all other persons except for the security interests permitted to exist under Section 2.1 of the Credit Agreement ("Permitted Encumbrances"), to the extent the Permitted Encumbrances are valid, enforceable, and are perfected and are not subject to avoidance, subordination, recharacterization, or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding, and properly perfected and are not subject to avoidance, subordination, or disallowance pursuant to the Bankruptcy Code or applicable law.

28.    The Bridge Loan Obligations are allegedly secured by security interests in assets owned by SMHI.  As of the Petition Date, the Debtors have not conducted a lien analysis with respect to the Bridge Loan Obligations and alleged security interests.

**IV.**
**Events Leading to Chapter 11 Cases and Restructuring Initiatives**

29.    Although the Debtors' management team believes it has a product that is well-received in the marketplace, recent judgment liens and multiple

10

garnishments over the past several months have left the Debtors with limited

liquidity necessary to fund their operations.

A.    **The Debtors' Need for Post-Petition Financing and the Proposed
       Sale of the Debtors' Assets.**

30.    As garnishments resulting from various judgment liens

continued, the Debtors' liquidity became more limited.  Additionally, the turmoil

caused by the Debtors' former Chief Executive Officer's breaches of fiduciary duty

and resulting departure caused upheaval, and certain of the Debtors' key employees,

perhaps concerned about the long-term viability of the Debtors' operations as a

going concern, resigned.

31.    It became increasingly clear during the summer of 2016 that

the Debtors could not continue as they were, and they hired Sherwood, and began a

sales process, seeking a buyer for the shares of SMI to purchase such shares through

an assignment for the benefit of creditors.  While many parties expressed an interest

in purchasing SMI, buyers expressed more willingness to do so through an organized

chapter 11 process that includes protections from successor liability.  Accordingly,

unfortunately, to date no stalking horse bidder has been selected.

32.    The Debtors commenced these Cases with the hope of selling

the assets of Debtors SMI and S.com as a going concern in a competitive auction to

be held in January 2017.  I believe that the proposed marketing period (as more

specifically identified in the motion filed by the Debtors on the date hereof to

approve certain bidding procedures), will allow the Debtors to devote funds to

11

continue operating as usual in these Cases during the period leading up to the auction

so as to preserve the value of their businesses, thereby encouraging a going concern

sale that would save jobs and maximize returns to creditors.

## V.
### Evidentiary Support for First Day Motions

33.    Concurrently with the filing of their chapter 11 petitions, the

Debtors have filed a number of First Day Motions seeking relief that the Debtors

believe is necessary to enable them to operate with minimal disruption and loss of

productivity.  The Debtors request that the relief requested in each of the First Day

Motions be granted as critical elements in ensuring a smooth transition into, and

stabilizing and facilitating the Debtors' operations during the pendency of these

Cases.

34.    I believe, with respect to the First Day Motions requesting

authority to pay discrete prepetition claims, the relief requested is essential to the

Debtors' efforts to preserve and maximize value in these Cases and avoid immediate

and irreparable harm to the Debtors, their estates, and creditors.  I have reviewed

each of the First Day Motions discussed below, and the facts set forth in each First

Day Motion are true and correct to the best of my knowledge and belief with

appropriate reliance on the Debtors' officers and advisors.

**A.**    **Motion For Entry of Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Postpetition Senior Secured Superpriority Financing Pursuant to 11 U.S.C. §§361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 and (B) Utilize Cash Collateral, (II) Granting Priming Liens, Priority Liens, and Superpriority Claims to the DIP Secured Parties, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules and (V) Granting Related Relief (the "DIP Financing Motion")**

35.    In order to fund their working capital needs and keep their operations running through the sales process, the Debtors have secured, subject to Court approval, a $6.2 million postpetition senior secured superpriority debtor-in-possession credit facility (the "DIP Credit Facility") from Multiplier Capital, LP (the "DIP Lender"). The Debtors' obligations under the DIP Credit Facility will be secured by priming liens on substantially all of the Debtors' assets. The DIP Lender is also the prepetition lender. The Bridge Loan Obligations are subordinated to the First Lien Obligations, and there are no other secured liens against the Debtors' assets. Accordingly, consent to the priming of the prior liens has been obtained.

36.    The DIP Credit Facility represents the best terms for debtor in possession financing the Debtors were able to arrange following arms'-length negotiations and an attempt by Sherwood to identify other third party financiers. The DIP Credit Facility will permit the Debtors to fund their businesses through a controlled sale process. Without the funding provided by the DIP Credit Facility, the Debtors will experience an immediate liquidity crisis, and will be unable to conduct a sale process in a way that maximizes value for their creditors. Accordingly, the

DIP Credit Facility will enhance the Debtors' ability to minimize disruption to their business and instill confidence amongst its publishers, members, employees, and service providers, and ensure these parties' continued support pending a sale of the assets of SMI and S.com.

