**KELLEY DRYE & WARREN LLP**
James S. Carr
Jason R. Adams
101 Park Avenue
New York, NY 10078
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors of Scout Media, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SCOUT MEDIA, INC., et al.,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 16–13369 (MEW)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 15**<br><br>**Hearing Date: January 11, 2017 at 2:00 p.m. (ET)**<br>**Objection Deadline: January 4, 2017 at 4:00 p.m. (ET)** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS TO DEBTORS' MOTION FOR**
**ENTRY OF A FINAL ORDER (A) AUTHORIZING POST-PETITION TERM**
**LOAN FINANCING AND USE OF CASH COLLATERAL; (B) GRANTING**
**LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE**
**STATUS; (D) GRANTING ADEQUATE PROTECTION; (D) MODIFYING**
**AUTOMATIC STAY; AND (E) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Scout Media, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this objection (the "Objection") to the Debtors' request for entry of a final order (the "Final Order")[2] approving the

---

[1] The Debtors in these cases are: Scout Media Holdings, Inc.; Scout Media, Inc.; FTFS Acquisition, LLC; and Scout.com, LLC.

[2] Although the Debtors did not file a form of Final Order prior to the filing of this Objection, the Committee received a draft from the Debtors on December 29, 2016, and have prepared this Objection based upon the proposed draft.

*Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507: (A) Authorizing the Debtors to Obtain Postpetition Term Loan Financing; (B) Authorizing Debtors to Use Cash Collateral; (C) Granting Liens and Providing Superpriority Administrative Expense Status; (D) Granting Adequate Protection; (E) Modifying Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* (the "DIP Motion").[3] In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. As set forth in the Committee's preliminary objection to the DIP Motion,[4] the Committee is in favor a financing package and sale process that will (i) maximize value for all creditors; (ii) ensure the administrative solvency of these estates; and (iii) provide for the orderly wind down of these estates to preserve value for unsecured creditors. The Committee raised significant concerns regarding the original financing proposal, including numerous provisions providing inappropriate benefits to Multiplier to the detriment of the Debtors' estates and unsecured creditors. With this Court's assistance, the Committee was ultimately able to negotiate significant revisions to the Interim Order addressing these concerns and allowing the Debtors to move forward with the proposed marketing process pending a final hearing on the DIP Motion. The Committee further preserved its ability to perform its fiduciary obligations to

---

[3] Docket No. 15. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion.

[4] *See Omnibus Objection of the Official Committee of Unsecured Creditors to Debtors' Motions For Entry of Orders: (I) Authorizing Postpetition Financing and Use of Cash Collateral on an Interim Basis; (II) Approving Bidding Procedures and Related Relief; and (III) Authorizing Payment of Critical Vendor Claims on an Interim Basis* (the "Preliminary Objection"). Docket No. 57.

unsecured creditors, including an investigation of Multiplier's alleged prepetition liens and claims.

2. Multiplier, however, now seeks to re-insert certain provisions into the Final Order that are inappropriate and designed to strip value from these estates and unsecured creditors. Specifically, although removed from the original draft Interim Order, Multiplier again requests (i) DIP and Adequate Protection Liens on chapter 5 avoidance actions: and (ii) waivers of the protections under sections 506(c) and 552(b). Neither request is appropriate.

3. The currently proposed budget also fails to provide sufficient funding to properly wind down these estates, let alone make distributions to unsecured creditors. As a result, the rights of unsecured creditors to realize value from the proceeds of avoidance actions and the rights of these estates to utilize the protections of sections 506(c) and 552(b) must be preserved. These cases should not be run for the sole benefit of Multiplier at the expense of unsecured creditors.

4. In light of the foregoing, absent modification, the Court should not allow the Debtors to proceed down a path that is only designed to benefit Multiplier. If the Debtors and Multiplier want to enjoy the benefits of chapter 11, they must conduct a process that leaves the estates administratively solvent and with sufficient resources to confirm a liquidating plan to facilitate distributions to general unsecured creditors.

**BACKGROUND**

5. On December 8, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, following the filing of an involuntary petition against Scout Media, Inc. on December 1, 2016. Since the Petition Date, the

Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On December 15, 2016, the Office of the United States Trustee for Region 2 appointed a five-member Committee consisting of: (i) Quad/Graphics, Inc.; (ii) LSC Communications, Inc.; (iii) Signature Consultants, LLC; (iv) Outbrain Inc.; and (v) Stone River Gear, LLC.[5]  The Committee selected Kelley Drye & Warren LLP as its bankruptcy counsel and BDO Consulting, LLC as its financial advisor.  No other official committee has been appointed in these cases.

