## <u>EXHIBIT A</u>

## Executed Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

**by and between**

**SCOUT MEDIA, INC.**

**and**

**CBS 247 INC.**

**Dated as of January [●], 2017**

# TABLE OF CONTENTS

ARTICLE 1

DEFINITIONS ................................................................................................1

1.1    Capitalized Terms ..............................................................................1
1.2    Interpretation ...................................................................................11

ARTICLE 2

PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
LIABILITIES .............................................................................................12

2.1    Purchase and Sale of Assets ...........................................................12
2.2    Excluded Assets ..............................................................................13
2.3    Assumed Liabilities ........................................................................13
2.4    Retained Liabilities .........................................................................13

ARTICLE 3

CLOSING; PURCHASE PRICE ................................................................14

3.1    Closing ............................................................................................14
3.2    Good Faith Deposit .........................................................................14
3.3    Payments at Closing ........................................................................14
3.4    Flow of Funds Memorandum ..........................................................15
3.5    Transfer Taxes ................................................................................15
3.6    Further Assurances; Post-Closing Cooperation .............................15
3.7    Cure Costs .......................................................................................16
3.8    [Reserved] .......................................................................................17
3.9    Disposition of Deposit ....................................................................17

ARTICLE 4

CONDITIONS PRECEDENT AND DELIVERIES ...................................17

4.1    Conditions Precedent to obligations of Purchaser .........................17
4.2    Conditions Precedent to obligations of Seller ................................19
4.3    Mutual Closing Deliverables ..........................................................20
4.4    Tangible Assets ...............................................................................20

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF SELLER ......................20

5.1    Organization; Good Standing; Qualification .................................20
5.2    No Subsidiaries ...............................................................................20
5.3    Authority .........................................................................................21
5.4    Consents ..........................................................................................21
5.5    Title .................................................................................................22
5.6    Intellectual Property Rights ............................................................22
5.7    Contracts .........................................................................................25
5.8    Brokers or Finders ..........................................................................25
5.9    Leases ..............................................................................................25

| | | |
|---|---|---|
| 5.10 | Taxes | 26 |
| 5.11 | Litigation | 26 |
| 5.12 | Compliance with Laws; Permits | 26 |
| 5.13 | Transactions with Insiders | 26 |
| 5.14 | Absence of Certain Changes | 27 |
| 5.15 | No Undisclosed Liabilities | 27 |
| 5.16 | Employee Benefits | 27 |
| 5.17 | Labor. | 28 |
| 5.18 | Condition and Sufficiency of Assets | 29 |
| 5.19 | Relationship with Publishers | 29 |
| 5.20 | No Other Representations or Warranties; Disclaimer | 29 |

**ARTICLE 6**

REPRESENTATIONS AND WARRANTIES OF PURCHASER .....................30

| | | |
|---|---|---|
| 6.1 | Organization, Good Standing and Qualification | 30 |
| 6.2 | Authority | 30 |
| 6.3 | Consents | 31 |
| 6.4 | Brokers or Finders | 31 |
| 6.5 | Litigation | 31 |

**ARTICLE 7**

COVENANTS AND AGREEMENTS ....................................................31

| | | |
|---|---|---|
| 7.1 | Notice of Transaction as Required by Bankruptcy Court; Seller Not Party to Other Agreement | 31 |
| 7.2 | Interim Covenants | 32 |
| 7.3 | Further Assurances | 34 |
| 7.4 | Public Announcements | 35 |
| 7.5 | Post-Closing Tax Covenants | 35 |
| 7.6 | Confidentiality | 36 |
| 7.7 | Intellectual Property; Domain Names | 36 |
| 7.8 | Brokers | 37 |
| 7.9 | Employee Matters | 37 |
| 7.10 | Assumption Effective Date | 37 |

**ARTICLE 8**

TERMINATION; TERMINATION PAYMENT ..............................................37

| | | |
|---|---|---|
| 8.1 | Termination | 37 |
| 8.2 | Effect of Termination or Breach | 39 |

**ARTICLE 9**

GENERAL ..............................................................................40

| | | |
|---|---|---|
| 9.1 | No Third Party Beneficiaries | 40 |
| 9.2 | Notices | 40 |
| 9.3 | Binding Effect | 41 |
| 9.4 | Entire Agreement; Modification; Waiver | 41 |

| | | | |
|---|---|---|---|
| 9.5 | Dispute Resolution; Bankruptcy Court Jurisdiction | ............................................... | 41 |
| 9.6 | Expenses | ............................................................................................ | 42 |
| 9.7 | Construction | ...................................................................................... | 42 |
| 9.8 | Assignment | ........................................................................................ | 42 |
| 9.9 | Specific Performance | ........................................................................ | 42 |
| 9.10 | Survival of Representations and Warranties | ..................................... | 42 |
| 9.11 | Non-Recourse | ..................................................................................... | 42 |
| 9.12 | Disclosure Schedules | ......................................................................... | 42 |
| 9.13 | Relationship | ....................................................................................... | 43 |
| 9.14 | Counterparts | ...................................................................................... | 43 |
| 9.15 | Headings | ............................................................................................ | 43 |
| 9.16 | Severability | ........................................................................................ | 43 |

| | | |
|---|---|---|
| Exhibit A | - | Form of Sale Order |
| Exhibit B | - | Form of General Assignment |
| Exhibit C | - | Form of Transition Services Agreement |
| Exhibit D | - | Form of Stalking Horse Order |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of January [●], 2017, is made by and between Scout Media, Inc., a Washington corporation ("Seller"), and CBS 247 Inc., a Delaware corporation ("Purchaser").  Seller and Purchaser are each referred to herein as a "Party" and collectively, as the "Parties".  Capitalized terms used but not defined elsewhere herein have the meanings assigned to them in Section 1.1.

### RECITALS

A.    On December 8, 2016, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et sec. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), commencing the case captioned *In re: Scout Media, Inc.*, 16-13369-MEW (the "Bankruptcy Case").

B.    Purchaser desires to purchase and acquire from Seller, and Seller desires to sell, assign, transfer, convey and deliver to Purchaser, all the Purchased Assets, free and clear of all Encumbrances, subject to and upon the terms and conditions in this Agreement.

C.    The Parties intend to effectuate the transactions contemplated by this Agreement through a sale by Seller of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code.

D.    The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of an order of the Bankruptcy Court under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code.

In consideration of the covenants and mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1    Capitalized Terms.  In addition to the other defined terms appearing elsewhere herein, the following capitalized terms shall have the meanings set forth below.

(a)    "Affiliate" means, as to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the first Person, where the term "control" means the power to direct, or cause the direction of, the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that Affiliates of Purchaser shall only mean CBS Corporation and any Person that directly, or indirectly through one or more intermediaries, is controlled by CBS Corporation.

(b)    "Accounts Receivable" has the meaning set forth in Section 2.1(j).

(c)     "<u>Alternative Transaction</u>" means a transaction or series of transactions in which any or all of the equity interests of Seller or Purchased Assets are sold, assigned, transferred or otherwise exchanged for value. For the avoidance of doubt any sale, assignment, transfer or exchange of any of the Excluded Assets shall not constitute an Alternative Transaction.

(d)     "<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

(e)     "<u>Back-up Bid</u>" means a binding offer from any Person approved by Seller and the Bankruptcy Court to purchase the Purchased Assets only upon the termination of this Agreement in accordance with its terms.

(f)     "<u>Bankruptcy Case</u>" has the meaning set forth in the Recitals.

(g)     "<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

(h)     "<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

(i)     "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure.

(j)     "<u>Benefit Arrangement</u>" means any employment, consulting, severance or other similar contract, arrangement or policy (written or oral) and each plan, arrangement, program, agreement or commitment (written or oral) providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health or accident benefits (including any "voluntary employees' beneficiary association" as defined in Section 501(c)(9) of the Code providing for the same or other benefits) or for deferred compensation, profit-sharing, bonuses, stock options, stock appreciation rights, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits which (a) is not a Welfare Plan, Pension Plan or Multiemployer Plan and (b) is entered into, maintained, contributed to or required to be contributed to or has been entered into, maintained, contributed to or required to be contributed to, by Seller or under which Seller has any Liability.

(k)     "<u>Books and Records</u>" has the meaning set forth in <u>Section 2.1(h)</u>.

(l)     "<u>Business</u>" means the operation of a proprietary platform that publishes team and player-specific news and commentary that is created through a network of publishers, as such platform is operated by Seller on the Closing Date.

(m)     "<u>Business Day</u>" means any day other than a Saturday or Sunday or any other day in which banks in New York, New York are required or authorized by law to be closed.

(n)     "<u>Business Intellectual Property</u>" means, collectively, the Owned Intellectual Property and Licensed Intellectual Property.

(o)     "<u>Case Closing Date</u>" has the meaning set forth in <u>Section 3.6(a)</u>.

(p)  "Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

(q)  "Closing" has the meaning set forth in Section 3.1.

(r)  "Closing Date" has the meaning set forth in Section 3.1.

(s)  "Closing Date Payment" means an amount equal to Nine Million, Five Hundred Thousand Dollars ($9,500,000.00).

(t)  "Code" means the Internal Revenue Code of 1986, as amended.

(u)  "Collateral Agreements" has the meaning set forth in Section 4.1(e)(ii).

(v)  "Confidential Information" has the meaning set forth in Section 7.6.

(w)  "Confidential Intellectual Property" means (a) all confidential, proprietary, non-public or sensitive Proprietary Information constituting Business Intellectual Property, and (b) any Personal Data of any Person in the possession, custody or control of Seller or with respect to which Seller has access.

(x)  "Contract" means any written or oral contract, agreement, instrument, commitment, arrangement or undertaking (including licenses, joint ventures, partnerships, engagements, guarantees, sublicenses, subcontracts and purchase orders).

(y)  "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed by the United States Trustee on December 15, 2016.

(z)  "Cure Costs" means all Liabilities of Seller for all cure, compensation and reinstatement costs or expenses of or relating to the assumption and assignment of any Contracts (including, for the avoidance of doubt, real and personal property leases) to be assumed and assigned as part of the Transferred Agreements that are payable or necessary to cure any defaults pursuant to Section 365 of the Bankruptcy Code on account of any obligation or default arising before the Closing Date and set forth on Schedule 1.1(z), plus an amount not to exceed twenty percent (20%) of the amount set forth on Schedule 1.1(z). For the avoidance of doubt, Purchaser shall be responsible for all amounts that are necessary to cure any defaults relating to the Transferred Agreements.

(aa)  "Domain Names" has the meaning set forth in Section 2.1(c).

(bb)  "Employee Benefit Plans" has the meaning set forth in Section 5.16.

(cc)  "Employees" means all individuals employed by Seller or its Affiliates in connection with the conduct of the Business on the date of this Agreement, together with individuals (if any) who are hired by Seller or its Affiliates in connection with the conduct of the Business after the date of this Agreement and prior to the consummation of the Closing.

(dd)  "<u>Employee Restrictive Covenant Rights</u>" means all rights of Seller under non-disclosure or confidentiality, non-competition or non-solicitation agreements to the extent contained in (i) that certain Employment Agreement between James Heckman and Scout Media Holdings, Inc. (f/k/a North American Membership Group, Inc.) or (ii) any "personal services contracts" that are not assignable under Section 365(c)(1)(A) of the Bankruptcy Code with Employees and agents of Seller.

(ee)  "<u>Encumbrances</u>" means all Liens, defenses (including, without limitation, rights of setoff and recoupment), and interests of third parties, including, without limitation, liabilities, demands, guarantees, rights of third parties, contractual commitments, assignments, preferences, debts, suits, licenses, rights-of-recovery, judgments, orders, and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, instruments, leases, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, labor, ERISA, Comprehensive Environmental Response, Compensation and Liability Act of 1980, alter ego and other liabilities, causes of action, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in Bankruptcy Code section 101(5)), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights, and claims arising out of Seller's continued operation following the Closing Date, whether imposed by agreement, understanding, law, equity or otherwise.  Notwithstanding the foregoing, performance obligations of an assignee of a Transferred Agreement and the other terms of such Transferred Agreement shall not be deemed to be an Encumbrance on such Transferred Agreement.

(ff)  "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended

(gg)  "<u>ERISA Affiliate</u>" means any corporation or other business entity that is included in a controlled group of corporations within which Seller is also included, as provided in Section 414(b) of the Code; or which is a trade or business under common control with Seller, as provided in Section 414(c) of the Code; or which constitutes a member of an affiliated service group within which Seller is also included, as provided in Section 414(m) of the Code; or which is required to be aggregated with Seller pursuant to regulations issued under Section 414(o) of the Code; or which is treated as a single employer with Seller under Section 4001 of ERISA.

(hh)  "<u>Escrow Letter</u>" means that certain Escrow Letter Agreement dated as of the date of this Agreement, by and among Purchaser, Sherwood and Seller.

