**KELLEY DRYE & WARREN LLP**
James S. Carr
Jason R. Adams
101 Park Avenue
New York, NY 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

*Counsel to the Official Committee of*
*Unsecured Creditors of Scout Media, Inc., et al.*

-and-

**LEVY, SMALL & LALLAS**
Leo D. Plotkin
815 Moraga Drive
Los Angeles, CA 90049
Tel: (310) 471-3000
Fax: (310) 471-7990

*Counsel to Multiplier Capital, LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SCOUT MEDIA, INC., et al.,[1] | Case No. 16-13369 (MEW) |
| Debtors. | (Jointly Administered) |

---

[1] The Debtors in these cases are: Scout Media Holdings, Inc.; Scout Media, Inc. ("SMI"); FTFS Acquisition, LLC ("FTFSA"); and Scout.com, LLC.

# JOINT MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND MULTIPLIER CAPITAL, LP FOR ENTRY OF AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

The Official Committee of Unsecured Creditors (the "Committee") of Scout Media, Inc., *et al.,* the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), and Multiplier Capital, LP ("Multiplier" and together with the Committee, the "Movants"), by and through their respective undersigned counsel, jointly submit this motion (the "Motion") pursuant to section 1112(b) of the Bankruptcy Code for entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. In support of this Motion, the Movants respectfully state as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

## BASIS FOR RELIEF REQUESTED

2. The predicates for the relief sought herein are section 1112(b) of the Bankruptcy Code, Bankruptcy Rules 1017, and 2002, and Local Rule 9014-1.

## BACKGROUND

**A. The Debtors' Prepetition Business**

3. The Debtors commenced operations following their November 2013 acquisition of certain operations from Fox Sports.[2] Historically, the Debtors operated a digital sports media network of approximately 150 team-specific credentialed publishers providing subscribers content related to the NFL, fantasy sports, college football and basketball, high

---

[2] *See Declaration of Craig Amazeen in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Amazeen Declaration"), ¶ 12. Docket No. 22.

2

school recruiting, hunting, fishing, outdoors and the military.³ The Debtors provided full-time video channels for every NFL and major college team, producing approximately 11,000 stories and 1,000 premium videos monthly.⁴ The Debtors primarily derived revenue from advertising and membership subscriptions.⁵

4. To help finance the Fox Sports acquisition, certain of the Debtors and their non-Debtor affiliates entered into a $7 million secured loan facility with Multiplier on November 13, 2013 (the "Multiplier Loan").⁶ To secure the financing, the Debtors (excluding FTFSA) granted Multiplier a lien on the Debtors' assets.⁷

5. In 2016, the Debtors faced a liquidity crisis and were unable to make mandatory payments to Multiplier. This liquidity crisis resulted in substantial unpaid obligations to creditors, multiple litigations and ultimately, numerous judgment liens and garnishments.⁸ As a result, the Debtors had insufficient liquidity to adequately fund operations.⁹

6. Beginning in the summer of 2016, the Debtors began exploring a sale process.¹⁰ During this period, Multiplier advanced additional funds to the Debtors through a series of amendments to the Multiplier Loan. As a result, as of the filing of the Debtors' voluntary chapter 11 cases, the outstanding balance of the Multiplier Loan had increased to approximately $10.9 million.¹¹

---

³ *Id. ¶¶* 5-6, 18.
⁴ *Id.* ¶ 6.
⁵ *Id.* ¶ 19.
⁶ *See Id,* ¶ 22; *Declaration of Henry O'Connor*, Exhibit 1 at ¶ 27. Docket No. 47.
⁷ *Id.* at ¶ 18.
⁸ *Amazeen Declaration* at ¶ 29.
⁹ *Id.*
¹⁰ *Id.* at ¶ 31.
¹¹ *Id.* at ¶ 23.

3

## B. The Debtors' Bankruptcy Cases

7. Following the filing of an involuntary petition against Scout Media, Inc. on December 1, 2016, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 8, 2016 (the "Petition Date"). Following the Petition Date, the Debtors remained in possession of their assets and continued to operate and manage their businesses as debtors-in-possession pursuant to 1107(a) and 1108 of the Bankruptcy Code.