37.    The principal terms of the DIP Credit Facility are described in the DIP Financing Motion.  My declaration in support of the DIP Financing Motion follows:[3]

- The DIP Lenders will provide up to $6.2 million (the "Total Commitment Amount") in senior secured post-petition financing.  Interest shall accrue at 13.00% per annum.

- The borrowers under the DIP Credit Facility are SMHI, SMI, S.com, and FTFS.

- The DIP Credit Facility will be used for general corporate purposes in support of the chapter 11 proceeding in accordance with the budget attached to the DIP Financing Motion.

- Under the DIP Credit Facility, the DIP Lender will be granted a senior, priming security interest upon all accounts, inventory, equipment, deposit accounts, documents, instruments, investment property, general intangibles (including software, copyrights, patents, trademarks and other intellectual property), stock pledge of any subsidiaries (with appropriate provisions for the stock of any foreign subsidiaries), and all other tangible and intangible assets of the Debtors (including avoidance actions).

---

[3]    The following is a summary of the relevant terms, and to the extent there is a discrepancy, the terms of the DIP Credit Facility and any related documents shall govern.

- Events of Default shall include failure to meet any of the Milestones; cancellation or nonperformance by the Debtors' existing publishers that collectively represent more than 15% of the aggregate membership revenues for the last twelve months; unfavorable variance from the Budget of greater than 10% measured on a two-week rolling basis; withdrawal of stalking horse bid (if applicable), case conversion, appointment of Trustee or Examiner, etc.

- The DIP Credit Facility terminates the earlier of 9-weeks or upon the closing of the sale of substantially all assets of SMI and S.com.

- There is an application fee of $65,000, an origination fee of $260,000, and a sliding scale contingency fee ranging from $0 to $500,000, depending on the amount of Unsecured Creditor Proceeds.

38.     Under the terms of the DIP Credit Facility, the Debtors must adhere to the following milestones:

- The Court must enter a final non-appealable order approving the DIP Financing in a form acceptable to the DIP Lender on or prior to January 5, 2017.

- The Court must approve bidding procedures acceptable to the DIP Lender on or before January 5, 2017.

- The Debtors must hold an auction for the sale of the assets of SMI and S.com on or before February 2, 2017.

- The hearing on the sale of the assets of SMI and S.com must occur on or before February 3, 2017.

- The Debtors must close on proposed sale transaction on or before February 6, 2017.

39.     In the event that any of these case milestones are not satisfied, there will be a default under the DIP Credit Facility.  A default under the DIP Credit Facility would likely result in immediate cessation of the Debtors' operations, and

the likely conversion of the Cases to liquidation proceedings under chapter 7 of the

Bankruptcy Code.  The conversion would eliminate any going concern value and

likely reduce creditor recoveries.

**B.     Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

40.     Many of the motions, applications, hearings, and orders that

will arise in these Cases will jointly affect each and every Debtor.  Thus, the Debtors

believe the interests of the various Debtors, their estates, their creditors, and other

parties in interest would be best served by the joint administration of these Cases for

procedural purposes.  In particular, joint administration will ease the administrative

burdens of these Cases on the Debtors, the Court, and all parties in interest.  For

these reasons, I believe that it is in the best interests of the estates and all parties in

interest for the Court to approve the joint administration of the Cases for procedural

purposes only.

**C.     Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Using Their Bank Accounts and Business Forms, (B) Granting the Debtors an Extension to Comply With the Requirements of Section 345(b) of the Bankruptcy Code and Interim Approval of the Debtors' Current Deposit Guidelines, (C) Authorizing the Debtors' Banks to Honor Certain Transfers and Charge Bank Fees and Certain Other Amounts, and (D) Authorizing the Debtors to Manage their Bank Accounts (the "Cash Management Motion")**

41.     By the Cash Management Motion, the Debtors seek entry of

an order authorizing them to:  (a) continue to (i) use, with the same account numbers,

their two bank accounts (collectively, the "Bank Accounts") in their cash

16

management system (as defined herein), (ii) treat the Bank Accounts for all purposes
as accounts of the Debtors as debtors-in-possession, (iii) open new debtor-in-
possession accounts, if needed; (iv) use, in their present form, all correspondence and
Business Forms (defined herein) (including, without limitation, letterhead and
invoices), and other documents related to the Bank Accounts existing immediately
before the Petition Date, without reference to their status as debtors-in-possession;
(b) granting (i) the Debtors an extension to comply with the requirements of
Bankruptcy Code section 345(b) and (ii) interim approval of the Debtors' current
deposit guidelines, (c) authorizing all the Debtors' banks to honor certain transfers
and charge bank fees and certain other amounts; and (d) authorizing the Debtors to
manage their bank accounts.  In connection with this relief, the Debtors respectfully
request a waiver of certain of the operating guidelines established by the Office of
the United States Trustee for the Southern District of New York (the "U.S. Trustee")
that would require the Debtors to close all prepetition bank accounts, open new
accounts designated as debtor in possession accounts, and obtain new checks bearing
a "debtor in possession" legend.