A.     **The Debtors' Capital Structure**

7.     In connection with the acquisition of the Debtors by North American Membership Group, on November 13, 2015, each of the Debtors (other than FTFS Acquisition, LLC ("FTFSA")), and certain non-Debtor affiliates (the "Non-Debtor Borrowers"), entered into a Loan and Security Agreement (the "Loan Agreement") with Multiplier Capital, LP, as lender ("Multiplier") in the original principal amount of $7.0 million and bearing interest at the rate of 11.0% (the "Prepetition Facility").[6]  The obligations under the Prepetition Facility are purportedly secured by first priority liens on substantially all of the Debtors' assets (excluding

---

[5]     Docket No. 44.

[6]     *See Declaration of Craig Amazeen in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Amazeen Declaration"), ¶ 22; *Declaration of Henry O'Connor* (the "O'Connor Declaration"), Exhibit 1 at 27.  Docket Nos. 22 and 47.

4

FTFSA) and the assets of the Non-Debtor Borrowers.[7]  As of October 5, 2015, the principal amount due under the Prepetition Facility was approximately $5.6 million.[8]

8. In March 2016, certain lenders, including certain of the Debtors' current equity owners, provided an $11.6 million bridge loan to Scout Media Holdings, purportedly secured by a second-priority lien on only the assets of Scout Media Holdings. The Debtors have not provided this Court with any additional information regarding the terms or use of the Bridge Loans or the validity of the prepetition liens.[9]

9. Between September 28, 2016 and December 8, 2016, the Debtors and Multiplier entered into a series of four amendments to the Loan Agreement and three protective advances to provide approximately $4 million of additional advances under the Prepetition Facility.[10] The interest rate under the Loan Agreement was also increased from 11.5% to 13%.[11] Some portion of this incremental financing was provided by certain of the Debtors' equity owners and/or lenders under the Bridge Loans (collectively, the "Participants") pursuant to one or more participation agreements with Multiplier.[12]

---

[7]     DIP Motion, ¶ 22.

[8]     *See* O'Connor Declaration, Exhibit 2 at 20.

[9]     DIP Motion, ¶ 16. The Committee has commenced any investigation with respect to the obligations and purported security interests with respect to the Prepetition Facility and the Bridge Loans, but is not yet in a position to make a determination with respect thereto.

[10]    *See* O'Connor Declaration, Exhibit 2 at 28-52.

[11]    *Id*. The original interest rate was increased from 11% to 11.5% pursuant to the First Amendment to the Loan Agreement, dated as of June 18, 2015. *See* O'Connor Declaration, Exhibit 2 at 4.

[12]    Based upon a review of the Debtors' interested parties list filed with their retention application, upon information and belief, each of the Participants is either a current equity holder, a party with designation rights on the board of directors, and/or a Bridge Loan lender. *See* Docket No. 83.

5

10. As of the Petition Date, approximately $10.9 million, or nearly twice the amount that was due as of October 2015, was allegedly outstanding under the Prepetition Facility.[13]

B. **The Debtors' Restructuring Efforts**

11. In or around July 2016, James Heckman was terminated by the Debtors' board of directors due to alleged breaches of his fiduciary duties.[14]  In September 2016, the Debtors engaged Sherwood Partners, Inc. ("Sherwood") to evaluate options to deleverage the Debtors' balance sheet and commenced efforts to sell the Debtors' stock through an assignment for the benefit of creditors.[15]

12. Sherwood commenced a marketing process, contacting 154 potential strategic and financial buyers that might be interested in the Debtors' businesses.[16]  Although a number of parties expressed interest, including twenty who signed non-disclosure agreements and are continuing to be provided with access to diligence materials, the marketing process did not yield any offers.[17]

---

[13]   DIP Motion, ¶ 15.

[14]   Amazeen Declaration, ¶ 30.

[15]   *See Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of Scout Media, Inc. and Scout.com, LLC's Assets, Including Procedures for Selection of a Stalking Horse Purchaser, (B) Scheduling an Auction, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures; and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Substantially All of Scout Media, Inc. and Scout.com, LLC's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief*, ¶ 8.