(ii)  "<u>Excluded Assets</u>" means the following items:

(i)  current assets of Seller, including cash and cash equivalents but excluding the Accounts Receivable, in each case determined in accordance with GAAP;

(ii)  all Contracts other than the Transferred Agreements;

(iii)     all claims for refunds of Taxes other than Transfer Taxes and other governmental charges of whatever nature;

(iv)     all health and Benefit Arrangements maintained by Seller for its employees;

(v)     all causes of action, including without limitation all claims and causes of action under sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and any other claims or causes of action belonging to Seller or its estate, including any claims or causes of actions against the Seller's directors and officers, any state-law claims and causes of action, and all of Seller's rights and causes of action arising under section 502 and 503 of the Bankruptcy Code and Rule 3007 thereunder;

(vi)     Seller's corporate seals, stock record books, corporate record books containing minutes of meeting of directors and stockholders, Tax Returns and records, books of account and ledgers and such other record having to do solely with Seller's organization or stock capitalization or Excluded Assets or the Retained Liabilities;

(vii)     all personal records and other records that Seller is required by Law to retain in its possession;

(viii)     the Employee Restrictive Covenant Rights; and

(ix)     all assets listed on Schedule 1.1(ii).

(jj)     "Expense Reimbursement" means the amount (not to exceed One Hundred Thousand Dollars ($100,000) in the aggregate) of all reasonable and documented third-party fees (including attorneys' fees), expenses and other costs incurred by Purchaser or any of its Affiliates in connection with this Agreement and the transactions contemplated hereby, including, without limitation, all fees and expenses relating to the diligence, negotiation, preparation, and implementation with respect to the transactions contemplated by this Agreement.

(kk)     "Final Order" means an order of the Bankruptcy Court as to which no stay pending appeal has been issued.

(ll)     "GAAP" means United States generally accepted accounting principles in effect from time to time.

(mm)     "Governmental Authority" means any governmental, regulatory or administrative authority, agency or commission or any court, tribunal, judicial or arbitral body, and any instrumentality of any of the foregoing.

(nn)     "Governmental Order" means any order, ruling, writ, judgment, injunction, decree, stipulation, determination, award or binding agreement issued, promulgated or entered by or with any Governmental Authority, and in the case of Tax-related matters, includes any closing agreement or similar settlement, ruling, technical advice request, voluntary disclosure or managed audit.

(oo)  "Informational Disclosures" has the meaning set forth in Section 9.12.

(pp)  "Insider" means (a) an officer or director of Seller, (b) an Affiliate of Seller or (c) any Relative of any Person referred to in clauses (a) through (b) who is an individual and any Affiliate of any such Relative.

(qq)  "Intellectual Property" means all (i) patents and patent applications, including reissues, divisions, provisionals, non-provisionals, continuations, renewals, re-examinations, extensions and continuations-in-part of the foregoing;  (ii) trademarks, service marks, trade dress, logos, Internet domain names, trade names, corporate names, designs, brand names, URLs, slogans, 800 numbers, social media usernames, handles, hashtags and account names, web sites, symbols, emblems, insignia and other distinctive identification and indicia of source of origin, whether or not registered, including all common law rights thereto, and all applications and registrations therefor, and all goodwill associated with any of the foregoing and/or the business connected with the use of and symbolized by the foregoing (collectively, "Trademarks"), (iii) copyrights, author's rights, moral rights and copyrightable subject matter and all other works of authorship and all rights under copyrights, whether or not published and registered or unregistered, and any registrations and applications for registration thereof, (iv) trade secrets and confidential or proprietary information, including inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, testing information, processes and techniques, research and development information, methods, formulations, drawings, specifications, designs, algorithms, plans, proposals, financial information, improvements, discoveries, ideas, developments, data, processes, techniques, manuals, instructions, blueprints, plans, descriptions, financial, technical, marketing and business data, sales, plans, pricing and cost information, vendor, customer, distributor, end user and supplier lists, Personal Data, prospect lists, projections, analyses and copies and tangible embodiments of all of the foregoing, in whatever form or medium ("Proprietary Information"); (v) Software; (vi) Websites and (vii) all other proprietary information and intellectual property in all forms and media, and all goodwill associated therewith, and whether or not subject to patent, copyright, trademark, design or other intellectual property registration or classification, now known or hereafter recognized in any jurisdiction worldwide; (j) all rights pertaining to the foregoing, including those arising under international treaties and convention rights; and (k) all proceeds, income, royalties, damages and payments now and/or hereafter due and payable under and/or in respect of all of the foregoing (including with respect to present or future infringement or violation thereof).

(rr)  "IP Assignment Agreements" has the meaning set forth in Section 5.6(e).

(ss)  "IT Systems" means information technology systems, resources and information, including all Software, hardware, networks, computers, equipment and related systems.

(tt)  "January Payables" means the costs incurred by Seller for the operation of the Business in January that are set forth on Schedule 1.1(tt), plus an amount not to exceed [●] ($[●]) in the aggregate.

(uu)　"<u>Knowledge</u>" means, with respect to Seller, the actual knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Strategy Officer of Seller after due inquiry.

(vv)　"<u>Laws</u>" means all constitutions, statutes, laws, ordinances, regulations, rules, codes, requirements and other rules of law.

(ww)　"<u>Liability</u>" means any direct or indirect debt, liability, commitment or obligation (whether known or unknown, matured or not matured, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, incurred or consequential and due or to become due), including any liability for Taxes, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in Bankruptcy Code section 101(5)), whether imposed by agreement, understanding, law, equity or otherwise.

(xx)　"<u>Licensed Intellectual Property</u>" means all Intellectual Property licensed or otherwise made available to Seller (in whole or in part) by any Person.

(yy)　"<u>Lien</u>" means all liens, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, encumbrances, rights of first refusal, easements, charges, options, judgment liens, restrictions and indentures.  Notwithstanding the foregoing, the mere performance obligations of an assignee of a Transferred Agreement and the other terms of such Transferred Agreement shall not in and of themselves be deemed to be a Lien on such Transferred Agreement.

(zz)　"<u>Material Adverse Change</u>" means any result, occurrence, fact, change, event or effect that (i) has, or is reasonably expected to have, a material adverse effect on the business, assets, liabilities, condition, or results of operations of the Business or the Purchased Assets taken as a whole, or (ii) results in any material respect in the inability of Seller to convey to Purchaser any of the Purchased Assets.

(aaa)　"<u>Multiemployer Plan</u>" means any "multiemployer plan," as defined in Section 4001(a)(3) of ERISA, which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or maintained, administered, contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate has or may have any Liability.

(bbb)　"<u>Open Source Materials</u>" means all Software and other materials that are distributed as "free software", "open source software" or under a similar licensing or distribution model, including to any license for Software that meets the "Open Source Definition" promulgated by the Open Source Initiative.

(ccc)　"<u>Ordinary Course</u>" means, with respect to an action taken by a Person:

(i)　such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person, as such

practices or actions are, or may have been, modified as a result of the proceedings of the Bankruptcy Case; and

(ii)     such action is consistent with the representations and warranties in Section 5.12(a) (Compliance with Laws; Permits) of this Agreement.

(ddd)   "Owned Intellectual Property" means all Intellectual Property owned or purported to be owned, in whole or in part, by Seller, including the Domain Names.

(eee)   "Pension Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or maintained, administered, contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate has or may have any Liability.

(fff)     "Permits" means all licenses, permits, franchises, approvals, registrations, authorizations, consents or orders of, or filings with, any Governmental Authority or any other Person.

(ggg)    "Person" means an individual, partnership, firm, corporation, limited liability company, association, joint venture, trust, unincorporated organization or other entity (including any Governmental Entity or any department, agency or political subdivision thereof).

(hhh)    "Personal Data" means any information (including a Person's name, physical address, telephone number, e-mail address, photograph, social security number, tax identification number, payment card number, bank account information and other financial information, customer or account numbers, codes and passwords, IP address, geographic location, family members, platform or transaction history, persistent identifier, order and purchase histories, platform behavior, conduct, preferences, demographic data and any other data and information) which, whether alone or in combination with other information, identifies or is associated with an identified natural Person.

(iii)     "Privacy Agreements" means data and privacy related policies (e.g., privacy policies, acceptable use policies, terms of service, etc.) and other Contracts in effect between Seller and any customers, clients, licensees, end users or other Persons that are applicable to or otherwise implicate the collection, protection, storage, processing, transfer, administration, review, monitoring, use and/or disclosure of Personal Data in connection with the Business.

(jjj)     "Privacy Laws" means all Laws concerning or otherwise applicable to the collection, protection, storage, processing, transfer, administration, review, monitoring, use or disclosure of Personal Data.

(kkk)    "Proceeding" means any actual or threatened claim, action (at law or in equity), suit, arbitration, review, inquiry, proceeding or investigation.

(lll)     "Proprietary Information" has the meaning set forth in the definition of Intellectual Property.

(mmm)"Purchase Price" means an amount equal to the Closing Date Payment plus all Cure Costs.

(nnn)   "Purchased Assets" has the meaning set forth in Section 2.1.

(ooo)   "Registered Owned Intellectual Property" means Owned Intellectual Property issued by, registered, recorded or filed with, renewed by or the subject of a pending application before any Government Authority, Internet domain name registrar or other authority.

(ppp)   "Retained Liabilities" has the meaning set forth in Section 2.4.

(qqq)   "Relative" of a Person means such Person's spouse, such Person's parents, sisters, brothers, children and the spouses of the foregoing and any member of the immediate household of such Person.

(rrr)   "Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

(sss)   "Sale Order" means an Order of the Bankruptcy Court in the form attached hereto as Exhibit A, with such changes as are reasonably acceptable to Purchaser and Seller.

(ttt)   "Sale Order Condition" means the Sale Order is a Final Order.

(uuu)   "Seller Contracts" has the meaning set forth in Section 5.7(a).

(vvv)   "Sherwood" means Sherwood Partners, Inc., a Delaware corporation.

(www)  "Software" means (a) all software, firmware, middleware, computer programs, applications, interfaces, tools, operating systems, software code of any nature, (including all object code, source code, interpreted code, data files, rules, definitions and methodology derived from the foregoing) and any derivations, updates, enhancements and customization of any of the foregoing, together with all processes, technical data, build scripts, test scripts, algorithms, APIs, subroutines, techniques, operating procedures, screens, user interfaces, report formats, development tools, templates, menus, buttons, icons and user interfaces, (b) all electronic data, databases and data collections, and (c) all documentation, including user manuals, technical manuals, programming comments, descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, and training materials, relating to any of the foregoing.

(xxx)   "Stalking Horse Order" means an Order (I) Authorizing the Debtors to Enter into the Stalking Horse Asset Purchase Agreement; (II) Approving Certain Bid Protections; (III) Amending the Bidding Procedures; and (IV) Granting Related Relief, in the form attached hereto as Exhibit D, with such changes as are reasonably acceptable to Purchaser and Seller.

(yyy)   "Stalking Horse Order Condition" means the Stalking Horse Order has become a Final Order.

(zzz)   "Subsidiary" means with respect to any Person, any corporation, association, business entity, partnership, limited liability company or other Person of which such Person, either alone or together with one or more Subsidiaries or by one or more other Subsidiaries (i) directly or indirectly owns or controls securities or other interests representing at least fifty percent (50%) of the voting power of such Person, or (ii) is entitled, by contract or otherwise, to elect, appoint or designate directors or other members constituting a majority of the members of such Person's board of directors, board of managers or other governing body.

(aaaa)   "Successor Taxes" means any Liability for the unpaid Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of Law), as a transferee or successor, by contract, or otherwise, including without limitation any Tax that (a) accrued prior to the effective time of the Closing with respect to or affecting the Purchased Assets or the Business, and (b) is transferred to Purchaser by operation of applicable successorship (including successor Tax liability) Law, including Tax-related "bulk transfer" Laws.

(bbbb)   "Tangible Assets" has the meaning set forth in Section 2.1(b).

(cccc)   "Tax" or, collectively, "Taxes," shall mean (i) any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, margin, franchise, withholding, payroll, recapture, employment, excise and property taxes, unclaimed, abandoned, or escheated property, and any other regulatory or governmental imposts, in each case together with all interest, penalties and additions imposed with respect to such amounts; (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period; and (iii) any Transfer Taxes or Successor Taxes.

(dddd)   "Tax Returns" means any return, report, declaration, form, claim for refund, information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(eeee)   "Termination Date" has the meaning set forth in Section 8.1(g).

(ffff)   "Termination Fee" means an amount equal to Two Hundred Eighty-Five Thousand Dollars ($285,000).

(gggg)   "Trademarks" has the meaning set forth in the definition of Intellectual Property.

(hhhh)   "Transaction Documents" means this Agreement and the other agreements, instruments and documents contemplated hereby, including each exhibit thereto.

(iiii)   "Transfer Taxes" has the meaning set forth in Section 3.5.

(jjjj) "<u>Transferred Agreements</u>" means, collectively, (i) the Transferred Contracts [and (ii) the Transferred Tangible Asset Leases]¹.

(kkkk) "<u>Transferred Contracts</u>" means those Contracts set forth on <u>Schedule 1.1(kkkk)</u>; provided, however, that notwithstanding the inclusion of a Contract on <u>Schedule 1.1(kkkk)</u> or anything else in this Agreement to the contrary, Transferred Contracts shall not include any Contract for which the Cure Costs exceed 120% of the amount set forth for such Contract on <u>Schedule 1.1(z)</u> unless the Purchaser consents in writing to the inclusion of any such Contract as a Transferred Contract following the determination of the Cure Cost for such Contract.