8. Contemporaneously with the filing, the Debtors sought approval of bid procedures for an expedited sale process.[12] To fund the sale process, the Debtors also sought authority for DIP financing from Multiplier.[13] A hearing on the bid procedures and financing was scheduled for December 19, 2016.[14]

9. On December 15, 2016, the United States Trustee for Region 2 appointed a five-member Committee consisting of (i) Quad/Graphics, Inc.; (ii) LSC Communications, Inc.; (iii) Signature Consultants, LLC; (iv) Outbrain Inc.; and (v) Stone River Gear, LLC.[15]

10. In light of the December 19 hearing, the Committee promptly began discussions with the Debtors and Multiplier regarding the terms of bid procedures and the Multiplier financing. After filing an objection, the Committee was able to resolve its concerns

---

[12] *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of Scout Media, Inc. and Scout.com, LLC's Assets, Including Procedures for Selection of a Stalking Horse Purchaser, (B) Scheduling an Auction, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Substantially All of Scout Media, Inc. and Scout.com, LLC's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Bid Procedures Motion"). Docket No. 20.

[13] *See Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507: (A) Authorizing the Debtors to Obtain Postpetition Term Loan Financing; (B) Authorizing Debtors to Use Cash Collateral; (C) Granting Liens and Providing Superpriority Administrative Expense Status; (D) Granting Adequate Protection; (E) Modifying Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* (the "DIP Motion"), ¶ 15. Docket No. 15.

[14] Docket Nos. 42, 43.

[15] Docket No. 44.

with the Debtors and Multiplier. As a result, on December 20, 2016, the Court entered orders: (i) approving bid procedures establishing a January 25, 2017 bid deadline and setting a sale hearing for February 1, 2017;[16] and (ii) approving DIP financing on an interim basis.[17]

11. Following the December 19 hearing, the Committee began analyzing the operational needs of the Debtors during its expedited sale process. During the first 60 days of these cases, the Committee worked with the Debtors and Multiplier on appropriately tailored critical vendor and severance programs that would ensure continued operations and employee retention through the sale process.

12. The Committee also commenced negotiations with the Debtors and Multiplier regarding final DIP financing approval, ultimately resulting in an agreement on the terms of the Final DIP Order (defined below) authorizing the Debtors to borrow up to $4.35 million.[18] The Final DIP Order also provided the Committee until February 21, 2017 to commence a challenge with respect to the prepetition liens and claims of Multiplier.[19]

---

[16] *Order (A) Approving Bidding Procedures for the Sale of Assets by Scout Media, Inc. and Scout.com, LLC, (B) Scheduling an Auction, (C) Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief.* Docket No. 74.

[17] Docket No. 71.

[18] *See Final Order (A) Authorizing Post-Petition Term Loan Financing and Use of Cash Collateral; (B) Granting Liens and Providing Superpriority Administrative Expense Status; (C) Granting Adequate Protection; (D) Modifying the Automatic Stay; and (E) Granting Related Relief* (the "Final DIP Order"). Docket No. 160.

[19] *Id.* ¶ 21.

## C. The Sale Process and Committee Investigation

13. On January 12, 2017, the Debtors filed a motion seeking approval of the selection of CBS 247 Inc. ("CBS") as the stalking horse bidder pursuant to a proposed asset purchase agreement (the "APA") with a stalking horse bid of $9.5 million.[20] On January 26, 2017, the Court approved CBS as the stalking horse bidder.[21]

14. Given the amount of secured debt owed to Multiplier under the DIP financing and the prepetition Loan Agreement, the Movants actively sought to foster a robust auction process. Although additional parties expressed some interest, no further bids were received by Debtors.

15. During this period, the Committee promptly conducted an investigation into the prepetition liens and claims of Multiplier. Following a thorough review, the Committee determined there were insufficient grounds to assert a challenge that would generate any meaningful value for unsecured creditors, especially in light of the $9.5 million sale price from CBS.