42.    The Debtors maintain bank accounts at Bank of America (the
"Operating Account"), Silicon Valley Bank (the "Secondary Account"), and Bridge
Bank (the "Bridge Bank Account").  The Debtor's cash management functions are
effectuated through the Operating Account and the Bridge Bank Account, which are
utilized by the Debtors to, among other things, remit payments with respect to
accounts payable and payroll obligations.  The Secondary Account merely holds

approximately $123,945, but has been frozen because of creditors' attempts to garnish this account.  In connection with the Bank Accounts, the Debtors utilize preprinted checks, stationery, and other forms and correspondence (collectively, the "Business Forms").

43.     I believe that any disruption of the Debtors' current cash management procedures would impair their operations and ability to optimize business performance to the detriment of parties in interest.  Accordingly, the Debtors request approval of the relief sought in the Cash Management Motion.

**D.      Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Employee Wages, Benefits, and Related Items (the "Employee Wage Motion")**

44.     The Debtors employ approximately thirty-three (33) full-time employees (the "Employees"), approximately half of which work in the Debtors' Hopkins, Minnesota and New York City offices, and approximately half of which work remotely.  All Employees are salaried workers and no employee is employed on an hourly basis.  These Employees perform a variety of critical functions, including, among others, sales, customer service, content production, managing and developing strategic partnerships, and a variety of administrative, legal, accounting, finance, operations, and management related tasks.  The Debtors' workforce is not unionized and none of the Debtors is party to any collective bargaining agreement.

45.     In addition to their Employees, the Debtors supplement their workforce by utilizing approximately six (6) independent contractors (the "Independent Contractors") who are vital to the Debtors' businesses and provide a

wide variety of technology support services to the Debtors that allow the Debtors to operate their business.

46.    In the Employee Wage Motion, the Debtors request an order authorizing them (i) to pay (a) prepetition wages, salaries, and other accrued compensation; (b) unreimbursed and unpaid prepetition business expenses; (c) amounts deducted from employee paychecks that were not then due to be paid over to the intended recipient or account; (d) prepetition contributions to benefit plans and programs, including the Scout Media 401(k) Plan; and (e) all costs and expenses incident to the foregoing payments and contributions, including payroll-related taxes and related processing and administration costs; and (ii) to continue to offer the employee benefit programs.

47.    A stable work force will play a critical role in the uninterrupted continuation of the Debtors' business and the preservation, and maximization of the value of the Debtors' estates during these Cases.  Any significant number of departures or deterioration in morale among the Debtors' small workforce at this time will immediately and substantially adversely impact the Debtors' efforts in chapter 11 and result in immediate and irreparable harm to the Debtors' estates and creditors.  There is a real and immediate risk that if the Debtors are not authorized to continue to honor their prepetition obligations to these parties in the ordinary course, the Employees and Independent Contractors would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations.  Accordingly, the Debtors strongly believe it is critical that they

19

be permitted to pay their Employees and Independent Contractors prepetition wages and continue in the ordinary course to honor the benefit programs that were in effect prior to the Petition Date.

**E.    Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Maintain and File a Consolidated List of Creditors; (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Top Thirty (30) Unsecured Creditors; and (III) Approving the Form and Manner of the Notice of Commencement (the "Consolidated Creditors Motion")**

48.    By the Consolidated Creditors Motion, the Debtors seek entry of an order (i) authorizing the Debtors to maintain and file a consolidated list of creditors; (ii) authorizing the Debtors to file a consolidated list of the Debtors' thirty (30) largest unsecured creditors; and (iii) approving the form and manner of notice of the commencement of these Cases and of the meeting of creditors to be held pursuant to Bankruptcy Code section 341.

49.    I believe that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would better reflect the body of unsecured creditors with the greatest stake in these cases than separate Top 20 Lists for each of the Debtors.  I believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these cases.

50.    The Debtors request that a claims agent, to be selected within seven (7) days after the Petition Date, and not the Clerk, be directed to serve the Commencement Notice attached as Exhibit B to the Creditors List Motion in

20

accordance with Bankruptcy Rule 2002(a).  The Debtors further propose that the

Commencement Notice be served by regular mail, postage prepaid, on those entities

entitled to receive such notice pursuant to Bankruptcy Rule 2002(a).  I believe that

this procedure will provide sufficient notice of the commencement of these Cases

and the Section 341 Meeting.