[16]   *Id.* ¶ 9.

[17]   *Id.* ¶¶ 10-11.

## C. The Chapter 11 Proceedings

13. The Debtors now seek to sell their assets pursuant to section 363 of the Bankruptcy Code.[18] To that end, the Court approved procedures to govern an expedited sale process intended to conclude by February 2017.[19]

14. To fund the sale process, the Debtors seek final approval of a $4.35 million DIP facility (the "DIP Facility") from Multiplier, $1.5 million of which has been approved by the Court on an interim basis.[20] The Interim Order incorporated a negotiated resolution of numerous issues and concerns raised by the Committee in its Preliminary Objection, as well as the issues raised by the Court at the first-day hearing.

15. The Debtors now seek approval of the Final Order and renew their request for various relief previously rebuffed by the Court and the Committee, including: (i) superpriority and adequate protections liens and claims against all of the Debtors' assets, including avoidance actions; and (ii) sections 506(c) and 552(b) waivers.[21]

## OBJECTION

16. Postpetition financing under section 364(d) of the Bankruptcy Code is only appropriate if a debtor proves (i) it is unable to obtain unsecured credit; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair,

---

[18] Amazeen Declaration, ¶ 32.

[19] *See* Docket No. 74.

[20] *See Interim Order (A) Authorizing Post-Petition Term Loan Financing and Use of Cash Collateral; (B) Granting Liens and Providing Superpriority Administrative Expense Status; (C) Granting Adequate Protection; (D) Modifying Automatic Stay; (E) Scheduling a Final Hearing; And (E) Granting Related Relief.* Docket No. 71.

[21] DIP Motion, ¶ 25.

7

reasonable and adequate.[22] Courts should only approve postpetition financing to the extent it is "in the best interests of the general creditor body."[23]

17.     As stated above, the Committee does not oppose the Debtors' pursuit of a marketing and sale process that is designed to maximize value for the Debtors' estates, including unsecured creditors.  The Committee is similarly not opposed to a reasonable financing request, on fair terms, that is designed to maximize value for all creditors.  The current proposal, however, still seeks inappropriate benefits for Multiplier, at the expense of unsecured creditors, providing Multiplier with relief that is not justified by the facts and circumstances of these cases.

A.    **Multiplier Should Not Receive Liens On Avoidance Actions**

18.     If approved, the Final Order will provide Multiplier DIP Liens on, and a superpriority claim against, Avoidance Actions.[24]  Similarly, Multiplier will receive adequate protections liens on, and claim against, Avoidance Actions.  Both are inappropriate and contrary to the interests of the Debtors' estates and unsecured creditors.

19.     Avoidance powers are intended to allow a debtor-in-possession or a trustee to recover certain payments for the benefit of unsecured creditors.[25]  Avoidance Actions should not be pursued for the exclusive benefit of a secured creditor.[26]  Moreover, Avoidance

---

[22]    *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).

[23]    *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

[24]    Final Order, ¶¶ 3-5 and 9.

[25]    *See United States Brass & Copper Co. v. Caplan (In re Century Brass Prods.),* 22 F.3d 37, 39 (2d Cir. 1994) (citing section 1107 in finding that a debtor in possession can exercise the same power as a trustee to bring avoidance actions); *In re WorldCom, Inc.,* 401 B.R. 637, 649 (Bankr. S.D.N.Y. 2009) (*citing Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.),* 390 B.R. 784, 793 (Bankr. S.D.N.Y. 2008) ("Avoidance claims … can only be brought by a trustee or debtor in possession on behalf of the estate's creditors")).

[26]    *See id.* (recognizing that avoidance actions should be pursued for the benefit of all unsecured creditors).

Actions belong to the Debtors' creditors, not the Debtors.[27] Thus, the Debtors should not be authorized to grant Multiplier a lien on Avoidance Actions because they belong to unsecured creditors. The proceeds of Avoidance Actions similarly belong to the Debtors' estates and their creditors. The Final Order, therefore, must be modified to preserve Avoidance Actions and their proceeds for the benefit of the Debtors' estates and their unsecured creditors.