(llll) "<u>Transferred Tangible Asset Leases</u>" has the meaning set forth in <u>Section 5.9(b)</u>.

(mmmm) "<u>Transferred Real Property Leases</u>" has the meaning set forth in <u>Section 5.9(b)</u>.

(nnnn) "<u>Transition Services Agreement</u>" means the Transition Services Agreement among Purchaser and Seller in the form attached hereto as <u>Exhibit C</u>.

(oooo) "<u>WARN Laws</u>" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. 21.01 et seq., and any other similar provision of any federal, state, regional, foreign or local Law governing plant closings or mass layoffs.

(pppp) "<u>Web Site</u>" means any public or private website owned, used, held for use, maintained or operated by or on behalf of Seller (together with all Intellectual Property located on, used with or otherwise associated therewith), including without limitation the websites located at the domain names listed on <u>Schedule 1.1(pppp)</u>.

(qqqq) "<u>Welfare Plan</u>" means any "employee welfare benefit plan" as defined in Section 3(1) of ERISA, which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or maintained, administered, contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate has or may have any Liability.

1.2     <u>Interpretation</u>.  For the purposes hereof:  (a) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires; (b) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the Schedules and Exhibits) and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits, and Schedules to this Agreement unless otherwise specified; (c) the words "<u>include</u>," "<u>includes</u>" and "<u>including</u>," when used herein, shall be deemed in each case to be followed by the words "<u>without limitation</u>"; and (d) the word "or" shall not be exclusive. Any rule of construction that permits a court to construe a document more strictly against its author shall not govern the interpretation of this Agreement.

_____

¹ <u>Note to Draft</u>: Purchaser is considering whether Transferred Tangible Asset Leases should be included.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1 <u>Purchase and Sale of Assets</u>.  Subject to the terms and conditions set forth in this Agreement and in accordance with Sections 363 and 365 of the Bankruptcy Code, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser good, valid and marketable title, free of any and all Encumbrances, and Purchaser hereby agrees to purchase and acquire from Seller, all of the property and assets of Seller owned, used, or held for use in connection with the conduct of the Business, whether real, personal or mixed, tangible and intangible, of every kind and description, wherever located, including without limitation the following (but excluding for all purposes the Excluded Assets):

(a)  all Intellectual Property, including the (y) Business Intellectual Property and (z) Registered Owned Intellectual Property set forth on <u>Schedule 2.1(a)</u>;

(b)  all tangible assets, including without limitation all furniture, fixtures, supplies, hardware and those assets set forth on <u>Schedule 2.1(b)</u> (collectively, the "<u>Tangible Assets</u>");

(c)  all Internet domain names, including those Internet domain names listed on <u>Schedule 2.1(c)</u> (the "<u>Domain Names</u>");

(d)  all Web Sites;

(e)  the Transferred Agreements;

(f)  all goodwill associated with the Purchased Assets;

(g)  to the extent transferable all Permits, if any, held by Seller;

(h)  all documents and records (in paper or electronic format) in Seller's or any of Seller's Affiliates' care, custody or control (collectively, "<u>Books and Records</u>") to the extent relating to the Purchased Assets, the Assumed Liabilities or the Business, including any documents relating to products, services, marketing, advertising, promotional materials, purchased Intellectual Property, personnel files for Transferred Employees, all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises used in connection with the Business, *provided*, *however*, that Seller may retain a copy of all such Books and Records relating to the Excluded Assets or for tax purposes;

(i)  all accounts receivable of Seller (as determined in accordance with GAAP) as of the consummation of the Closing (the "<u>Accounts Receivable</u>"); and

(j)  all rights of Seller under non-disclosure or confidentiality, non-competition or non-solicitation agreements with third parties, in each case, excluding the Employee Restrictive Covenant Rights.

All of the assets referred to in this Section 2.1 are collectively referred to herein as the "Purchased Assets".

2.2 **Excluded Assets.** Anything herein to the contrary notwithstanding, the Purchased Assets shall not include, and Seller shall retain ownership of, the Excluded Assets.

2.3 **Assumed Liabilities.** In connection with the acquisition of the Purchased Assets pursuant to this Agreement, at the Closing, Purchaser shall assume and agree to pay, perform, satisfy and discharge (the following are referred to as the "Assumed Liabilities"): (a) all Cure Costs; (b) all January Payables; and (c) all Liabilities of Seller under the Transferred Agreements but only to the extent to be performed after the consummation of the Closing (except to the extent relating to a breach thereof occurring prior to the consummation of the Closing).

2.4 **Retained Liabilities.** Anything in this Agreement to the contrary notwithstanding, Purchaser is not assuming nor shall it be obligated to pay, perform or otherwise discharge, and Seller or its Affiliates (as applicable) shall retain and remain solely responsible for the payment or satisfaction, without recourse to Purchaser, any and all Liabilities other than the Assumed Liabilities of Seller or any of its Affiliates (collectively, "Retained Liabilities"), which Retained Liabilities include without limitation all Liabilities (x) arising from or in connection with circumstances, events or transactions occurring prior to the consummation of the Closing (other than all Cure Costs and January Payables); or (y) currently existing or hereafter arising with respect to:

(i) all employment or contractor arrangements, Benefit Arrangements, Pension Plans, Multiemployer Plans and Welfare Plans maintained or participated in by Seller or any of its Affiliates, whether such Liability (or the claim related thereto) accrued or arose prior or subsequent to the Closing Date;

(ii) all Taxes of Seller or any of its Affiliates, including, without limitation, any Tax in any way based upon, arising out of, relating in any way to or in connection with Seller's or any of its Affiliates' ownership and operation of the Business or the Purchased Assets for the period prior to the consummation of the Closing, whether the filing of the applicable Tax Return, if any, occurs prior or subsequent to the consummation of the Closing, and including any Successor Taxes;

(iii) all Liabilities of Seller based upon, arising out of, relating in any way to or in connection with the negotiation, preparation, investigation and performance of this Agreement (including any inaccuracy or breach of any representation or warranty of Seller contained in or made pursuant to this Agreement) or the Collateral Agreements or the transactions contemplated hereby or thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(iv) all Liabilities associated with indebtedness of Seller;

(v) all Liabilities based upon, arising out of, relating in any way to or in connection with the failure by Seller to comply with any Law or Governmental Order;

(vi)     all current liabilities of Seller (as determined in accordance with GAAP) other than the January Payables;

(vii)     all Liabilities based upon, arising out of, relating in any way to or in connection with any of the Excluded Assets;

(viii)     except with respect to the January Payables or other Liabilities listed as an Assumed Liability in <u>Section 2.3</u>, all Liabilities based upon, arising under or relating in any way to the operation of the Business, or the operation or use of the Purchased Assets, in each case, prior to the consummation of the Closing (or which may be asserted against or imposed upon Purchaser as a successor or transferee of Seller as an acquirer of the Purchased Assets or the Business or otherwise as a matter of law) and all other Liabilities based upon, arising out of, relating in any way to or in connection with events or conditions occurring at or prior to the consummation of the Closing; and/or

(ix)     all Liabilities based upon, arising under or relating in any way to the WARN Laws.

**ARTICLE 3**
**CLOSING; PURCHASE PRICE**

3.1     <u>Closing</u>.  The consummation of the transactions contemplated hereby (the "<u>Closing</u>") shall take place by electronic exchange of signature pages no later than three (3) Business Days following the satisfaction or waiver of the conditions precedent set forth in Sections <u>4.1</u>, <u>4.2</u> and <u>4.3</u> (other than the satisfaction or waiver of those conditions precedent that, by the terms, require the delivery of any documents or the taking of any other action at the Closing but subject to the satisfaction or waiver thereof at the Closing) or such other date as mutually agreed upon by Purchaser and Seller.  The date on which the Closing shall occur is referred to herein as the "<u>Closing Date</u>."  The Closing shall be effective for all purposes as of 12:01 a.m. on the Closing Date.

3.2     <u>Good Faith Deposit</u>.  On the date of this Agreement, Purchaser has delivered to Sherwood a deposit in an aggregate amount equal to $950,000 (the "<u>Deposit</u>"), by wire transfer to be held in escrow until the Closing pursuant to the Escrow Letter.

3.3     <u>Payments at Closing</u>.  At the Closing, in consideration of the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Purchaser, Purchaser shall:

(a)     direct Sherwood to release, on behalf of Purchaser, the Deposit to Seller;

(b)     pay by wire transfer of immediately available funds an amount equal to the Closing Date Payment (after the deduction of the Deposit) to an account designated by Seller in the Flow of Funds Memorandum; and

(c)     subject to <u>Section 3.7</u>, pay by wire transfer of immediately available funds to each counterparty to a Transferred Agreement in accordance with the wire transfer instructions set forth in the Flow of Funds Memorandum the Cure Costs, if any, set forth opposite such Person's name on the Flow of Funds Memorandum.

3.4    Flow of Funds Memorandum.  No later than three (3) Business Days prior to the Closing Date, Seller and Purchaser shall jointly prepare a flow of funds memorandum (the "Flow of Funds Memorandum") that sets forth the applicable payees, amounts payable and wire instructions for all amounts payable under Section 3.3.

3.5    Transfer Taxes.  Purchaser shall be responsible for any sales, use, excise, VAT or other transfer Taxes ("Transfer Taxes"), which are incurred or owed as a result of the sale, assignment, transfer, conveyance and delivery of the Purchased Assets.

3.6    Further Assurances; Post-Closing Cooperation.

(a)    From time to time after the consummation of the Closing until the date of the closing of the Bankruptcy Case pursuant to a Final Order issued by the Bankruptcy Court (the "Case Closing Date"), at the request of Purchaser and at Purchaser's sole cost and expense, Seller shall execute and deliver to Purchaser such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as may be reasonably necessary in order to sell, assign, transfer, convey and deliver to Purchaser, and to confirm Purchaser's title to, all of the Purchased Assets.  Without limiting the generality of the foregoing, from the consummation of the Closing until the Case Closing Date, except with respect to any Excluded Asset or as otherwise expressly set forth in this Agreement, in the event that an asset used or held for use by Seller in the conduct of the Business is owned by Scout Media Holdings, Inc. and Purchaser requests that such asset be transferred to Purchaser, Seller will ensure that Scout Media Holdings, Inc. transfers such asset to Purchaser for no additional consideration.

(b)    Following the consummation of the Closing until the Case Closing Date, Purchaser will afford Seller, and its successors and assigns, their counsel and accountants, during normal business hours and upon reasonable advance notice, reasonable access to review (i) the books, records and other data which are transferred to Purchaser pursuant to the terms of this Agreement and which relate to the applicable Purchased Assets prior to the consummation of the Closing,  the right to make copies and extracts therefrom, at Seller's cost and expense, and access to former employees of Seller but only to the extent that such access may be reasonably required by Seller in connection with (A) Seller's compliance with the requirements of any Governmental Authority with jurisdiction over such Purchased Assets, (B) Seller's attempt to enforce any of their rights or interests against any Person other than Purchaser or their its Affiliates, and/or (C) estate administration, the winding down of Seller in connection with the Bankruptcy Case, the provision of any information required for the defense and prosecution of claims and any other legitimate purpose of Seller, and (ii) financial and Tax records relating exclusively to such Purchased Assets prior to the consummation of the Closing.  Any such review shall be conducted by Seller, their counsel and/or accountants in such manner as to cause the least disruption to Purchaser's businesses as reasonably practicable, and Purchaser shall have the right to redact and not make available to Seller any information contained in such books, records and other data that is related to the Purchased Assets or the conduct of the Business from and after the consummation of the Closing.

(c)    If, following the consummation of Closing, any customer of the Business inadvertently remits a payment to Purchaser or its Affiliates and Purchaser becomes aware that

such payment was owed or payable to Seller or any Affiliate of Seller in respect of services provided by the Business prior to the consummation of the Closing, Purchaser shall, or shall cause its Affiliate to, promptly remit such payment to Seller, *provided*, that nothing herein shall require Purchaser to pay to Seller any amount received by Purchaser in respect of the Accounts Receivable.  If, following the consummation of the Closing, any customer of the Business inadvertently remits a payment to Seller or its  Affiliates that was owed or payable to Purchaser or its Affiliates in respect of services provided by the Business on or after the consummation of the Closing, Seller shall, or shall cause its Affiliates to, promptly remit such payment to Purchaser.

(d)     Following the consummation of the Closing until the Case Closing Date, Seller shall, upon receipt of written notice from Purchaser, at Purchaser's election, either (i) use its commercially reasonable efforts to enforce, at Purchaser's sole cost and expense, Seller's rights under the Employee Restrictive Covenant Agreements as reasonably directed by Purchaser, or (ii) subrogate Purchaser to any rights Seller may have against a third-party under the Employee Restrictive Covenant Agreements.  Notwithstanding the foregoing, in no event shall Seller be required to enforce its rights against any Person, or effect any subrogation for purpose of enforcing Seller's rights against any Person, to the extent in respect of any act, omission, circumstance or event that occurred or arose prior to the consummation of the Closing.  Nothing in this Section 3.6(d) shall prevent Seller from asserting or prosecuting a claim against any Person in respect of the Employee Restrictive Covenant Agreements if the act, omission, circumstance or event underlying such claim occurred prior to the consummation of the Closing or from assigning, transferring or selling such claim.  Following the consummation of the Closing until the Case Closing Date, Purchaser shall, upon receipt of written notice from Seller, at Seller's election, either (x) use its reasonable efforts to enforce, at Seller's sole cost and expense, Purchaser's rights under any non-disclosure, confidentiality, non-competition or non-solicitation agreement that was assigned to Purchaser hereunder as reasonably directed by Seller, or (y) subrogate Seller to any rights Purchaser may have against a third-party under such agreement.  Notwithstanding the foregoing, in no event shall Purchaser be required to enforce its rights against any Person, or effect any subrogation for the purpose of enforcing Purchaser's rights against any Person, to the extent in respect of any act, omission, circumstance or event that occurred or arose after the consummation of the Closing.