16. Instead, the Committee promptly engaged in negotiations with Multiplier in advance of, and during, the February 1 sale hearing to determine whether an orderly wind down of the Debtors' estates through a liquidating plan could preserve the possibility of future recoveries for both Multiplier and unsecured creditors.

---

[20] *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Enter into the Stalking Horse Asset Purchase Agreement; (II) Approving Certain Bid Protections; (III) Approving the Amendment of the Bidding Procedures; and (IV) Granting Related Relief* (the "Amended Bid Procedures Motion"). Docket No. 148.

[21] *Order (I) Authorizing the Debtors to Enter Into the Stalking Horse Asset Purchase Agreement; (II) Approving Certain Bid Protections; (III) Amending the Bidding Procedures; and (IV) Granting Related Relief*. Docket No. 186.

17. Given the expedited sale process, the Committee and Multiplier did not have sufficient time to complete these negotiations. The Movants, however, agreed to continue negotiations following the sale hearing and, as set forth in the Court's February 7, 2017 sale order, agreed to escrow 50% of the sale proceeds (after payment of certain costs and the repayment of the DIP). The escrow would ensure the availability of sufficient funds to maintain limited post-sale operations, satisfy administrative claims, and provide a source of funding for a potential consensual wind down process.[22]

18. The sale closed on February 7, 2017. To facilitate the transfer of operations to CBS, the Debtors and CBS entered into a transition services agreement obligating the Debtors to provide certain services to CBS for an initial 3-month term, with the option for CBS to extend the term for 3 successive one-month periods.

19. The $9.5 million of sale proceeds were utilized to pay a $95,000 sale fee to Sherwood Partners and to pay off the $1,157,298.75 owing under the Multiplier DIP financing. 50% of the balance ($4,123,850.12) was utilized to pay down the outstanding amount under Multiplier's prepetition Loan Agreement, leaving a balance of $6,803,210.32. The remaining 50% was transferred to Kelley Drye to be held in escrow (the "Escrowed Funds").

D.  **The Current Status of The Debtors' Cases**

20. As of the filing of this Motion, the Debtors have ceased all operations. The initial 3-month term under the transition services agreement has expired and CBS did not exercise its option to further extend the term. The Debtors have informed the Committee that all of the Debtors' leases and executory contracts have either been assigned to CBS or rejected. The

---

[22] *Order Approving Sale of Assets and Assumption and Assignment of Executory Contracts and Unexpired Leases by Scout Media, Inc*. Docket No. 238.

Committee is not aware of any further actions that must be taken to address the operations of the Debtors.

21. On January 10, 2017, the Debtors filed their schedules and statements of financial affairs.[23] In addition to the outstanding claims of Multiplier under the Loan Agreement, the Debtors listed approximately $5.3 million in liquidated unsecured claims. No claims bar date has been established in these cases.

E. **Continued Negotiations Between Movants and The Debtors**

22. Following the February 7 sale closing, the Movants and the Debtors participated in continued good faith negotiations regarding the feasibility and benefits of any orderly wind down and liquidating plan process. These negotiations included the Movants' analysis of: (i) the costs to confirm a liquidating plan; (ii) potential claims that could be preserved and the ultimate value of such claims, including but not limited to potential preference and D&O insurance claims; (iii) the costs of pursuing such claims; and (iv) the likely recovery on such claims.

23. Following this analysis, the Movants determined that there is insufficient value that can be preserved in these cases warranting the costs of confirming a chapter 11 liquidating plan. Since February 7, Multiplier has continued to fund the chapter 11 cases through the Escrowed Funds. As of the filing of this Motion, the balance of the Escrowed Funds after the payment of ongoing operational costs, administrative expenses, and budgeted professional fees is $2,871,460.20. Multiplier is no longer willing to fund these cases and the Committee believes it has exhausted its reasonable options in seeking a return to unsecured creditors. As a result, the

---

[23] *See* Docket Nos. 135-142.