51.    I believe that these procedures, which I understand commonly

to be approved in bankruptcy cases of similar size and complexity, will improve the

administrative efficiency of these cases, conserve resources, and better serve the

interests of the Debtors and their creditors.

### F.    Motion for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees (the "Taxes Motion")

52.    In the ordinary course of business, the Debtors:  (a) incur

and/or collect taxes, including franchise, unemployment, and other miscellaneous

taxes in the operation of their businesses (collectively, the "Taxes"); (b) incur

business license fees and other similar fees and assessments (collectively, the

"Fees") in connection with obtaining the licenses and permits necessary to operate

their businesses; and (c) remit such Taxes and Fees to various taxing, licensing, and

other governmental authorities (each, an "Authority" and, collectively,

the "Authorities").  The Debtors also seek an order directing their banks to honor,

process, and pay, to the extent funds are available in their accounts, any checks or

wire transfer requests issued by the Debtors with respect to their tax obligations.  The

Debtors pay the Taxes and Fees monthly, quarterly, or annually, in each case as required by applicable laws and regulations.

53.    It is essential that the Debtors be authorized to pay the Taxes and Fees because, in accordance with Bankruptcy Code section 541(d), certain of the Taxes and Fees are "trust fund" taxes and are not property of the debtors' estates.  In addition, the Debtors' directors and officers may be held personally liable for the non-payment of certain taxes.  Certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which would distract the Debtors from their efforts to complete a successful reorganization.

54.    Moreover, any regulatory dispute or delinquency that affects the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole. Accordingly, the Debtors must continue to pay the Taxes and Fees as they become due to ensure that their officers and directors remain focused during these Cases on operating the businesses and implementing a successful restructuring.

55.    I believe that the relief requested in the Taxes Motion is necessary to ensure the effective administration of these cases, and is in the best interests of the Debtors and their creditors.

**G.    Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Prepetition Insurance Coverage (the "Insurance Motion")**

56.    The Debtors are requesting authority (a) continue to maintain prepetition insurance policies and programs, including payment of any prepetition

22

amounts related to those policies and programs and (b) revise, extend, renew, supplement, change such insurance policies and programs, or enter into new policies, as needed in the ordinary course of business. The Debtors also seek an order directing their banks to honor, process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their insurance obligations.

57.    The Debtors maintain policies with respect to, among other things, potential liability arising from automobile, property, cybercrime, directors and officers, total umbrella liability, and workers' compensation policies (collectively, the "Policies"). A schedule of the Debtors' Policies is attached to the Insurance Motion as Exhibit C, and is incorporated herein by reference (the "Policy Schedule").

58.    The annual premiums for the Debtors' Policies total approximately $268,500.00.

59.    The Policies are important to the preservation of the Debtors' businesses, properties, and assets. If the Debtors are unable to make payments that may be required under or in connection with their Policies, insurance coverage may be terminated. The Debtors would then be required to obtain replacement Policies on an expedited basis and at significant cost to the estates. Moreover, even if the Policies are not ultimately terminated, any disruption in the Policies would prevent the Debtors from being able to operate in the ordinary course of their businesses. Given the importance of maintaining the Policies with respect to their business

activities, the Debtors believe it is in the best interests of the estates for the Court to

authorize the Debtors to honor their insurance obligations under the Policies.

**H.      Debtors' Motion for Entry of Interim and Final Orders
(I) Authorizing Debtors to Pay Certain Repetition Claims of
Critical Vendors And (II) Granting Related Relief (the "Critical
Vendor Motion")**

60.      The Debtors are requesting the authority, but not direction, to

pay prepetition claims held by Critical Vendors in an amount not to exceed $975,000

on an interim basis and up to $1,820,000 on a final basis.

61.      In connection with their businesses, the Debtors rely on a

number of third party vendors to provide them with services.  After careful review,

the Debtors determined that a loss of goods or services from certain of these vendors

would cause immediate and irreparable harm their business, reduce their enterprise

value, and/or significantly impair their going-concern viability.  Additionally,

because of, among other things, the specialized services required to operate the

Debtors' business, the Debtors have limited alternatives when going to the market

for these necessary services.

62.      Accordingly, the Debtors seek authority, but not direction, to

honor, in an amount not to exceed the applicable Critical Vendor Cap, their

prepetition obligations to Critical Vendors where such party may, in the Debtors'
reasonable business judgment, be capable of terminating their contract, refuse to
perform under their contract, or where the delay associated with the Debtors' attempt
to enforce the applicable contract would threaten the viability of the Debtors'
operations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the
foregoing statements are true and correct.

Dated:  December 7, 2016

Craig Amazeen
President

25