**B.      The Budget Should Provide For The Orderly Wind Down of the Estates**

20.     In the event the sale fails to generate sufficient value to satisfy the purported secured claims of Multiplier, the budget must provide a sufficient carve out to properly wind down these cases and preserve potentially valuable actions for the benefit of unsecured creditors. Although the current budget allocates $1.2 million for disbursements following the sale, a substantial portion of this amount is allocated to expenses that will not aid in the wind down of these estates.[28] This includes: (i) $100,000 of DIP interest payable to Multiplier as DIP lender; (ii) $575,000 of employee related costs, including $400,000 in retention payments and $100,000 in accrued vacation; (iii) $120,000 for insurance; and (iv) $22,500 for board fees.

21.     While the budget does attribute $100,000 to certain wind down costs, including $25,000 to prepare final tax returns, $36,000 for a potential CEO replacement and $30,000 to wind down the Debtors' 401(k) plan, noticeably missing is any post-sale funding to wind down the Debtors' estates, including any funding for the Committee.[29] Given the Debtors'

---

[27]   *See Higgins v. Erickson (In re Higgins),* 270 B.R. 147, 153 (Bankr. S.D.N.Y. 2001) (stating that "the theory and purpose of preference avoidance [is] to protect the rights of general unsecured creditors" and that funds recovered from avoidance actions are "divided equally among all unsecured creditors").

[28]   *See* Budget. Docket No. 61.

[29]   The lack of any funding for the Committee is highlighted by the fact that the budget allocates $50,000 to Sherwood Partners, $175,000 to the Debtors' bankruptcy counsel, and $50,000 for the claims agent.

9

own assertions of potential breaches of fiduciary duties by former management, it is critical there be sufficient funds to confirm a plan and preserve these and other potential valuable causes of action.[30]

22. Although the Committee remains hopeful that the Debtors will be able to locate prospective purchasers whose bids will be sufficient to satisfy the Debtors' allowed secured debt, the Debtors have yet to identify a stalking horse purchaser to set a minimum baseline for potential recoveries. Approval of a DIP facility to fund a sale process that will only benefit Multiplier and will potentially render these estates administrative insolvent is not in the best interest of the general creditor body. The DIP Facility, therefore, should be denied unless Multiplier agrees to carve-out sufficient sale proceeds to fund an appropriate wind down process, including a chapter 11 liquidating plan that preserves potentially valuable estate causes of action.

## C. The 506(c) And 552(b) Waivers Are Inappropriate

23. The advance waivers sought by the Debtors under section 506(c) and 552(b) of the Bankruptcy Code are inappropriate and must be denied.[31] Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself.[32] This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured creditor recoveries.[33] Similarly, the "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor,

---

[30] Amazeen Declaration ¶ 20.

[31] *See* Final Order, ¶¶ 14-15.

[32] *See* 11 U.S.C. § 506(c).

[33] *See, e.g., In re Codesco, Inc.,* 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs").

10

committee or other party-in-interest to exclude postpetition proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure.[34]

24. Courts have widely recognized that section 506(c) waivers are not to be granted lightly.[35] To the extent Multiplier wishes to receive the benefits of a chapter 11 process undertaken for its benefit, it must pay the associated costs. The Debtors have not yet filed their schedules of assets and liabilities or statement of financial affairs, and such documents are unlikely to be filed until the end of January.[36] Thus, there is currently no information regarding the extent of the Debtors' administrative and priority claims. Absent sufficient funding in a consensual budget that ensures administrative solvency and a wind down after the sale, the Debtors should not be allowed to waive their statutory ability to compel Multiplier to pay its own way.[37]

---

[34] *See* 11 U.S.C. § 552(b).

[35] *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 12 (2000) (finding that section 506(c) is a rule of fundamental fairness for all parties in interest and authorizing the surcharge of a secured lender's collateral where reasonable and appropriate).

[36] The Debtors filed a *Motion For Entry of an Order Granting an Extension of Time to File (I) Schedules and Statements; and (II) Rule 2015.3 Financial Reports,* seeking to extend the deadline to file their schedules of assets and liabilities and statements of financial affairs to January 21, 2017. Docket No. 79.

[37] *See, e.g., In re The Colad Group, Inc.,* 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve DIP financing to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)).

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) deny the proposed Final Order unless modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 4, 2017

KELLEY DRYE & WARREN LLP

By: */s/ James S. Carr*
James S. Carr
Jason R. Adams
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

*Proposed Counsel to the Official Committee of Unsecured Creditors of Scout Media, Inc., et al.*