3.7     Cure Costs.  At Closing and pursuant to Section 365 of the Bankruptcy Code, Seller will assume the Transferred Agreements (to the extent not previously assumed) and assign the Transferred Agreements to Purchaser, and Purchaser will assume the Transferred Agreements.  Except as otherwise set forth in this Section 3.7, all Cure Costs related to the Transferred Agreements will be paid by Purchaser at Closing as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Bid Procedures.  Notwithstanding any obligation of Purchaser to pay a Cure Cost on the Closing Date, if a Cure Cost for a Transferred Agreement is disputed as of the Closing Date by a counterparty to such Transferred Agreement with standing in the Bankruptcy Case to dispute such Cure Cost (an "Objecting Party"), Purchaser shall not be required to pay the Cure Cost in respect of such Transferred Agreement at Closing, *provided*, that following the final determination (whether by the Bankruptcy Court or consent of Purchaser and the Objecting Party) of such Cure Cost, Purchaser shall promptly pay such Cure Cost to the Objecting Party.

3.8　　[Reserved].

3.9　　Disposition of Deposit.  In the event that this Agreement is terminated by (1) Purchaser or Seller (or jointly by both Purchaser and Seller) pursuant to Sections 8.1(a), (b), (e), (f), (g) or (h)  or (2) by Purchaser pursuant to Sections 8.1(c) or (d), then, in each case, Purchaser and Seller shall promptly, and in any event no later than five (5) Business Days following the termination of this Agreement, direct and cause Sherwood to return the entire Deposit to Purchaser.  In the event this Agreement is terminated by Seller pursuant to Sections 8.1(c) or (d), Purchaser and Seller shall promptly, and in any event no later than five (5) Business Days following the termination of this Agreement, direct and cause Sherwood to pay the Deposit to Seller.  Provided however, notwithstanding anything to the contrary herein, in the case of termination by the Purchaser pursuant to Sections 8.1(e)(iii) or (f), Sherwood shall not be required to return the Deposit if the Purchaser remains obligated as Back-up Bidder until such time as the Sellers consummate an Alternative Transaction.

**ARTICLE 4**
**CONDITIONS PRECEDENT AND DELIVERIES**

4.1　　Conditions Precedent to obligations of Purchaser.  The obligations of Purchaser under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date (which conditions precedent may be waived prior to the consummation of the Closing by Purchaser in its sole discretion):

　　　　(a)　　Representations and Warranties True on the Closing Date; Covenants.

　　　　　　　(i)　　As of the date of this Agreement and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) the representations and warranties contained in Sections 5.1, 5.2, 5.3(a), (b), and (c) and 5.5, 5.14(a), and 5.15 shall be true and correct in all respects (except, in the case of Section 5.5, for de minimis inaccuracies), and (ii) all other representations and warranties set forth in Article 5 shall, in the aggregate (and when read without any qualification as to "materiality" or "Material Adverse Change" or another similar qualifier and, with respect to Sections 5.6 and 5.9 only, when read without any qualification as to the "Knowledge of Seller" or similar qualification), be true and correct in all material respects.

　　　　　　　(ii)　　Seller shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date, provided that if an obligation or covenant is already qualified by materiality or Material Adverse Change, then such obligation or covenant must be true in all material respects and shall not be subject to the materiality qualifier herein.

　　　　(b)　　Bankruptcy Proceedings.

　　　　　　　(i)　　The Sale Order Condition shall be satisfied in full.

　　　　　　　(ii)　　Notwithstanding anything in Section 4.1(b)(i) to the contrary, nothing in this Agreement shall preclude Purchaser or Seller from consummating the transactions contemplated herein if the Parties waive the requirement that the Sale Order shall have become a

Final Order.  No notice of such waiver of this or any other condition to Closing need be given except to Seller, the Creditors' Committee, and the United States Trustee, it being the intention of the Parties that Purchaser shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of Law if the Closing occurs in the absence of Final Orders.

(iii)    The Stalking Horse Order Condition shall be satisfied in full.

(c)    <u>Litigation</u>.  No court order or Governmental Order shall have been entered that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(d)    <u>Approvals</u>.  Subject to the receipt of the approval of the Bankruptcy Court pursuant to the Sale Order, all authorizations, consents, filings and approvals necessary to permit Seller to perform the transactions contemplated hereby, other than those authorizations, consents, filings and approvals which are not material, shall have been duly obtained, made or given, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.  All terminations or expirations of waiting periods (and any extension thereof) imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

(e)    <u>Closing Deliverables</u>.

(i)    Seller shall have delivered to Purchaser a certificate signed by the Chief Executive Officer, the Chief Strategy Officer or any Vice President of Seller, dated as of the Closing Date, certifying that the conditions specified in <u>Section 4.1(a)</u> and <u>Section 4.1(b)</u> have been satisfied as of the Closing.

(ii)    Seller shall have delivered to Purchaser (1) a duly executed General Assignment and Bill of Sale for the Purchased Assets in the form attached hereto as <u>Exhibit B</u> (the "<u>General Assignment</u>"); (2) duly executed assignments of registered Intellectual Property included within the Purchased Assets in a form reasonably acceptable to the Parties and suitable for recording in the U.S. Patent and Trademark Office and U.S. Copyright Office and duly executed general assignments of all other purchased Intellectual Property, and (3) such other instruments of conveyance, assignment and transfer as shall be reasonably required to vest in Purchaser good, valid and marketable title in and to the Purchased Assets, duly executed by Seller (the agreements and other instruments referred to in this <u>Section 4.1(e)(ii)</u> and <u>Section 4.3</u> are collectively referred to herein as the "<u>Collateral Agreements</u>").

(iii)    Seller shall have delivered to Purchaser all necessary forms and certificates complying with applicable Legal Requirements, duly executed and acknowledged by Seller, certifying that the transactions contemplated hereby are exempt from withholding under Section 1445 of the Code.

(iv)    Seller shall have delivered to Purchaser those documents referred to in <u>Section 4.3</u> to which it is a party.

(v)    Seller shall have delivered to Purchaser a certificate of the Secretary of Seller certifying as to:  (i) the full force and effect of its certificate of incorporation

and bylaws attached as exhibits; (ii) the full force and effect of the resolutions of its board of directors and stockholders authorizing the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby; and (iii) the signature and incumbency of each officer of Seller executing this Agreement or any of the other Transaction Documents to which it is a party.

(vi)     Seller shall have delivered a certificate evidencing the good standing of Seller in its jurisdiction of organization as of a recent date.

4.2     Conditions Precedent to obligations of Seller.  The obligations of Seller under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date (which conditions precedent may be waived by Seller, in accordance with applicable law and in consultation with the Creditors' Committee, prior to the consummation of the Closing):

(a)     Representations and Warranties True on the Closing Date; Covenants.

(i)     As of the date of this Agreement and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) the representations and warranties contained in Sections 6.1 and 6.2(a), (b) and (c) shall be true and correct in all respects and (ii) all other representations and warranties set forth in Article 6 shall, in the aggregate (and when read without any qualification as to "materiality" or "Material Adverse Change" or another similar qualifier), be true and correct in all material respects.

(ii)     Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, provided that if an obligation or covenant is already qualified by materiality or Material Adverse Change, then such obligation or covenant must be true in all material respects and shall not be subject to the materiality qualifier herein.

(b)     Bankruptcy Court Approval.  The Sale Order shall have been entered by the Bankruptcy Court.

(c)     Litigation.  No court order or Governmental Order shall have been entered that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

(d)     Closing Deliverables.

(i)     Purchaser shall have delivered to Seller a certificate signed by the Chief Executive Officer or any Vice President of Purchaser, dated as of the date of the Closing Date, certifying that the conditions specified in Section 4.2(a) have been satisfied as of the Closing.

(ii)     Purchaser shall have delivered to Seller those documents referred to in Section 4.3 to which it is a party.

4.3     Mutual Closing Deliverables.  At the Closing, Purchaser and Seller shall mutually execute and deliver to the other:

(a)     one or more Assignment and Assumption Agreements with respect to the Transferred Agreements, in forms reasonably acceptable to the Parties (the "Assignment and Assumption Agreements");

(b)     the Transition Services Agreement; and

(c)     such other agreements, instruments and documents which shall be necessary or appropriate to effectuate and consummate the transactions contemplated hereby on and as of the Closing Date.

4.4     Tangible Assets.  Purchaser and Seller shall mutually agree upon the schedule for the delivery to Purchaser of the physical Books and Records and the Tangible Assets, and such delivery shall (a) be made at Purchaser's expense and (b) take place no later than 10 days after Closing.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLER

Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided herein, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets, the Assumed Liabilities or the Business. Except as specifically disclosed in the disclosure schedule attached hereto (the "Disclosure Schedule") (referencing the appropriate section and paragraph numbers), Seller hereby represents and warrants to Purchaser, as follows:

5.1     Organization; Good Standing; Qualification.

(a)     Seller is a corporation duly formed and organized, validly existing, and in good standing under the Laws of the State of Delaware.  Seller has all necessary corporate power and authority to own its properties and to carry on its business as now conducted and as currently contemplated to be conducted.

(b)     Seller is duly qualified to transact business and is in good standing in all jurisdictions in which the nature of its business or of its properties makes such qualification necessary, except where the failure to be so qualified and in good standing, individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Change. Prior to the date of this Agreement, Seller has delivered to Purchaser complete and correct copies of the certificate of incorporation and bylaws of Seller, as presently in effect.

5.2     No Subsidiaries.  Seller does not have any Subsidiary and does not own any shares of capital stock or securities of any other Person.

5.3     Authority.

(a)     Except for such authorization as is required by the Bankruptcy Court, Seller has all requisite corporate power and authority to enter into this Agreement and the other Transaction Documents to which it is or will be a party, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.

(b)     Except for such authorization as is required by the Bankruptcy Court, the execution and delivery of this Agreement and the other Transaction Documents to which Seller is or will be a party,  the consummation by Seller of the transactions contemplated hereby and thereby and the performance by Seller of its obligations hereunder and thereunder have been duly and validly authorized by all necessary corporate action on the part of Seller, and no other corporate proceedings on the part of Seller or any holders of its equity is required to authorize this Agreement and the other Transaction Documents to which Seller is or will be a party or for Seller to consummate the transactions contemplated hereby or thereby.

(c)     Except for such authorization as is required by the Bankruptcy Court, this Agreement has been and the other Transaction Documents to be executed and delivered by Seller at the Closing will, at the Closing, have been, duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Purchaser (in the case of this Agreement) or by the other parties thereto (in the case of the other Transaction Documents), constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, subject to the effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar Laws affecting the rights of creditors.

(d)     Except as set forth in Section 5.3(d) of the Disclosure Schedule, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which Seller is or will be a party, the consummation by Seller of the transactions contemplated hereby and thereby and the performance by Seller of its obligations hereunder and thereunder does not and will not, (i) with such exceptions as, individually and in the aggregate, do not have and are not reasonably likely to have a Material Adverse Change and subject to the entry by the Bankruptcy Court of the Sale Order, conflict with, result in any violation or breach of, constitute a default under, give rise to a right of termination, cancellation or acceleration of any obligation under, require any consent, notice, authorization, approval or waiver under, or result in any other adverse consequence under, any Transferred Agreement or other Contract to which Seller is a party, (ii) result in any violation of or default under, or give rise to a right of termination, cancellation or acceleration of any obligation under, any Governmental Order applicable to Seller or its Affiliates or the Purchased Assets, (iii) conflict with or violate any provision of the certificate of incorporation or bylaws of Seller; (iv)  subject to the entry by the Bankruptcy Court of the Sale Order, violate or breach the terms of or cause any default under any applicable Law; (v) result in the imposition of any Lien upon any assets or properties of Seller; or (vi) with the passage of time, the giving of notice or the taking of any action by another Person, have any of the effects described in clauses (i) through (v) of this Section 5.3(d).

5.4     Consents.  Subject to the necessary authorization from the Bankruptcy Court, no consent, waiver, approval, order, action or authorization of any other Person, or registration, declaration or filing with any Governmental Authority with jurisdiction over the Purchased

Assets, is required by, or with respect to, Seller in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Seller is or will be a party, the consummation by Seller of the transactions contemplated hereby and thereby or the performance by Seller of any of its obligations hereunder or thereunder. Subject to the necessary authorization from the Bankruptcy Court, there is no Contract (not to compete or otherwise), commitment or Governmental Order to which Seller is a party binding upon the Purchased Assets which prohibits the consummation of the transactions contemplated hereby or Purchaser's use and conduct of the Purchased Assets and the Business following the Closing Date as such Purchased Assets and Business are presently used and conducted, as applicable, by Seller.