Movants have concluded that conversion of these cases to cases under chapter 7 of the Bankruptcy Code is appropriate.

24. As a result, the Movants and the Debtors engaged in discussions regarding the conversion of these cases. Following good faith negotiations, the Movants reached an agreement to proceed with this Motion. Given the closing of the sale, the Debtors' completion of their obligations under the transition services agreement, and the rejection of all executory contracts and leases, the Movants submit there are no further assets to administer.

25. To facilitate conversion, the Committee's and the Debtors' professionals have agreed to voluntary reductions to their fees, as set forth in their respective fee applications filed contemporaneously herewith. Multiplier has further agreed to pay the outstanding fees of the Debtors' independent director and leave $50,000 for a chapter 7 trustee.[24] The Movants, therefore, request entry of an order approving the conversion of these cases to chapter 7 and the release of the balance of the Escrowed Funds, except as provided above, to Multiplier.

## ARGUMENT

26. Section 1112(b)(1) provides that a court should convert a chapter 11 case to chapter 7 when cause is demonstrated, if conversion is in the best interests of creditors and the estate.[25] The purpose of section 1112(b)(1) is to prevent "the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation."[26]

---

[24] The Movants anticipate the independent director fees as well as other outstanding fees will be paid prior to the hearing on this Motion. The Movants will provide an update to the Court on the payment of any additional fees at the hearing. To the extent there are any funds remaining in Debtors' operating account upon conversion of these cases, such amounts shall be left for the chapter 7 trustee and the balance of the $50,000 shall be funded by Multiplier through the Escrowed Funds.

[25] 11 U.S.C. § 1112(b)(1).

[26] *In re AdBrite Corp.,* 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) (internal citations and quotations omitted).

27. Although section 1112(b) does not define "cause," section 1112(b)(4) provides sixteen factors that constitute "cause" to convert a case.[27] The 1112(b)(4) list, however, is "not exhaustive" and courts are free to consider other factors.[28] The application of the factors is partly dependent on where the debtor is in the bankruptcy reorganization process.[29]

28. The movant initially bears the burden of establishing cause under section 1112(b) of the Bankruptcy Code.[30]

   A. <u>Continuing Losses Without a Prospect for Rehabilitation</u>

29. Section 1112(b)(4)(A) provides that "cause" exists if there are substantial or continuing losses or diminution of the estate and there is the absence of a reasonable likelihood of rehabilitation.[31] Although section 1112(b)(4)(A) is often analyzed in the context of a debtor attempting to reorganize, courts have found section 1112(b)(4)(A) applicable to debtors liquidating their assets in chapter 11 as well.[32] With respect to satisfying the requirements of section 1112(b)(4)(A) in a liquidating case, the Eighth Circuit noted that:

> In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow— including that resulting only from administrative expenses— effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of § 1112(b)(1). Thus, the bankruptcy court did not err in finding continuing loss to or diminution of the estate. Likewise, the bankruptcy court did

---

[27] *See* 11 U.S.C. § 1112(b)(4).

[28] *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (internal citations omitted); *Quarles v. U.S. Trustee,* 194 B.R. 95, 96 (W.D. Va. 1996) (courts may consider additional grounds in determining cause).

[29] *In re Gateway Access Solutions,* 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).

[30] *See* 11 U.S.C. § 1112(b)(2); *AdBrite Corp.*, 290 B.R. at 214-15; *Gateway Access Solutions,* 374 B.R. at 561.

[31] 11 U.S.C. § 1112(b)(4)(A).