5.5     Title. Subject to the receipt of the approval of the Bankruptcy Court pursuant to the Sale Order, Seller has good, valid and marketable title to all of the Purchased Assets free and clear of any and all Liens, other than Liens that will be discharged by the Bankruptcy Court pursuant to the Sale Order. After giving effect to the consummation of the transactions contemplated by this Agreement, including the entry by the Bankruptcy Court of the Sale Order, Purchaser will have good, valid and marketable title to the Purchased Assets free and clear of any and all Encumbrances.

5.6     Intellectual Property Rights.

(a)     Section 5.6(a) of the Disclosure Schedule contains a true and complete list of all Registered Owned Intellectual Property, in each case, enumerating specifically the applicable filing or registration number, title, registrar, jurisdiction, status, date of filing/issuance and current applicant(s)/registered owners(s), as applicable and as to domain names, current Administrative Contacts with an active and attended email address. All assignments of the Owned Intellectual Property to Seller have been properly executed, delivered and recorded. All registrations and applications for the Registered Owned Intellectual Property are valid and enforceable and all issuance, renewal, maintenance and other payments that are or have become due with respect thereto have been timely paid by or on behalf of the Seller.

(b)     Seller (i) is the sole and exclusive owner of all right, title and interest in and to all Owned Intellectual Property, and (ii) possesses a valid and enforceable license to use all other Intellectual Property used in connection with the Business. Each item of Business Intellectual Property will be owned or available for use by Purchaser immediately following the Closing Date on substantially identical terms and conditions as it was prior to the Closing Date. All Owned Intellectual Property is valid and enforceable and Seller is not party to or bound by any Contract that limits, restricts or otherwise impairs its ability to use, sell, transfer, assign, license or convey, or that otherwise affects, any of the Owned Intellectual Property. None of the Owned Intellectual Property is subject to any claims of joint ownership, and, except as set forth in Section 5.6(b) of the Disclosure Schedule, to the Knowledge of Seller, all actions necessary to maintain and protect the Owned Intellectual Property and the Seller's rights in and to the Licensed Intellectual Property have been taken, including payment of all applicable royalty, license, usage and service fees and the filing of applicable registrations, applications and renewals.

(c)     The Business Intellectual Property constitutes all Intellectual Property necessary for the conduct of the Business and the same shall not be adversely affected by the

execution and delivery of this Agreement, the performance by the Parties of their obligations hereunder or the consummation of the transactions contemplated hereby.

(d)     To the Knowledge of Seller, neither the conduct of the Business nor the Business Intellectual Property (or any use thereof) infringes, misappropriates or otherwise violates the rights of any Person, including any Intellectual Property owned or purported to be owned by any third party. Seller is not the subject of, and has not been the subject of, any actual or, to the Knowledge of Seller, threatened Proceeding (i) alleging that Seller has infringed, misappropriated or violated any Intellectual Property of any other Person in connection with the conduct of Seller's businesses or (ii) concerning the ownership, validity, registerability, enforceability or use of, or right to use, any Business Intellectual Property. No complaint, claim or notice, or threat of any of the foregoing (including any notification that a license under any patent or other Intellectual Property is or may be required), whether, directly or indirectly, communicated orally and/or via email, writing, or otherwise, has been received by or communicated to Seller alleging any such infringement, violation or misappropriation or concerning the ownership, validity, registerability, enforceability or use of, or right to use, any Business Intellectual Property. To the Knowledge of Seller, no Person (including any current or former employee or consultant of the Seller) is infringing, misappropriating, or violating the Business Intellectual Property, or any rights of Seller in or to any Business Intellectual Property.

(e)     Except as set forth in <u>Section 5.6(e)</u> of the Disclosure Schedule, each current and former employee of Seller who works or worked in the Seller's businesses and each current and former independent contractor of Seller who provides or provided services to the Business, in each instance, that was or is involved in the invention, creation, formulation, development, design or modification of any Owned Intellectual Property material to the operation of the Business has executed a valid and binding written agreement expressly assigning to Seller (and requiring the confidentiality of) all right, title and interest in and to all Intellectual Property invented, created, formulated, developed, modified, conceived and/or reduced to practice during the term of such employee's employment or such independent contractor's work for the Seller, and has waived all moral rights therein to the extent legally permissible (collectively, "<u>IP Assignment Agreements</u>"). To the Knowledge of Seller, all invention, creation, formulation, development, design and modification of the Owned Intellectual Property was undertaken by either current or former employees of Seller who work or worked in the Business within the scope of their employment or current or former independent contractors of Seller who provide or provided services to the Business within the scope of their engagement.

(f)     The IT Systems owned or used by Seller in connection with the Business (i) are sufficient in all material respects for the current and contemplated operations of the Seller's businesses; (ii) operate properly without any material defect, malfunction, unavailability or error; and (iii) are reasonably secure against unauthorized access, intrusion, tampering, impairment, disruption, computer virus or malfunction. To the Knowledge of Seller, there has been no: (x) breach of such IT Systems whereby any Proprietary Information constituting Business Intellectual Property has been accessed by, or disclosed to, any Person in an unauthorized manner or (y) unauthorized disclosure of any Proprietary Information in the possession, custody or control of the Seller.

(g)     Except as set forth in <u>Section 5.6(g)</u> of the Disclosure Schedule, Seller has not (i) incorporated Open Source Materials into, or combined Open Source Materials with, the Owned Intellectual Property; (ii) distributed Open Source Materials in conjunction with any other Software developed, distributed or otherwise exploited by the Seller; or (iii) used Open Source Materials that create, or purport to create, obligations for Seller with respect to the Owned Intellectual Property or grant, or purport to grant, to any third party, any rights or immunities under Intellectual Property rights (including, but not limited to, using any Open Source Materials that require, as a condition of the use of such Open Source Materials, that other Software incorporated into, derived from or distributed with such Open Source Materials be (x) disclosed or distributed in source code form, (y) licensed for the purpose of making derivative works, or (z) redistributable at no charge or minimal charge).

(h)     Seller has taken reasonable measures and implemented reasonable procedures, standards, systems, policies and technologies consistent with industry standards to maintain in confidence and protect the proprietary nature of all Confidential Intellectual Property. None of the Confidential Intellectual Property has been disclosed other than to Persons who are bound by written confidentiality agreements or IP Assignment Agreements protecting the confidentiality thereof, and there has been, to the Knowledge of Seller, no actual or alleged violation of such agreements with respect to any Confidential Intellectual Property. No Proceeding relating to an improper use or disclosure, or breach in the security or confidentiality, of any Confidential Intellectual Property has been initiated or threatened against the Seller.

(i)     (i) Seller is not a party to or bound by any Contract that limits, restricts or impairs its ability to use, sell, transfer, assign, license or convey, or that otherwise adversely affects, any of the Owned Intellectual Property and (ii) none of the Owned Intellectual Property is subject to, or have been the subject of, any Governmental Order or Contract restricting the use thereof by Seller.

(j)     Seller has at all times complied with (i) all Privacy Laws and (ii) all Privacy Agreements, and, to the Knowledge of Seller, no Person has made any illegal or unauthorized use of any Personal Data constituting Business Intellectual Property. Except as set forth in <u>Section 5.6(j)</u> of the Disclosure Schedule, the Privacy Agreements do not require the delivery of any notice to or consent from any Person, or prohibit the unqualified transfer of Personal Data constituting Business Intellectual Property, in connection with the execution, delivery or performance of this Agreement, or the consummation of any of the transactions contemplated hereby and thereby.

(k)     Seller has since December 31, 2013 complied with (i) card industry regulations and contractual requirements regarding the collection, protection, storage, processing, use and disclosure of Personal Data, including (y) the Payment Card Industry Data Security Standard (PCI-DSS) together with any related mandates, policies, standards and guidelines applicable thereto, and (z) any similar certification programs implemented by the major credit card companies governing the use, disclosure, storage, transmission, privacy and/or security of Personal Data and (ii) applicable Laws regarding lotteries, games of chance and sweepstakes.

5.7    Contracts.

(a)    Section 5.7(a) of the Disclosure Schedule contains a true and complete listing of all Contracts to which Seller is a party and are directly or indirectly related to the conduct of the Business (collectively, the "Seller Contracts").   Section 5.7(a) of the Disclosure Schedule sets forth the title and date, and the identity of the parties thereto for each such Contract.  True and correct copies of each such written Seller Contract (including all material written amendments, supplements and modifications, and all exhibits, schedules and attachments thereof) have been provided or made available to Purchaser prior to the date of this Agreement.  There are no oral Contracts that are Transferred Agreements.

(b)    Immediately after giving effect to the payment of the Cure Costs and the entry by the Bankruptcy Court of the Sale Order, (i) each Transferred Contract will be in full force and effect and a legal, valid and binding obligation of Seller and, to the Knowledge of Seller, each other party thereto, enforceable against Seller and each such other party in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar Laws affecting the rights of creditors, (ii) neither Seller, nor, to the Knowledge of Seller, any other party thereto, will be in default or breach of any such Transferred Contract, (iii) Seller has not waived any material right under any Seller Contract and (iv) there will be no unresolved disputes under any of Transferred Contracts. Subject to the receipt of the approval of the Bankruptcy Court pursuant to the Sale Order, no Transferred Contract will require any other party's consent in connection with the consummation of the transactions contemplated hereby or if such Transferred Contract does require such consent, such consent will be granted prior to or on the Closing Date.  The consummation of the transactions contemplated herein will not result in the breach of any material provision of or termination or voiding of any Transferred Contract.

5.8    Brokers or Finders.  Except for the arrangement with Sherwood as approved by the Bankruptcy Court, Seller has not dealt with any broker or finder in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof (it being understood that the fees and commissions due to Sherwood are the responsibility of Seller).

5.9    Leases.

(a)    Seller does not own, and, to the Knowledge of Seller, has never owned, any real property.

(b)    Section 5.9(b) of the Disclosure Schedule lists all leases, licenses, access agreements, subleases and other use agreements of real property to which Seller is a party relating to or used in connection with the Purchased Assets or the Business (collectively, the "Transferred Real Property Leases"). Subject to the entry of the Sale Order and payment of any Cure Costs and the entry of appropriate orders of the Bankruptcy Court, each Transferred Real Property Lease is in full force and effect and is enforceable against the counterparty thereto. True and correct copies of the leases, licenses, access agreements, subleases and other use agreements of the Leased Real Property and any and all ancillary documents pertaining thereto, including but not limited to, all amendments, extensions, side agreements and confirmation

letters, and to which Seller is a party or is bound have been made available to Purchaser prior to the date of this Agreement. Subject to the entry of the Sale Order and payment of any Cure Costs and the entry of appropriate orders of the Bankruptcy Court, each lease, license, access agreement, and other use agreements of furniture, fixtures, hardware, supplies, equipment and other personal property to which Seller is a party relating to or used in connection with the Purchased Assets or the Business (collectively, the "<u>Transferred Tangible Asset Leases</u>"), is in full force and effect and is enforceable against the counterparty thereto. True and correct copies of the Transferred Tangible Asset Leases and any and all ancillary documents pertaining thereto have been made available to Purchaser.

     5.10   <u>Taxes</u>.

     (a)   Except as set forth in <u>Section 5.10(a)</u> of the Disclosure Schedules, all Tax Returns required to be filed by Seller prior to the Closing Date have been timely filed and were correct and complete in all material respects and were prepared in substantial compliance with all applicable Laws. All Taxes required to be paid by Seller with respect to the Business or the Purchased Assets (whether or not required to be shown on any Tax Return) have been timely paid or will be timely paid by Seller when or prior to the time required by Law. Seller has withheld or paid over to the proper Governmental Authority all Taxes related to the Business or the Purchased Assets that are required to be withheld or paid over with respect to any period or transaction ended prior to the Closing Date.

     (b)   The taxpayer identification number of Seller is set forth on Section 5.10(b) of the Disclosure Schedule.

     5.11   <u>Litigation</u>. Except as set forth in <u>Section 5.11</u> of the Disclosure Schedule, there is no Proceeding pending or, to Seller's Knowledge, threatened against or affecting Seller that is arising out of, relating in any way to or in connection with the Business or the Purchased Assets.

     5.12   <u>Compliance with Laws; Permits</u>.

     (a)   Seller conducts the Business and holds the Purchased Assets, and since December 31, 2013 has conducted the Business and held the Purchased Assets, in compliance in all material respects with all applicable Laws. Seller has not received any written notice, or to Seller's Knowledge, any other notice of, or been charged with, the violation of any Laws.

     (b)   <u>Section 5.12(b)</u> of the Disclosure Schedule contains a true and complete list of all Permits held by Seller based upon, arising out of, or relating in any way to or in connection with the conduct of the Business or the Purchased Assets. Seller has all Permits that are required to operate the Business and hold the Purchased Assets. Seller is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any such Permit.