[32] *See e.g., In re Wen-Kev Mgmt.,* No. 13-36463, 2014 U.S. Dist. LEXIS 177650 (D. N.J. Dec. 29, 2014); *Loop Corp. v. U.S. Trustee,* 379 F.3d 511 (8th Cir. 2004); *BH S&B Holdings* 439 B.R. at 342; *Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.)*, 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009).

err in concluding that a liquidating debtor who had no intention of restoring its business had no reasonable likelihood of rehabilitation. Courts have consistently understood "rehabilitation" to refer to the debtor's ability to restore the viability of its business. Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.[33]

30. As set forth above, the Debtors have no ongoing business operations or cash flow. The Debtors have closed the sale to CBS and have completed their obligations under the transition services agreement. As a result, there are no further assets to administer. In addition, all of the Debtors' executory contracts and leases have either been assigned to CBS or have been rejected. The Debtors do not have any further sources of revenue and the Escrowed Funds would only be further depleted through the continuation of these chapter 11 cases without any likelihood of creating additional value for creditors. Accordingly, section 1112(b)(4)(A) is easily satisfied because the Debtors are incurring continual losses and there are no remaining assets to reorganize around, let alone liquidate.

B. The Debtors Have Not Filed a Plan and Disclosure Statement

31. Section 1112(b)(4)(J) provides that "cause" may include the failure to file a disclosure statement, or the failure to file or confirm a plan, within the time fixed by the Bankruptcy Code or by order of the court.[34] Whether the period during which a debtor fails to

---

[33] *Loop Corp.,* 379 F.3d at 516 (affirming conversion of debtors' cases to cases under chapter 7 pursuant to section 1112(B)(4)(A) of the Bankruptcy Code) (internal citations omitted); *see also Wen-Kev Mgmt.,* 2014 U.S. Dist. LEXIS 177650 at *12 (agreeing with decision of *Loop Corp.* and finding that "'the ongoing expenses associated with administering the estate and attempting to negotiate confirmable plans … can be deemed to be continued loss to … the estate'"); *BH S&B Holdings,* 439 B.R. at 348 (cause exists to convert the case where "the Debtors' financial statements reflecting continuing losses and the Debtors' intention to liquidate establish that there is no likelihood of rehabilitation"); *In re Citi-Toledo Partners,* 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) ("first requirement of § 1112(b)(1) satisfied because administrative expenses eroded the position of the estate's creditors and diminished the value of the estate"); *Vallambrosa Holdings,* 419 B.R. at 89 ("accumulating administrative expenses are eroding the position of the estate's creditors and further diminishing the value of the estate").

[34] *See* 11 U.S.C. § 1112(b)(4)(J).

file a plan or disclosure statement constitutes a reasonable period of time will depend upon the unique circumstances of each case.[35]

32. The Debtors do not have the ability to confirm a plan. Even though the Debtors received an extension of their exclusive period to file a chapter 11 plan through June, the Debtors do not have access to sufficient funds to begin a plan process, let alone confirm a plan.

C. No Unusual Circumstances are Present

33. Under section 1112(b) of the Bankruptcy Code, a court should convert the case if the movant establishes cause unless the court determines that unusual circumstances exist.[36] Once the movant meets its burden of establishing cause for conversion, the burden shifts to the debtor or a party in interest to establish the "unusual circumstances" which would make conversion to chapter 7 against the best interests of the debtor's estate and its creditors.[37] If neither the debtor nor a party in interest can meet that burden, then the court should convert the chapter 11 case.

34. Here, there are no "unusual circumstances" that would make conversion against the best interests of the Debtors' estates and their creditors. To the contrary, conversion of these cases to chapter 7 is in the best interests of the Debtors' estates and their creditors.

D. Conversion is in the Best Interests of Creditors and the Debtors' Estates

35. Having established cause for conversion, a court must examine whether conversion or dismissal is in the best interests of the creditors and the estate.[38] Here, conversion, rather than dismissal, would best serve the interests of the Debtors' estates. Although both

---

[35] *See BH S&B Holdings,* 439 B.R. at 351 (while the complexity and nature of the case will dictate its pace, "a debtor cannot wallow in chapter 11").

[36] *See* 7 COLLIER ON BANKRUPTCY ¶ 1112.04[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[37] 11 U.S.C. § 1112(c).