     5.13   <u>Transactions with Insiders</u>. <u>Section 5.13</u> of the Disclosure Schedule contains a true and complete list of all Contracts arising out of, relating in any way to or in connection with the Business between Seller, on the one hand, and any Insider, on the other hand, and a description of all other transactions between Seller, on the one hand, and any Insider, on the other hand, arising out of, relating in any way to or in connection with the Business that have

occurred since December 31, 2013.  No Insider has any interest in any of the Purchased Assets other than a security interest that will be released pursuant to the effectiveness of the Sale Order.

5.14    Absence of Certain Changes.  Except for the commencement of the Bankruptcy case or as set forth in Section 5.14 of the Disclosure Schedule, since December 31, 2015, Seller has conducted the Business only in the Ordinary Course and:

(a)    there has been no circumstance, state of facts or matters, change, event, occurrence, action or omission that, individually or in the aggregate, has, or would be reasonably likely to have, a Material Adverse Change; and

(b)    Seller has not taken any action that it is prohibited from taking after the date of this Agreement pursuant to Section 7.2.

5.15    No Undisclosed Liabilities.  Seller has not incurred any indebtedness, obligations or other Liabilities, other than Liabilities incurred in the Ordinary Course since December 31, 2015, Liabilities under this Agreement, Excluded Liabilities, and Liabilities that, individually and in the aggregate, have not had and are not reasonably likely to have a Material Adverse Change.

5.16    Employee Benefits.  Section 5.16 of the Disclosure Schedule contains a true and complete list of all Benefit Arrangements, Welfare Plans, Pension Plans, Multiemployer Plans or Contracts as to which Seller and their respective Affiliates have any Liability for current or former employees of Seller (the "Employee Benefit Plans").

(a)    True, correct and complete copies of the following documents, with respect to each of the Employee Benefit Plans have prior to the date of this Agreement, to the extent within the possession or control of Seller, been made available to Purchaser: (i) any plan and related trust documents, and all amendments thereto; (ii) the most recent Form 5500 and schedules thereto; (iii) the most recent financial statement and actuarial valuation; (iv) the most recent IRS determination letter; and (v) the most recent summary plan description (including letters or other documents updating such description).

(b)    None of the Employee Benefit Plans is or has been a Multiemployer Plan or is or has been subject to Sections 4063 or 4064 of ERISA, or is or has been subject to Section 412 of the Code or Title IV of ERISA, and Seller does not have any Liability under any such plan, including, but not limited to, any plan previously maintained or contributed to by Seller or any of their respective ERISA Affiliates.

(c)    Each of the Employee Benefit Plans intended to qualify under Section 401 of the Code has been determined by the IRS to be so qualified and, to the Knowledge of Seller, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)    Each Employee Benefit Plan is and has been operated and administered in accordance with its terms in all material respects and all applicable Laws.

(e)     Except as set forth in Section 5.16(e) of the Disclosure Schedule, no Employee Benefit Plan provides health, life insurance or other welfare benefits to retirees or other terminated employees of Seller, other than continuation coverage required by Section 4980B of the Code or Sections 601-608 of ERISA.

(f)     There are no legal proceedings with respect to any Employee Benefit Plan pending, or to the Knowledge of Seller, threatened, that are reasonably expected to give rise to a material Liability.  There is currently no audit or, to the Knowledge of Seller, investigation by any Governmental Authority or any claim (other than routine claims for benefits in the Ordinary Course) or legal proceeding against or involving any Employee Benefit Plan.

(g)     Except as set forth in Section 5.16(g) of the Disclosure Schedule, no event has occurred and no condition exists with respect to any Employee Benefit Plan or any other employee benefit plan or arrangement currently or previously maintained or contributed to by Seller, any of its Affiliates, or any of their respective ERISA Affiliates, that could subject Purchaser, or any of its Affiliates or their respective officers, directors, employees or agents, directly or indirectly, to any Tax, penalty, fine or other Liability or that could result in the imposition of any Lien.

(h)     All material contributions and premium payments required to have been paid under or with respect to any Employee Benefit Plan have been timely paid.

(i)     (x) No Employee Benefit Plan is (i) subject to Section 430 of the Code or Title IV of ERISA or Section 412 of the Code, (ii) subject to Sections 4063 or 4064 of ERISA, or (iii) a Multiemployer Plan, and (y) Seller has no obligation to contribute, and otherwise has no Liability with respect to, any such plans previously maintained or contributed to by Seller.

5.17   Labor.

(a)     Section 5.17(a) of the Disclosure Schedule sets forth a true and complete list of each currently effective labor or collective bargaining agreement, works council or similar agreement to which Seller is a party or by which Seller or any of its respective properties or assets is bound or otherwise subject.

(b)     There are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Seller, threatened against or involving Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Seller, threatened by or on behalf of any employee or group of employees of Seller.

(c)     Section 5.17(c) of the Disclosure Schedule also contains and true and complete list of each Employee as of the date of this Agreement, including for each such Employee his or her (i) name, (ii) date of birth, (iii) job title, (iv) status as a full-time, part-time or temporary employee, consultant, independent contractor or leased employee, (v) base salary or wage rate, (vi) 2015 bonus, (vii) date of hire, (viii) direct supervisor, and (ix) work location. Section 5.17(c) of the Disclosure Schedule also contains a true and complete list as of the date of this Agreement of each Employee who has not been attending work during the 30 day period preceding the date hereof on a basis that is consistent with such Employee's attendance at work during the 30 day period immediately prior to the filing of the Bankruptcy Case for any reason

other than vacation and the reason for such absence.  No individual who performs services for Seller is a leased employee or is domiciled outside of the United States.

(d)     Seller has, in good faith, properly classified for all purposes (including for Tax purposes and for purposes of determining eligibility to participate in any Employee Benefit Plan) all Persons who have performed services for or on behalf of Seller or the Business and have properly withheld and paid all applicable Taxes and makes appropriate filings in connection with services provided by such Persons to Seller or the Business in accordance with such classifications.

5.18     Condition and Sufficiency of Assets.

(a)     Except as set forth in Section 5.18 of the Disclosure Schedule, all of the Purchased Assets that are tangible assets of any kind or description are in good operating condition and repair, ordinary wear and tear excepted, and suitable in all material respects for their current and intended use.

(b)     The Purchased Assets constitute all the assets, properties and rights owned, used or held for use in connection with the Business.

5.19     [Reserved].

5.20     No Other Representations or Warranties; Disclaimer.  Except for the representations and warranties made by Seller in this Article 5 (as modified by the Disclosure Schedule) or Section 7.1(b), Seller has not made or shall be deemed to make or have made any other express or implied representation or warranty in this Agreement, and Purchaser expressly disclaims any such other representations or warranties.  Without limiting the generality of the foregoing, notwithstanding anything to the contrary in this Agreement, Seller has not made and shall not be deemed to make or have made any representation or warranty to Purchaser with respect to (a) any estimates, projections, forecasts, plans, budgets, or similar materials or information relating to the future operating and financial performance of the Business heretofore or hereafter delivered or made available to Purchaser or any of its agents or representatives, or (b) except as expressly covered by a representation and warranty contained in this Article 5, any other information or documents (financial or otherwise) delivered or made available to Purchaser or any of its agents or representatives with respect to Seller, its Affiliates, the Business, the Purchased Assets or the Assumed Liabilities. Without limiting the generality of the immediately foregoing, except for the representations and warranties specifically contained in Article 5 or Section 7.1(b), Seller hereby expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets; it being the intention of the Parties that the Purchased Assets are to be accepted by Purchaser in their present condition and state of repair.  Notwithstanding the forgoing, in no event shall this Section 5.20 limit Purchaser's remedies in the event of fraud by Seller.

# ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller, as of the date of this Agreement, as follows:

6.1     <u>Organization, Good Standing and Qualification</u>.  Purchaser is a corporation duly formed and organized, validly existing, and in good standing under the laws of Delaware. Purchaser has all necessary corporate power and authority to own its properties and to carry on its business as now conducted and as currently contemplated to be conducted.

6.2     <u>Authority</u>.

(a)     Purchaser has all requisite corporate power and authority to enter into this Agreement and the other Transaction Documents to which it is or will be a party, to consummate the transactions contemplated hereby and thereby and the perform its obligations hereunder and thereunder.

(b)     The execution and delivery of this Agreement and the other Transaction Documents to which Purchaser is or will be a party, the consummation by Purchaser of the transactions contemplated hereby and thereby and the performance by Purchaser of its obligations hereunder and thereunder have been duly and validly authorized by all necessary corporate action on the part of Purchaser, and no other corporate proceedings on the part of Purchaser or any holders of its equity is required to authorize this Agreement and the other Transaction Documents to which it is or will be a party or for Purchaser to consummate the transactions contemplated hereby or thereby.

(c)     This Agreement has been and the other Transaction Documents to be executed and delivered by Purchaser at the Closing will, at the Closing, have been, duly executed and delivered by Purchaser and, assuming the due authorization, execution and delivery by Seller and the other parties thereto, constitute legal, valid and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, subject to the effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar Laws affecting the rights of creditors.

(d)     The execution and delivery by Purchaser of this Agreement and the other Transaction Documents to which Purchaser is or will be a party, the consummation by Purchaser of the transactions contemplated hereby and thereby and the performance by Purchaser of its obligations hereunder and thereunder does not and will not, (i) with such exceptions as, individually and in the aggregate, do not have and are not reasonably likely to have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement, conflict with, result in any violation or breach of, constitute a default under, give rise to a right of termination, cancellation or acceleration of any obligation under, require any consent, notice, authorization, approval or waiver under, or result in any other adverse consequence under, any Contract to which Purchaser is a party,  (ii) result in any violation or default under, or give rise to a right of termination, cancellation or acceleration of any obligation under, any Governmental Order applicable to Purchaser, (iii) conflict with or violate any

provision of the certificate of incorporation or bylaws (or other similar organizational documents with different names) of Purchaser, (iv) subject to the entry by the Bankruptcy Court of the Sale Order, violate or breach the terms of or cause any default under any applicable Law, or (v) with the passage of time, the giving of notice or the taking of any action by another Person, have any of the effects described in clauses (i) through (iv) of this Section 6.2(d).

6.3     Consents.  Subject to the necessary authorization from the Bankruptcy Court, no consent, waiver, approval, order, action or authorization of any other Person, or registration, declaration or filing with any Governmental Authority with jurisdiction over Purchaser, is required by, or with respect to, Purchaser in connection with the execution and delivery by Purchaser of this Agreement and the other Transaction Documents to which it is or will be a party, the consummation by Purchaser of the transactions contemplated hereby and thereby or the performance by Purchaser of its obligations hereunder or thereunder.

6.4     Brokers or Finders.  Purchaser has not dealt with any broker or finder in connection with the transactions contemplated by this Agreement.  Purchaser has not incurred, and shall not incur, directly or indirectly, any Liability for any brokerage or finders' fees, agent's commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby for which any Person other than Purchaser and its Affiliates are responsible.

6.5     Litigation.  There is no Proceeding pending against Purchaser or any of its Affiliates that seeks to enjoin or prevent the consummation of the transactions contemplated hereby or, if determined adversely to Purchaser, would reasonably be expected to impair the ability of Purchaser to consummate the transactions contemplated hereby.

6.6     Sufficiency of Funds.  Purchaser, at the Closing, will have sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

6.7     Non-Reliance.  Except for the representations and warranties made by Purchaser in this Article 6, Purchaser has not made or shall be deemed to make or have made any other express or implied representation or warranty in this Agreement, and Seller expressly disclaims any such other representations or warranties.   Notwithstanding the forgoing, in no event shall this Section 6.7 limit Seller's remedies in the event of fraud by Purchaser.

## ARTICLE 7
## COVENANTS AND AGREEMENTS

7.1     Notice of Transaction as Required by Bankruptcy Court; Seller Not Party to Other Agreement.

(a)     The Parties acknowledge that under the Bankruptcy Code the sale of Purchased Assets is subject to approval of the Bankruptcy Court.  The Parties acknowledge that to obtain such approval Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to responsible

bidders, entertaining higher or better offers from responsible bidders. On or prior to January 13, 2017, Seller shall file an amended motion with the Bankruptcy Court seeking approval of Purchaser as the stalking horse bidder and of the payment to Purchaser of the Termination Fee and the Expense Reimbursement pursuant to the terms of this Agreement.

(b)     Seller represents that Seller is not a party to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or part of the equity interests of Seller, the Business or the Purchased Assets (other than any agreement relating to the Back-up Bid).

(c)     Seller covenants to provide timely, proper and sufficient notice of the transactions contemplated by this Agreement to (i) the Office of the United States Trustee, the Creditors' Committee, and any other party requesting notice in the Bankruptcy Case, (ii) all creditors in the Bankruptcy Case (with such notice to be in a form reasonably acceptable to Purchaser), (iii) all known holders of Liens in or parties with an interest in any of the Purchased Assets, (iv) all parties to or with any interest in the Transferred Agreements or the assets or business relating thereto, (v) any and all parties required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Practice and Procedure of the Bankruptcy Court or the Bankruptcy Court and (vi) any and all other parties reasonably requested by Purchaser.

7.2     <u>Interim Covenants</u>.