[38] *BH S&B Holdings,* 439 B.R. at 346.

conversion and dismissal would end the administrative burn in fees and costs associated with chapter 11, conversion to chapter 7 is clearly preferable. Conversion would result in a chapter 7 trustee being able to pursue potential causes of action for the benefit of all creditors. If the Debtors' cases were dismissed, no one would be able to pursue avoidance actions. Accordingly, the appointment of a chapter 7 trustee would allow for the pursuit of such claims and the distribution of any resulting proceeds to the Debtors' creditors in an efficient manner.

36. For the foregoing reasons, conversion of these cases to cases under chapter 7 of the Bankruptcy Code is warranted, necessary, and in the best interests of creditors and the estate.

## NO PRIOR REQUEST

37. The Movants have not made a prior request seeking the relief requested by this Motion to this or any other Court.

## NOTICE

38. Notice of this Motion has been given to (i) the Debtors; (ii) the United States Trustee; and (iii) all parties who have requested notice in these cases pursuant to Rule 2002. The Movants submit that no other or further notice of this Motion need be given.

WHEREFORE, the Movants request that the Court: (i) enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, converting these cases to cases under chapter 7 of the Bankruptcy Code; and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: June 15, 2017

                            **KELLEY DRYE & WARREN LLP**

                            By: */s/ James S. Carr*
                                James S. Carr
                                Jason R. Adams
                            101 Park Avenue
                            New York, NY 10178
                            Tel: (212) 808-7800
                            Fax: (212) 808-7897

                            *Counsel to the Official Committee of*
                            *Unsecured Creditors for Scout Media, Inc., et al.*

                            -and-

Dated: June 15, 2017

                            **LEVY, SMALL & LALLAS**

                            By: */s/ Leo D. Plotkin*
                                Leo D. Plotkin
                            815 Moraga Drive
                            Los Angeles, CA 90049
                            Tel: (310) 471-3000
                            Fax: (310) 471-7990

                            *Counsel to Multiplier Capital, LP*

**EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SCOUT MEDIA, INC., et al.,[1] | Case No. 16-13369 (MEW) |
| Debtors. | (Jointly Administered) |

**ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The Court having considered the joint motion (the "Motion")[2] of the Official Committee of Unsecured Creditors (the "Committee") of Scout Media, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (the "Debtors") and Multiplier Capital, LP ("Multiplier") for the entry of an order, pursuant to sections 105 and 1112(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 1017(f)(1) and 9014, converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code and, based upon the record before the Court, it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest; that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; that adequate notice of the Motion has been given and that that no other notice need be given; and that due, good, and sufficient cause exists to grant the relief set forth herein. Accordingly, it is hereby:

ORDERED that:

1. The Motion is granted.

2. The Debtors' chapter 11 cases are hereby converted to cases under chapter 7 of the Bankruptcy Code.

---

[1] The Debtors in these cases are: Scout Media Holdings, Inc.; Scout Media, Inc.; FTFS Acquisition, LLC; and Scout.com, LLC.

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

3. The Debtors shall file (i) a schedule of unpaid debts incurred after the commencement of the chapter 11 cases within 14 days of the date of this Order; and (ii) a final report and account within 30 days of the date of this Order, pursuant to Bankruptcy Rule 1019(5).

4. Kelley Drye is authorized and directed to make the following transfers from the Escrowed Funds:

 (a) Any amounts owed by the Debtors to the Office of the United States Trustee;

 (b) Upon appointment, the sum of $50,000 to the chapter 7 trustee, less any amounts remaining in the Debtors' operating accounts, which shall be transferred to the chapter 7 trustee;

 (c) Upon entry of final orders, any amounts owing to the professionals for the Debtors or the Committee in the amounts set forth in such final orders; and

 (d) The outstanding fees of Jim Carroll, the Debtors' independent director, if any.

5. After payment of the amounts set forth in paragraph 4 of this Order, Kelley Drye is authorized and directed to release the balance of the Escrowed Funds to Multiplier.

Dated: New York, New York
   July ___, 2017

                   _____
                   The Honorable Michael E. Wiles
                   United States Bankruptcy Judge