(a)     Except with the prior written consent of Purchaser, from and after the date of this Agreement through the consummation of the Closing, Seller shall operate the Business in the Ordinary Course. Without limiting the foregoing, from and after the date of this Agreement through the consummation of the Closing, Seller shall:

(i)     maintain the Purchased Assets in a manner consistent with past practices, reasonable wear and tear excepted and maintain the types and levels of insurance currently in effect in respect of the Purchased Assets;

(ii)     subject to approval of the Bankruptcy Court (if required), upon any damage, destruction or loss to any Purchased Asset, apply any insurance proceeds received with respect thereto to the prompt repair, replacement and restoration thereof to the condition of such Purchased Asset before such event or, if required, to such other (better) condition as may be required by applicable Law;

(iii)     use commercially reasonable efforts consistent with past practice to: (A) preserve intact the Business; (B) keep available the services of all individuals who perform services for or on behalf of Seller (as an employee, consultant, independent contractor, leased employee, intern or otherwise); (C) preserve the goodwill of the suppliers, customers and others having business relationships with Seller; (D) not shorten or lengthen the customary payment cycles for any of their payables or receivables; and (E) continue in full force and effect without modification any existing policies or binders of insurance currently maintained by Seller;

(iv)     promptly advise Purchaser in writing of the occurrence of any event that: (A) has resulted in or would reasonably be expected to result in any of the conditions to the consummation of the transactions contemplated by this Agreement not being satisfied

(other than Seller's negotiation or entry into a Contract relating to an Alternative Transaction); (B) would require the consent of any Person for the consummation of the transactions contemplated by this Agreement; (C) there is any Proceeding pending or, to the Knowledge of Seller, threatened, that relates to the transactions contemplated by this Agreement; (D) any of the representations, warranties, covenants or agreements of Seller in this Agreement is or may be inaccurate or otherwise breached; or (E) has had, or would reasonably be expected to have, a Material Adverse Change;

(v)     consult with Purchaser and its representatives upon Purchaser's reasonable request concerning the Stalking Horse Order and Sale Order, and the bankruptcy proceedings in connection therewith, provide Purchaser with copies of requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable (but in no event less than twelve (12) hours) prior to any submission thereof to the Bankruptcy Court, and incorporate into such filings all reasonable comments provided by Purchaser prior to the filing thereof; and

(vi)     promptly take such actions, including, without limitation, furnishing affidavits or other documents for filing with the Bankruptcy Court and providing a witness to testify, as are reasonably necessary to satisfy the Sale Order Condition.

(b)     From and after the date of this Agreement through the consummation of the Closing, except with respect to the negotiation or entry into a Contract relating to an Alternative Transaction or any action authorized by this Agreement, Seller shall not take any material action outside of the Ordinary Course without the prior written consent of Purchaser, including without limitation the following:

(i)     enter into, terminate or amend or reject any of the Transferred Agreements, or cancel, modify or waive any claims held in respect of the Purchased Assets or waive any rights of value;

(ii)     acquire any properties or assets that are related to the Business or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets or any interest in any of the Purchased Assets;

(iii)     dispose of or fail to keep in effect any material rights in, to, or for the use of any of the Intellectual Property used in the Business, except for rights which expire or terminate in accordance with their terms;

(iv)     subject any Purchased Assets to any Liens other than Liens that are approved by the Bankruptcy Court;

(v)     (A) increase the annual level of compensation of any Employee, (B) grant any additional compensation to any Employee, (C) increase the coverage or benefits available under any Employee Benefit Plan or (D) enter into any employment, deferred compensation, severance or similar Contract (or amend any such Contract) to which a Seller is a party with an Employee, in each case, except for additional compensation or benefit arrangements that are approved by the Bankruptcy Court with respect to Seller's management level employees;

(vi)     enter into, modify or terminate any labor or collective bargaining agreement;

(vii)    change or modify the accounting policies, practices or procedures of the Business, except as required by GAAP or a change in Law;

(viii)   change or modify any of the following:  (i) billing and collection policies, procedures and practices with respect to Accounts Receivable or unbilled charges that relate to the Business; or (ii) policies, procedures and practices with respect to the provision of discounts, rebates or allowances that relate to the Business;

(ix)     enter into any material transaction relating to the Business; or

(x)      authorize any of the foregoing, or commit or agree to take actions, whether in writing or otherwise, to do any of the foregoing.

7.3     Further Assurances.  Each Party covenants from and after the date of this Agreement and until the consummation of the Closing (and subject to the other terms and conditions of this Agreement):

(a)      to cooperate with the other party and to take such actions as may be reasonably necessary, in each case, as promptly as possible in: (i) determining whether notices, declarations, registrations and filings are required to be made with or consents required to be obtained from any Governmental Authority in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents, and in making or causing to be made any such notices, declarations, registrations and filings promptly; (ii) obtaining, in a timely manner, any such consents; and (iii) furnishing the other party and to the other party's counsel all such information as may be reasonably required in order to effectuate the foregoing actions; and

(b)      without limiting the specific obligations of any party under any covenant or agreement under this Agreement, to use commercially reasonable efforts to take all action and do all things necessary in order to promptly consummate the transactions contemplated hereby and by the other Transaction Documents, including satisfaction, but not waiver, of the conditions precedent set forth in Article 4; provided, however, that nothing in this Agreement shall require (i) Seller to limit its efforts to enter into a Contract relating to an Alternative Transaction, or (ii) Purchaser to incur any out-of-pocket expense or change any terms to any Contract to which Purchaser or any of its Affiliates is a party in order to obtain any consent or cause any condition precedent to be satisfied.  Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement will require or obligate Purchaser or any of its Affiliates to (and in no event shall any representation, warranty or covenant of Purchaser contained in this Agreement be breached or deemed breached as a result of the failure of Purchaser to take any of the following actions) (i) agree to or otherwise become subject to any limitations on (A) the right of Purchaser effectively to control or operate its business (including the Business) or assets (including the Purchased Assets), (B) the right of Purchaser to acquire the Purchased Assets, or (C) the right of Purchaser to exercise full rights of ownership of its business (including the Business) or assets (including the Acquired Assets), (ii) agree or be required to sell or otherwise dispose of, hold

(through the establishment of a trust or otherwise), or divest itself of all or any portion of the business, assets or operations of Purchaser or any of its Affiliates or the Business or any of the Purchased Assets, or (iii) otherwise take any steps to avoid or eliminate any impediment that may be asserted under any Law governing competition, monopolies or restrictive trade practices.

7.4     <u>Public Announcements</u>.  Except as may be required by the Bankruptcy Court, the Bankruptcy Code, the federal securities laws or any other applicable Law, prior to the Closing, neither of Purchaser nor Seller will issue any press release or make any other public announcement relating to the transactions contemplated by this Agreement without the prior consent of the other Parties.  Except as may be required by the Bankruptcy Court, the Bankruptcy Code, the federal securities laws or any other applicable Law, following the Closing, (i) Seller shall not issue any public announcement regarding the transactions contemplated hereby without Purchaser's prior consent, and (ii) Purchaser shall have the right to make a public announcement regarding the transactions contemplated hereby.  Any party wishing to issue any such press release or make any such other public announcement that references any of the other Parties other than to state that the acquisition has occurred or other information contained in a Final Order, will afford such other Parties a reasonable opportunity to review and comment on such press release or public announcement relating to the transactions contemplated by this Agreement.

7.5     <u>Post-Closing Tax Covenants</u>.

(a)     To the extent relevant to the Business or the Purchased Assets, each Party shall (i) provide the other Parties with such assistance as may reasonably be required in connection with the preparation of any Tax Return and the conduct of any audit or other examination by any Governmental Authority or in connection with judicial or administrative proceedings relating to any Liability for Taxes arising out of or related to the Business or the Purchased Assets, (ii) retain until the expiration of the applicable statute of limitations (and any extensions thereof) and provide the other Parties with reasonable access to all records or other information that may be relevant to the preparation of any Tax Returns, or the conduct of any audit, examination or other proceeding by a Governmental Authority relating to Taxes arising out of or related to the Business or the Purchased Assets, and (iii) give the other Parties reasonable written notice prior to transferring, destroying or discarding any such records or other information, and if any other Party so requests, allow such Party to take possession of such records or other information at such Party's expense.

(b)     Property Taxes with respect to the Purchased Assets (to the extent they constitute Tangible Assets) for a taxable period beginning on or before and ending after the Closing Date shall be prorated based on the number of days in such period that occur before the Closing Date, on the one hand, and the number of days in such period that occur after the Closing Date, on the other hand, the amount of such property Taxes allocable to the portion of the period ending on the Closing Date being the responsibility of Seller and the remainder being the responsibility of Purchaser.  No later than five (5) days after receipt by Seller of a written statement from Purchaser so apportioning any such property Taxes in accordance with the prior sentence, Seller shall pay to Purchaser the portion of such property Taxes that are the responsibility of Seller.

(c)     Purchaser and Seller agree to use the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53 for employment Taxes with respect to any employees of Seller employed in the Business that become employees of Purchaser after the Closing.

(d)     In the event of any audit or other proceeding with respect to the Taxes of Seller arising out of or related to the Business or the Purchased Assets, Seller may not compromise, settle or otherwise resolve any such audit or other proceeding in a manner that could have an adverse effect on Purchaser or any of its Affiliates, including by reference to Purchaser's future business operations and use of the Purchased Assets, without the prior written consent of Purchaser, such consent not to be unreasonably withheld, conditioned or delayed. Seller may not file any amended Tax Return or refund claim with respect to the Business or the Purchased Assets that could have an adverse effect on Purchaser or any of its Affiliates, including by reference to Purchaser's future business operations and use of the Purchased Assets, without the prior written consent of Purchaser, such consent not to be unreasonably withheld, conditioned or delayed.

7.6     Confidentiality.  Subject to Section 7.4 above, each Party will not use, and maintain strict confidentiality with respect to, all of the other Parties' Confidential Information (as hereinafter defined) furnished by or on behalf of such other Parties  in connection with this Agreement except to the extent required by Law or Governmental Order, provided, however, that following the Closing Date, all Confidential Information relating to the Purchased Assets and the Business shall be deemed to be Confidential Information of Purchaser.  "Confidential Information" means any and all non-public, confidential or proprietary information that, with respect to Purchaser, is related to the Purchased Assets or the operations of Purchaser and its Affiliates, and with respect to Seller, is based upon, arising under or relating in any way to the Business, the Purchased Assets, or the operations of Seller and its Affiliates, other than information that (i) is, at the time of disclosure to the receiving party, already in the receiving party's possession; (ii) is or becomes available to the public other than as a result of a breach of this Agreement by the receiving party or its representatives; (iii) becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party or their representatives, provided that such source is not known by receiving party to be bound by a confidentiality agreement or other legal or fiduciary obligation of secrecy to the disclosing party; or (iv) is independently developed by the receiving party.

7.7     Intellectual Property; Domain Names.  Following the Closing, Seller shall, at Purchaser's sole cost and expense, take all actions reasonably requested by Purchaser, and shall execute any documents as may be reasonably requested by Purchaser, from time to time to fully vest or perfect in Purchaser all right, title and interest in and to all of the Owned Intellectual Property.  Such actions shall include, without limitation, execution of the assignments in form and substance reasonably acceptable to Purchaser, which shall be suitable for recording with the applicable Governmental Authority in the applicable jurisdictions throughout the world in which the Owned Intellectual Property is issued, granted or registered or for which an application has been filed and providing documents and information in the possession or control of Seller that are reasonably necessary for Purchaser or any of its Affiliates, designees or agents to prosecute or maintain any registration or application for any of the Owned Intellectual Property, or pursue or defend any administrative, court or other legal proceeding involving any of the Intellectual Property included in the Purchased Assets, including taking such actions as are reasonably

necessary pursuant to the procedures of the applicable registrar(s) to transfer the Domain Names to Purchaser (*e.g.*, providing access, forwarding "authorization codes").

7.8    <u>Brokers</u>.  Seller shall be responsible for all amounts due to Sherwood.

7.9    <u>Employee Matters</u>.  Notwithstanding any non-solicitation provision contained in the Non-Disclosure Agreement dated as of [●], 2016 entered into by and between Purchaser, Seller and Scout Media Holdings, Inc., Purchaser and its Affiliates shall have the right, but not the obligation, to offer employment to any or all of the Employees.  Purchaser may offer employment to such employees on such terms and conditions as may be acceptable to Purchaser in its sole discretion and need not bear any relationship to terms and provisions applicable to their employment by Seller or its Affiliates.  In the event Seller hires any individual as an employee after the date of this Agreement and prior to the Closing Date, it shall give Purchaser written notice thereof no less than five (5) Business Days prior to the Closing Date.  Purchaser may, at its option, offer employment to such individual on such terms and conditions as it may determine.  Each employee to whom Purchaser or one of its Affiliates has made an offer of employment or offer of another type of services relationship and who has accepted such offer and commences employment or other services relationship with Purchaser or its Affiliates on or following the Closing Date (including, for the avoidance of doubt, deemed acceptance by continuing to report to work following the Closing Date) is hereinafter referred to as a "<u>Transferred Employee</u>." Seller shall deliver to Purchaser on the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such Employees as Seller certifies in writing are exempt from such requirement). Purchaser acknowledges that Seller or its Affiliates may, in their sole discretion, issue notices required under the WARN Act. Purchaser agrees and acknowledges that any such notices and that the matters or consequences arising from the issuance or failure to issue such notices shall not constitute a Material Adverse Change. Nothing contained in this <u>Section 7.9</u> or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee by Purchaser or any change in the particular benefits made available to any individual Transferred Employee by Purchaser.

7.10    <u>Assumption Effective Date</u>.  The Parties agree that all Transferred Contracts that are assigned to, and assumed by, Purchaser will be deemed to have been assigned to, and assumed by, Purchaser on the date that is the later of (a) the Closing Date, or (b) (i) the date following the expiration of the deadline for objection to assumption and assignment of the Contract or to a proposed cure amount, if no such objection is submitted or (i) the third (3rd) Business Day following the date of resolution of any such objection.

## ARTICLE 8
## TERMINATION; TERMINATION PAYMENT

8.1    <u>Termination</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)    by written agreement of each of Purchaser and Seller;

(b)      by either of Purchaser or Seller if any Governmental Authority shall have issued a Governmental Order or taken any other action, in each case permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated hereby;

(c)      by either of Purchaser or Seller (*provided* that the terminating Party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of or failure to perform in any material respect any of the covenants or obligations set forth in this Agreement on the part of Seller, on the one hand, or Purchaser, on the other hand, which breach, misrepresentation or failure would give rise to the failure of the conditions set forth in Section 4.1(a) or Section 4.2(a), as the case may be, and such breach, misrepresentation or failure cannot be cured prior to the Termination Date, unless such breach, misrepresentation or failure, by its nature, cannot be cured prior to the Closing;

(d)      by either of Purchaser or Seller (*provided* that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if satisfaction of a material condition set forth in Section 4.1 or Section 4.2, as the case may be, for the benefit of the terminating party cannot be fulfilled or satisfied prior to the Termination Date and has not been waived by the terminating party, provided that the terminating party shall not be responsible for the failure of such condition to be satisfied;

(e)      by either Purchaser or Seller if Seller (i) consummates an Alternative Transaction (other than with Purchaser), (ii) files a motion seeking approval of chapter 11 plan that contemplates the sale or retention of the Purchased Assets in a manner substantially inconsistent with the terms of this Agreement or (iii) Seller executes and delivers an agreement or understanding of any kind with respect to an Alternative Transaction with any party other than Purchaser (other than an agreement pertaining to the Back-up Bid) and the Purchaser is no longer obligated to be the Back-up Bidder;

(f)      by either of Purchaser or Seller if the Bankruptcy Court enters an order approving any Alternative Transaction and the Purchaser is no longer obligated to be the Back-up Bidder;

(g)      by Purchaser or Seller on any day on or after the date that is ten (10) Business Days after the Bankruptcy Court's entry of the Sale Order (the "Termination Date") if the Closing shall not have been consummated by such date (or by such later date as may be mutually agreed to by Purchaser and Seller in writing) (*provided* that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein); or

(h)      without limitation of any obligation of Purchaser to be the Back-up Bidder, by Purchaser after April 1, 2017 if the Closing shall not have been consummated by such date (or by such later date as may be agreed by Purchaser in writing) (*provided* that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein).

8.2    Effect of Termination or Breach.

(a)    Except as otherwise provided herein, in the event of termination of this Agreement, this Agreement (other than the terms and provisions set forth in Section 3.9, this Section 8.2 and Article 9, which shall survive such termination) shall become null and void and be deemed of no force and effect, with no liability on the part of any party hereto (or of any of its directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives), and no party hereto shall have any obligations to any other party hereto arising out of this Agreement; provided, however, that no termination of this Agreement shall relieve or release any party from any Liabilities or damages resulting from any willful breach of this Agreement.

(b)    Notwithstanding Section 8.2(a), from and after the entry of the Stalking Horse Order, if this Agreement is terminated by a Party pursuant to Sections 8.1(e) or (f) then Seller shall be liable to Purchaser for the Termination Fee and Expense Reimbursement and shall pay such amount to Purchaser on the (i) date of consummation of an Alternative Transaction if this Agreement is terminated by a Party pursuant to Sections 8.1(e)(i), (iii), or (f) or (ii) date required by section 1129(a)(9)(A) of the Bankruptcy Code if this Agreement is terminated by a Party pursuant to Section 8.1(e)(ii); provided however, that the Expense Reimbursement invoices shall be subject to the review of the Sellers, the United States Trustee, and the Creditors' Committee as set forth in the Stalking Horse Order.  The Termination Fee and Expense Reimbursement shall be treated as an administrative expense of Seller's bankruptcy estate under sections 503(b) or 507(b) of the Bankruptcy Code with priority over all other administrative expenses in the Bankruptcy Case, including any administrative expense claims that may have priority over certain other administrative expenses. The Termination Fee and Expense Reimbursement shall be in consideration of the substantial commitment of time and resources by Purchaser, including but not limited to, the preparation, negotiation, execution, and performance of this Agreement.  Purchaser's right to receive the Termination Fee and Expense Reimbursement pursuant to Section 8.2(b) hereto shall constitute the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of Purchaser against Seller and its Affiliates for any damages suffered as a result of the failure of the Closing to be consummated upon a termination of this Agreement pursuant to Sections 8.1(e) or (f).

(c)    Seller acknowledges that the agreements contained in Section 8.2(b) are an integral part of the transactions contemplated hereby and that, without these agreements, Purchaser would not enter into this Agreement.  Accordingly, if Seller fail to pay the amount payable under Section 8.2(b), then Seller shall also pay to Purchaser all costs and expenses (including reasonable attorneys' fees and expenses) incurred by Purchaser and its Affiliates in connection with the collection of such overdue amounts and the enforcement by Purchaser of its rights under Section 8.2(b).  Such costs and expenses shall be treated as an administrative expense of Seller's bankruptcy estate under sections 503(b) or 507(b) of the Bankruptcy Code with priority over all other administrative expenses in the Bankruptcy Case, including any administrative expense claims that may have priority over certain other administrative expenses.

**ARTICLE 9**
**GENERAL**

9.1     No Third Party Beneficiaries.  Nothing contained in this Agreement shall be construed to confer upon or give to any Person other than the parties hereto and their successors and permitted assigns any rights or remedies under or by reason of this Agreement.

9.2     Notices.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service (or, if given after the normal business hours of the recipient, on the next Business Day) if served personally or by commercial messenger or courier service on the party to whom notice is to be given; on the date of transmission (with hard copy confirmation to follow) (or, if given after the normal business hours of the recipient, on the next Business Day) if sent by electronic mail or facsimile; or on the third day after mailing if mailed to the party to whom notice is to be given, by first-class mail registered or certified, postage prepaid, and properly addressed as follows:

If Purchaser, to:

CBS 247 Inc.
235 Second Street,
San Francisco, CA  94105
Attn: General Counsel
Telephone: (415) 344-1528
E-mail: eric.schuldt@cbsinteractive.com

with a copies to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Attn:   Chuck Samuelson, Esq.
          Katie Coleman, Esq.
Telephone: (212) 837-6454
E-mail: chuck.samuelson@hugheshubbard.com, katie.coleman@hugheshubbard.com

If to Seller, to:

Scout Media, Inc.
122 West 26th Street, Fifth Floor
New York, NY 10036
Attn: James Carroll
Telephone: (617) 899-9007
E-mail: jim.carroll@carrollservicesllc.com

with copies to:

Womble Carlyle Sandridge & Rice, LLP
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182-2738
Attn:  Jeffrey A.  D.  Cohen, Esq.
      Rajan Singh, Esq.
Telecopy:  (703) 918-2260
Telephone:  (703) 394-2238
Attn:  Matthew Ward, Esq.
Telecopy:  (302) 661-7711
Telephone: (302) 252-4338


A party may change the address to which notices hereunder are to be sent to it by giving notice to the other parties to this Agreement of such change of address in the manner provided above.

      9.3     <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors, permitted assigns, heirs, executors and personal representatives (including any liquidating trustee, responsible Person or similar representative for Seller or Seller's estate appointed in connection with the Bankruptcy Case).

      9.4     <u>Entire Agreement; Modification; Waiver</u>.  This Agreement and the schedules and exhibits attached to this Agreement (which are hereby incorporated herein by this reference), set forth the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous written and oral negotiations, discussions, understandings and agreements pertaining to such subject matter.  No supplement, modification or amendment to this Agreement shall be binding unless executed in writing by all of the Parties.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, any waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

      9.5     <u>Dispute Resolution; Bankruptcy Court Jurisdiction</u>.

      (a)     The Parties agree that the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof.

      (b)     In the event the Bankruptcy Court reserves jurisdiction to consider disputes arising under this Agreement post-confirmation, then all such disputes shall be brought before the Bankruptcy Court.  The Parties shall jointly request that the Bankruptcy Court reserve such jurisdiction.

      (c)     In the event the Bankruptcy Court does not reserve such jurisdiction, then, subject to the right of each party to seek specific performance, injunctive relief and/or other non-monetary relief in any court, any controversy, dispute or claim arising between Seller and

Purchaser with respect to this Agreement or the subject matter covered hereby may be submitted to any of the state or federal courts located in the State of Delaware. The Parties hereby consent and submit to the jurisdiction of the state and federal courts of the State of Delaware for any such controversy, dispute or claim.

9.6     Expenses. Except as set forth in Section 8.2(b) of this Agreement, whether or not the transactions contemplated hereby are consummated, each of the Parties shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and all other Transaction Documents and in closing and carrying out the transactions contemplated by this Agreement and such other Transaction Documents.

9.7     Construction. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the conflict of laws principles thereof.

9.8     Assignment. No Party may assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Party.

9.9     Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity without the necessity of proving the inadequacy of monetary damages as a remedy or the posting of any bond.

9.10    Survival of Representations and Warranties. The Parties hereto agree that, other than for fraud or intentional misrepresentation and notwithstanding any investigation conducted by any Party or any knowledge that a Party may have or receive, the representations and warranties of the Parties in this Agreement shall terminate and expire on the earlier to occur of (a) the one year anniversary of the Closing Date and (b) the Case Closing Date. The covenants contained in this Agreement to be performed prior to the Closing shall expire at the Closing. The covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant, until fully performed or, if earlier, upon the Case Closing Date.

9.11    Non-Recourse. Except as expressly contemplated by this Agreement, no past, present or future director, officer, employee, advisor, lawyer, agent, representative, incorporator, member, partner or equityholder of Seller or Purchaser shall have any liability for (a) any obligations or liabilities of Seller or Purchaser (as applicable) under this Agreement or the certificate of incorporation and by-laws (or similar organizational documents with different names) of Seller or Purchaser (as applicable), or (b) any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby.

9.12    Disclosure Schedules. The Disclosure Schedules that correspond to Sections 5 and 6 of this Agreement are a material part of this Agreement as if fully set forth in this Agreement and are intended only to qualify and limit the representations, warranties and covenants of the Parties contained in Sections 5 and 6, and will not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. The Parties

hereby acknowledge and agree that: (a) certain agreements and other matters may be listed in the Disclosure Schedules for informational purposes only, as they do not rise above applicable materiality thresholds, they are not outside of the Ordinary Course or their disclosure is not otherwise required under the terms of this Agreement (items that are not required to be disclosed but are disclosed, the "Informational Disclosures"); (b) in no event will the Informational Disclosures be deemed or interpreted to broaden or otherwise amplify or influence the construction or interpretation of any of the representations and warranties; (c) disclosures made for the purpose of any Section of the Disclosure Schedules will be deemed made for the purpose of all Sections of the Disclosure Schedules so long as cross-references are made or the applicability to the other section(s) is reasonably apparent on the face of such disclosure; (d) headings in the Disclosure Schedules have been inserted for reference only and will not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules or this Agreement; (e) no disclosure in the Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violations exists or has actually occurred; (f) the inclusion of any matter, information or item in the Disclosure Schedules will not be deemed to constitute an admission of any liability by any Person to any third party; and (g) summaries of or references to any written document in the Disclosure Schedules do not purport to be complete and are qualified in their entirety by the written documents themselves.

9.13    Relationship.  The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  This Agreement does not create any agency, partnership, joint venture or trust.

9.14    Counterparts.  This Agreement may be executed in counterparts (and by facsimile signatures), each of which shall be deemed an original but all of which shall constitute one and the same agreement.

9.15    Headings.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.16    Severability.  If any provision of this Agreement is held to be invalid or unenforceable at Law, that provision will be reformed as a valid provision to reflect as closely as possible the original provision giving maximum effect to the intent of the parties, or if that cannot be done, will be severed from this Agreement without affecting the validity or enforceability of the remaining provisions.

9.17    Business Days.  If any date provided for in this Agreement shall fall on a day that is not a Business Day, the date provided for shall be deemed to refer to the next Business Day.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SCOUT MEDIA, INC.

By:_____
Name: Craig Amazeen - President
Title: ~~Chief Executive Officer~~

CBS 247 INC.

By:_____
Name:
Title:

[Signature Page to Asset Purchase Agreement]

-44-

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SCOUT MEDIA, INC.

By:_____

    Name:
    Title: Chief Executive Officer

CBS 247 INC.

By_____

    Name: D BASSIN
    Title: EVP.

[Signature Page to Asset Purchase Agreement]